## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLLINS & AIKMAN CORPORATION, et al.[1] | ) | Case No. 05-55927 (SWR) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | (Tax Identification #13-3489233) |
| | ) | |
| | ) | Honorable Steven W. Rhodes |

---

### AMENDED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES

---

KIRKLAND & ELLIS LLP

Richard M. Cieri (NY RC 6062)
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

-and-

David L. Eaton (IL 3122303)
Ray C. Schrock (IL 6257005)
Marc J. Carmel (IL 6272032)
Scott R. Zemnick (IL 6276224)
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Co-Counsel for the Debtors

CARSON FISCHER, P.L.C.

Joseph M. Fischer (P13452)
Lawrence A. Lichtman (P35403)
4111 West Andover Road - Second Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Facsimile: (248) 644-1832

Co-Counsel for the Debtors

Dated: February 9, 2007

---

1   The Debtors in the jointly administered cases include: Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

# TABLE OF CONTENTS

ARTICLE I. SUMMARY ...................................................................................................................... 1
    A.    The Debtors' Principal Assets and Indebtedness ................................................................ 2
    B.    Foreign Subsidiaries and European Affiliates ..................................................................... 2
    C.    The Purpose of the Plan ....................................................................................................... 2
    D.    Treatment of Claims and Equity Interests .......................................................................... 2
    E.    The Litigation Trust Interests .............................................................................................. 4
    F.    Claims Estimates ................................................................................................................. 4
    G.    Preservation of Rights of Action ......................................................................................... 5
    H.    The Releasing Parties and Debtor Releasees ....................................................................... 6
    I.    Compromise and Settlement ................................................................................................ 7
    J.    Releases by the Debtors and the OEMs ............................................................................... 7
    K.    Third Party Release .............................................................................................................. 8
    L.    Exculpation .......................................................................................................................... 9
    M.    Injunction .......................................................................................................................... 10
    N.    Limitation on Discharge of Pension Plan Liabilities ........................................................ 10
    O.    Consummation of the Plan ................................................................................................. 11
    P.    Certain Factors to Be Considered Prior to Voting ............................................................ 11
    Q.    Voting and Confirmation ................................................................................................... 11

ARTICLE II. GENERAL INFORMATION ..................................................................................... 13
    A.    The Debtors' Businesses .................................................................................................... 13
    B.    The Debtors' Industry ........................................................................................................ 15
    C.    Prepetition Capital Structure of the Debtors ..................................................................... 16
    D.    Directors of Collins & Aikman Corporation ..................................................................... 17

ARTICLE III. THE CHAPTER 11 CASES ...................................................................................... 17
    A.    Events Leading to the Chapter 11 Cases ........................................................................... 17
    B.    Crisis Period Surrounding the Filing of the Chapter 11 Cases .......................................... 19
    C.    Initiation of the Chapter 11 Cases ..................................................................................... 20
    D.    Appointment of the Creditors Committee .......................................................................... 20
    E.    The Debtors' Initial Stabilization Initiatives ..................................................................... 20
    F.    The Debtors' Aggressive Restructuring Initiatives ........................................................... 22
    G.    The Debtors' Attempts to Reorganize ............................................................................... 23
    H.    Certain Administrative Matters in the Chapter 11 Cases .................................................. 28
    I.    Litigation and Investigations .............................................................................................. 34

ARTICLE IV. THE SALE PROCESS ............................................................................................... 40
    A.    Customer Agreement with the OEMs ................................................................................. 41
    B.    Sale of Carpet & Acoustics ............................................................................................... 42
    C.    Sale of Plastics ................................................................................................................... 43
    D.    Labor, Pension and Retiree Benefits .................................................................................. 44

ARTICLE V. SUMMARY OF THE PLAN ....................................................................................... 45
    A.    Overview of Chapter 11 ..................................................................................................... 46
    B.    Classification and Treatment of Claims and Equity Interests ............................................ 46
    C.    Means for Implementation of the Plan ............................................................................... 52
    D.    Treatment of Executory Contracts and Unexpired Leases ................................................ 59
    E.    Provisions Governing Distributions ................................................................................... 61
    F.    Procedures for Resolving Disputed Claims ........................................................................ 64

K&E 11625375.1

05-55927-swr    Doc 4160    Filed 02/20/07    Entered 02/20/07 15:48:21    Page 2 of 96

G.     Conditions Precedent to Confirmation and Consummation of the Plan ........................................ 65
H.     Cramdown ......................................................................................................................... 66
I.      Settlement, Release, Injunction and Related Provisions ............................................. 66
J.      Injunction ......................................................................................................................... 69
K.     Retention of Jurisdiction ................................................................................................ 70
L.     Miscellaneous Provisions ............................................................................................... 70

ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................................ 70
A.     The Confirmation Hearing ............................................................................................. 70
B.     Confirmation Standards .................................................................................................. 71
C.     Financial Feasibility ....................................................................................................... 72
D.     Best Interests of Creditors Test ..................................................................................... 72
E.     Acceptance by Impaired Classes ................................................................................... 74
F.     Confirmation without Acceptance by All Impaired Classes ......................................... 74

ARTICLE VII. CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ..................................... 75
A.     Certain Bankruptcy Considerations ............................................................................... 75
B.     Risks Relating to the Sale Process ................................................................................ 77
C.     Other Risks ..................................................................................................................... 78
D.     Liquidation under Chapter 7 .......................................................................................... 79

ARTICLE VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ................................................... 80
A.     Certain United States Federal Income Tax Consequences to the Debtors .................... 80
B.     Certain United States Federal Income Tax Consequences to the Holders of Class 1 and Class 2 Claims ............................................................................................................................. 81
C.     Certain United States Federal Income Tax Consequences to the Holders of Class 3 Claims ................. 81
D.     Certain United States Federal Income Tax Consequences to the Holders of Class 5 Claims, Class 6 Claims and Class 7 Claims ............................................................................................. 82
E.     Receipt of Interests in Post-Consummation Trust and in the Litigation Trust ............. 83

ARTICLE IX. VOTING INSTRUCTIONS .............................................................................................. 84
A.     Voting Record Date ........................................................................................................ 84
B.     Voting Deadline .............................................................................................................. 84
C.     Holders of Claims Entitled to Vote ............................................................................... 85
D.     Voting Procedures .......................................................................................................... 85
E.     Tabulation of Votes ........................................................................................................ 86
F.     Votes Required for Acceptance by a Class ................................................................... 89

ARTICLE X. RECOMMENDATION ..................................................................................................... 89

K&E 11625375.1

THIS AMENDED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF COLLINS & AIKMAN CORPORATION AND ITS DEBTOR SUBSIDIARIES (THIS "DISCLOSURE STATEMENT") CONTAINS, AMONG OTHER THINGS, SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE SUMMARIES OF THE DOCUMENTS THAT ARE ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN BETWEEN THE DATE HEREOF AND THE TIME OF SUCH REVIEW. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND EXHIBITS TO THE PLAN IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH ANY DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN DETERMINED BY THE BANKRUPTCY COURT TO CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE, WHICH DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL OF THE PLAN.

K&E 11625375.1

05-55927-swr    Doc 4160    Filed 02/20/07    Entered 02/20/07 15:48:21    Page 4 of 96

UNLESS OTHERWISE STATED, ANY CAPITALIZED TERM USED HEREIN SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM HEREIN OR, IF NO MEANING IS SO ASSIGNED, THE MEANING ASSIGNED TO SUCH TERM IN THE PLAN.

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE APRIL 9, 2007, AT 5:00 P.M. PREVAILING PACIFIC TIME (THE "PLAN OBJECTION DEADLINE"), IN ACCORDANCE WITH THE SOLICITATION NOTICE FILED AND SERVED ON HOLDERS OF CLAIMS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION NOTICE, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON APRIL 19, 2007, AT 10:00 A.M. PREVAILING EASTERN TIME, BEFORE THE HONORABLE STEVEN W. RHODES, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION, 211 WEST FORT STREET, DETROIT, MICHIGAN 48226. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE ON OR PRIOR TO THE PLAN OBJECTION DEADLINE. IF THE DEBTORS ADJOURN THE CONFIRMATION HEARING AFTER THE PLAN OBJECTION DEADLINE, THE DEBTORS WILL PROVIDE WRITTEN NOTICE OF SUCH ADJOURNMENT TO ANY OBJECTING PARTY AND THE CORE GROUP AND THE 2002 LIST, AS DEFINED IN THE FIRST AMENDED NOTICE, CASE MANAGEMENT AND ADMINISTRATIVE PROCEDURES FILED ON JUNE 9, 2005 [DOCKET NO. 294] (THE "CASE MANAGEMENT PROCEDURES").**

K&E 11625375.1

# ARTICLE I.
## SUMMARY

The following summary is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.

On May 17, 2005 (the "Petition Date"), Collins & Aikman Corporation, Collins & Aikman Products Co. and substantially all of their direct and indirect wholly-owned subsidiaries incorporated or organized in the United States (additional 36 entities) (each a "Debtor," and collectively, the "Debtors") filed voluntary petitions for relief commencing cases (each a "Chapter 11 Case," and collectively, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

Collins & Aikman Corporation has been a leading supplier of automotive components, systems and modules to the largest automotive original equipment manufacturers, including DaimlerChrysler Corporation ("DaimlerChrysler"), Ford Motor Company ("Ford"), General Motors Corporation ("General Motors"), Honda of America Manufacturing, Inc. ("Honda"), Nissan North America, Inc. ("Nissan"), AutoAlliance International, Inc., and Toyota Engineering Motor Manufacturing North America, Inc. ("Toyota") and certain of their affiliates (other than Nissan and Toyota, each, an "OEM"). Collins & Aikman Corporation conducts all operating activities through its wholly-owned subsidiary, Collins & Aikman Products Co., and the direct and indirect subsidiaries of Collins & Aikman Products Co. (Collins & Aikman Corporation, Collins & Aikman Products Co. and their direct and indirect subsidiaries are hereinafter collectively referred to as "C&A" or the "Company").

Throughout the Chapter 11 Cases, C&A has operated in two business segments: "Plastics" and "Soft Trim." Through its Plastics segment, C&A manufactures a full range of plastic-based automotive interior products, including instrument panels and instrument panel components, door panels, consoles and other trim components, as well as exterior products including front and rear bumper parts. C&A also assembles and sequences the delivery of complex systems and modules that incorporate these products and products from other suppliers, including cockpits, door modules and front and rear fascia modules. C&A's Soft Trim segment manufactures a variety of automotive carpet and acoustics products (the "Carpet & Acoustics" business) and convertible roof systems (the "Convertibles" business). C&A is headquartered in Southfield, Michigan.

As a result of various factors described more fully herein, the Debtors' management, in consultation with key constituencies in the Chapter 11 Cases, including the Prepetition Lenders, the OEMs and the Creditors Committee, have determined that the reorganization of the Debtors as a going concern is not feasible. Consequently, the Debtors have embarked on a sale process (the "Sale Process") to maximize the value that can be realized from the Debtors' businesses and assets. The Sale Process contemplates, among other things: (i) a going concern sale of the Carpet & Acoustics business in the Debtors' Soft Trim segment; (ii) going concern sales of certain plants or divisions in the Debtors' Plastics business segment; (iii) an orderly wind-down of the Debtors' non-salable business operations in cooperation with the OEMs; (iv) sales of all remaining assets; and (v) preservation of the Debtors' working capital assets and mitigation of administrative claims and other wind-down costs to the extent possible. For a description of the status and expectations with regard to the Sale Process, see Article IV herein.

To fairly and expeditiously monetize and distribute the proceeds realized from the Sale Process and certain retained causes of action (the "Retained Causes of Action") consistent with the Bankruptcy Code, the Debtors have proposed their First Amended Joint Plan of Collins & Aikman Corporation and Its Debtor Subsidiaries pursuant to chapter 11 of the Bankruptcy Code (as it may be amended or supplemented from time to time, the "Plan"). This Disclosure Statement is being furnished by the Debtors pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes for the acceptance or rejection of the Plan in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). A copy of the Plan is attached hereto as **Appendix A**.

This Disclosure Statement describes certain aspects of the Plan, including the treatment of Claims against and Equity Interests in the Debtors and describes certain aspects of the Debtors' operations, the Sale Process and other related matters.

1

A.     The Debtors' Principal Assets and Indebtedness

The principal assets of Collins & Aikman Corporation include the stock of Collins & Aikman Products Co. and its direct and indirect subsidiaries.  The principal assets of Collins & Aikman Products Co. include its automotive parts supply businesses and the stock of its direct and indirect subsidiaries.  The principal indebtedness of Collins & Aikman Corporation, Collins & Aikman Products Co. and their Debtor subsidiaries includes:  (1) DIP Facility Claims; (2) OEM Junior Secured DIP Claims; (3) Prepetition Facility Claims; (4) Senior Notes Claims; and (5) Senior Subordinated Note Claims.    Collins & Aikman Products Co. is the primary borrower with respect to the DIP Facility, the OEM Subordinated DIP Loan, the Prepetition Facility, the Senior Notes and the Senior Subordinated Notes.  Each of the Debtors is either jointly and severally liable for such indebtedness or a guarantor of such indebtedness.

B.     Foreign Subsidiaries and European Affiliates

None of C&A's foreign subsidiaries are Debtors.  The subsidiaries of Collins & Aikman Products Co. incorporated or organized in Canada and Mexico did not file for bankruptcy protection and continue to operate as part of C&A outside of such proceedings.  C&A's non-Debtor subsidiaries organized in Canada and Mexico operate twelve manufacturing and sequencing facilities in Canada and five manufacturing facilities in Mexico, respectively.

On July 15, 2005, the Debtors' European affiliates (each, a "European Debtor," and collectively, the "European Debtors") commenced administration proceedings in accordance with English insolvency law (the "UK Proceedings").  The English court appointed certain administrators in the UK Proceedings to act in the best interests of the creditors of the European Debtors (the "UK Administrators").  Further, to facilitate efficient administration, the Bankruptcy Court and the English court each approved an insolvency protocol to govern information exchange and other issues arising in and between the UK Proceedings and the Chapter 11 Cases.

On November 28, 2005, after holding discussions with over 100 parties interested in purchasing some or all of the European Debtors' assets, the UK Administrators agreed to sell substantially all of the European Debtors' assets to IAC Acquisition Corporation Limited (which the Debtors understand to be an entity funded by, among others, WL Ross & Co. LLC and Franklin Mutual Advisors LLC) in a series of individual transactions for an aggregate purchase price in excess of $100 million.  As part of the sale, the Debtors agreed to transfer and license certain intellectual property to IAC Acquisition Corporation Limited for approximately $12.5 million.  The sale substantially closed on March 3, 2006.

C.     The Purpose of the Plan

The Plan provides for the continuation of the Sale Process and realization on the Retained Causes of Action for the benefit of the Holders of Allowed Claims.  Cash on hand and cash generated by the Sale Process and Retained Causes of Action will be segregated and distributed to Holders of Allowed Claims after the Effective Date of the Plan.

The Debtors believe that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommend that you vote to accept the Plan (if you are entitled to vote).  The Debtors believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation and additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims.

D.     Treatment of Claims and Equity Interests

Except for unclassified Administrative Claims and Priority Tax Claims, the Plan divides all Claims against and Equity Interests in the Debtors into various Classes.  The table set forth below summarizes the Classes of Claims and Equity Interests under the Plan, the treatment and projected recovery of such Classes under the Plan and such Classes' entitlement to vote on the Plan.

1. Summary and Treatment of Unclassified Claims

| Claim | Plan Treatment |
|---|---|
| Administrative Claims | Unless otherwise agreed to by the Holder and the applicable Debtor or Post-Consummation Trust, payment in full in Cash. |
| Priority Tax Claims | Unless otherwise agreed to by the Holder and the applicable Debtor or Post-Consummation Trust, each Holder of an Allowed Priority Tax Claim will receive (a) Cash in the amount of 100% of the unpaid Allowed amount of such Claim, on or as soon as practicable after the Effective Date or, (b) at the sole option of the Post-Consummation Trust, Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the Tax Rate as of the Effective Date, paid in equal semi-annual installments, commencing six months after the Effective Date and concluding six years after the date of assessment of such Allowed Priority Tax Claim. |

2. Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Plan Treatment of Class | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Other Secured Claims | (a) Payment in full in Cash, (b) return of collateral securing such Claim and interest required to be paid under section 506(b) of the Bankruptcy Code or (c) treatment otherwise rendering such Claim Unimpaired. | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unless otherwise agreed to by the Holder and the Debtor or Plan Administrator, (a) payment in full in Cash or (b) treatment otherwise rendering such Claim Unimpaired. | Unimpaired | Deemed to Accept |
| 3 | Prepetition Facility Claims | (a) Pro Rata share of the Prepetition Facility Distribution, (b) Pro Rata share of the Post-Consummation Trust Beneficial Interests, (c) Pro Rata share of the Tranche A Litigation Recovery Interests, (d) retention of all adequate protection payments except those that were deferred by order of the Bankruptcy Court, (e) payment of the Agent's reasonable attorneys and financial advisor fees and (f) releases and exculpation provided in Article XII of the Plan. | Impaired | Entitled to Vote |
| 4 | OEM Claims | Satisfied pursuant to Section 9 of the Customer Agreement. | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan. | Impaired | Entitled to Vote |
| 6 | Senior Note Claims and PBGC Claims | Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan. | Impaired | Entitled to Vote |

| Class | Claim | Plan Treatment of Class | Status | Voting Rights |
|---|---|---|---|---|
| 7 | Senior Subordinated Note Claims | Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan.<br><br>In accordance with the subordination provisions of the Senior Subordinated Note Indenture, distributions on account of Class 7 Claims will first be distributed to the Holders of Allowed Senior Note Claims on a Pro Rata basis until such Allowed Senior Note Claims have been paid in full. | Impaired | Entitled to Vote |
| 8 | Equity Interests | Not entitled to receive any distribution or retain any property under the Plan. | Impaired | Deemed to Reject |
| 9 | Subordinated Securities Claims | Not entitled to receive any distribution or retain any property under the Plan. | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Not entitled to receive any distribution or retain any property under the Plan; provided that Claims of a European Debtor will be deemed Allowed General Unsecured Claims and not Intercompany Claims. | Impaired | Deemed to Reject |

E.     The Litigation Trust Interests

The Litigation Trust Allocation Exhibit, attached to the Plan as Exhibit J, will govern the allocation of the Litigation Recovery Interests among the Holders of Allowed General Unsecured Claims in Class 5, the Holders of Allowed Senior Note Claims and Allowed PBGC Claims in Class 6 and the Holders of Allowed Senior Subordinated Note Claims in Class 7. Pursuant to the Litigation Trust Allocation Exhibit, the Litigation Recovery Interests are delineated into: (1) the Tranche A Litigation Recovery Interests, equal to 75% of the beneficial interest in the proceeds of the Litigation Trust Assets until the Tranche A Termination Date (as defined below); and (2) the Tranche B Litigation Recovery Interests, equal to the remaining 25% of the beneficial interest in the proceeds of the Litigation Trust Assets until the Tranche A Termination Date and 100% of such beneficial interests thereafter. The "Tranche A Termination Date" is the date on which the Allowed Class 3 Claims (which, for this purpose, will include interest accrued through the Effective Date on the Prepetition Facility Claims at the non default contractual interest rate based on a spread above the Alternate Base Rate) have been paid in full including from, for the avoidance of doubt, distributions (a) by the Debtors prior to the Effective Date, (b) by the Debtors under the Plan, (c) by the Post Consummation Trust or (d) by the Litigation Trust (but excluding any distributions or other revenues received by any Holder of Prepetition Facility Claims in respect of any investment made by such Holder pursuant to a co-investment right offered to such Holder).

The Litigation Trust Allocation Exhibit will be filed and mailed to the Holders of General Unsecured Claims in Class 5, the Holders of Senior Note Claims and PBGC Claims in Class 6 and the Holders of Senior Subordinated Notes in Class 7 no later than thirty days before the Voting Deadline (as defined below).

F.     Claims Estimates

As of January 24, 2006, the Debtors' Claims Agent had received approximately 9,246 Claims. The total amounts of Claims filed against one or more of the Debtors were as follows: (1) 1,037 Secured Claims in the total amount of $3,176,773,827; (2) 44 Administrative Claims in the total amount of $2,380,409; (3) 910 Priority Claims in the total amount of $7,887,323,690; and (4) 7,255 Unsecured Claims in the total amount of $42,756,485,600. The Debtors believe that many of the filed proofs of Claim are invalid, untimely, duplicative and/or overstated. Therefore, the Debtors are in the process of objecting to such Claims. Through withdrawal of claims and disallowance by the Bankruptcy Court after objection, 556 claims totaling $4,414,393,899 have been expunged.

The Debtors estimate that, at the conclusion of the Claims objection, reconciliation and resolution process, the aggregate amount of claims will be as follows: (1) Allowed Administrative Claims will be approximately $74 million;

(2) Allowed Secured Claims will be approximately $827 million; (3) Allowed Priority Claims will be approximately $12 million; (4) Allowed Senior Note Claims will be approximately $521 million; (5) Allowed Senior Subordinated Note Claims will be approximately $428 million; (6) PBGC Claims will be approximately $110 million to $208 million depending upon the discount rate used to value hypothetical future benefits (neither the applicable discount rate nor the amount of hypothetical future benefits has been determined; the applicable discount rate may or may not fall within the range of discount rates reflected in this estimate); (7) Allowed General Unsecured Claims will be approximately $539 million. The estimate of Allowed Administrative Claims includes, among others, the final payment due under the KERP, payments contemplated by a new key employee retention plan, severance expenses, professional fees, cure costs from the assumption of executory contracts to be assigned to potential purchasers (which may or may not be paid by such purchasers), property taxes, early termination penalties under postpetition contracts and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a distribution. Pursuant to the Customer Agreement (as defined and discussed more fully in Article IV.A), the Agent for the Prepetition Lenders has consented to the use of their cash collateral to pay, among other things, certain Administrative Claims. The Debtors believe that the Administrative Claims included in the estimate of $74 million fall within the range of consent. The Administrative Claim estimate does not include $26 million of OEM Administrative DIP Claims, payment of which is expected to be waived by the OEMs pursuant to the Customer Agreement at the time and in exchange for a release in the form set forth in the Plan pursuant to the Plan. Further, the estimate of Allowed Secured Claims does not include the OEM Subordinated DIP Loan in the amount of $82.5 million, payment of which is expected to be waived by the OEMs pursuant to the Customer Agreement at the time and in exchange for a release in the form set forth in the Plan pursuant to the Plan.

The estimates set forth herein are approximate and based upon numerous assumptions and there is no guarantee that the ultimate amount of Claims will conform to these estimates. Numerous Claims have been asserted in unliquidated amounts. Further, additional Claims may be filed or identified during the Claims objection, reconciliation and resolution process that may materially affect the foregoing estimates. Although the Debtors believe that certain Claims are without merit and intend to object to all such Claims, there can be no assurance that these objections will be successful.

G.      Preservation of Rights of Action

1.      Maintenance of Causes of Action

Pursuant to the Plan, and except as otherwise provided therein or in any Final Order with respect to any Causes of Action that are barred, waived, relinquished, released, settled or compromised, on the Effective Date, all of the Debtors' rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal in an adversary proceeding or contested matter Filed in one or more of the Chapter 11 Cases, including the following actions and any Causes of Actions specified on Exhibit A to the Plan, will be transferred to the Litigation Trust: (a) objections to Claims under the Plan; and (b) any other litigation or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations or otherwise affecting the Debtors, including possible claims against the following types of parties, both domestic and foreign, for the following types of claims: (i) Causes of Action against vendors, suppliers of goods or services, or other parties for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities or setoff; (ii) Causes of Action against utilities, vendors, suppliers of services or goods, or other parties for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (iii) Causes of Action against vendors, suppliers of goods or services, or other parties for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection of the subject contracts; (iv) Causes of Action for any liens, including mechanic's, artisan's, materialmen's, possessory or statutory liens held by any one or more of the Debtors; (v) Causes of Action for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, lessor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (vi) Causes of Action against any current or former director, officer, employee or agent of the Debtors arising out of employment related matters, including Causes of Action regarding intellectual property, confidentiality obligations, employment contracts, wage and benefit overpayments, travel, contractual covenants, or employee fraud or wrongdoing; (vii) Causes of Action against any professional services provider or any other party arising out of financial reporting; (viii) Causes of Action arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (ix) Causes of Action against insurance carriers, reinsurance

carriers, underwriters or surety bond issuers relating to coverage, indemnity, contribution, reimbursement or other matters; (x) counterclaims and defenses relating to notes, bonds or other contract obligations; (xi) Causes of Action against local, state, federal and foreign taxing authorities for refunds of overpayments or other payments; (xii) Causes of Action against attorneys, accountants, consultants or other professional service providers relating to services rendered; (xiii) contract, tort or equitable Causes of Action that may exist or subsequently arise; (xiv) any intracompany or intercompany Causes of Action; (xv) Causes of Action of the Debtors arising under section 362 of the Bankruptcy Code; (xvi) equitable subordination Causes of Action arising under section 510 of the Bankruptcy Code or other applicable law; (xvii) turnover Causes of Action arising under sections 542 or 543 of the Bankruptcy Code; (xviii) Causes of Action arising under chapter 5 of the Bankruptcy Code, including preferences under section 547 of the Bankruptcy Code; (xix) Causes of Action against any union arising from, among other things, state or federal law or under a collective bargaining agreement, including any wrongful or illegal acts, any wrongful termination, suspension of performance, defamation or failure to meet other contract or regulatory obligations; and (xx) Causes of Action for unfair competition, interference with contract or potential business advantage, conversion, infringement of intellectual property or other business tort claims.

The Litigation Trust will be transferred the foregoing Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Debtors' Chapter 11 Cases. In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan (including Article XII.B of the Plan), any claims, rights and Causes of Action that the respective Debtors may hold against any Person will vest in the Litigation Trust. The Litigation Trust, through its authorized agents or representatives, will have and may exclusively enforce any and all such claims, rights or Causes of Action transferred to it, and all other similar claims arising pursuant to applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession pursuant to the Bankruptcy Code in accordance with the provisions of the Litigation Trust Agreement. The Litigation Trust will have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any and all such claims, rights and Causes of Action transferred to it, and to decline to do any of the foregoing in accordance with the terms of the Litigation Trust Agreement.

The Litigation Trust will be transferred all of the Litigation Trust Claims and all other Causes of Action as of the Effective Date. Notwithstanding anything to the contrary in the Plan, the Post-Consummation Trust will own and control any causes of action or claims arising after the Effective Date in respect of any Post-Consummation Trust Asset. To the extent that any proceeds of any claim that would have constituted a Litigation Trust Claim following the Effective Date becomes available prior to the Effective Date, the Debtors will hold such proceeds in a separate interest-bearing account for the benefit of the Holders of Allowed Claims entitled to Litigation Trust Recovery Interests pursuant to the Plan. The Post-Consummation Trust will have the right to object to all administrative expenses and Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Post-Consummation Trust and the Litigation Trust will have the right to object to all Claims other than Prepetition Facility Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Litigation Trust.

    2.        Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action in the Plan for later adjudication by the Litigation Trust and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order. In addition, the Litigation Trust expressly reserves the right to pursue or adopt any claims not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person, including the plaintiffs or co-defendants in such lawsuits. Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer or transaction may be reviewed by the Litigation Trust subsequent to the Effective Date and may, to the extent not theretofore expressly waived,

relinquished, released, compromised or settled, be the subject of an action after the Effective Date, whether or not: (a) such Person has Filed a proof of claim against the Debtors in the Chapter 11 Cases; (b) such Person's proof of claim has been objected to; (c) such Person's Claim was included in the Debtors' Schedules; or (d) such Person's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

H.     The Releasing Parties and Debtor Releasees

The "Releasing Parties" include the Creditors Committee, each current member of the Creditors Committee, the DIP Lenders, the DIP Agent, the Prepetition Lenders, the Agent, the Steering Committee, each member of the Steering Committee, all Holders of Claims in Class 3, each Holder of a Claim that votes in favor of the Plan and, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or at any time was a Holder of a Claim of any of the Debtors and that does not vote on the Plan or votes against the Plan; but the Releasing Parties do not include any of the OEMs or the Holders of Equity Interests in Class 8.

The "Debtor Releasees" include (a) all officers, directors and employees employed by the Debtors and their respective subsidiaries at any time on or after November 1, 2006, (b) all attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives of the Debtors and their subsidiaries and (c) the Releasing Parties, their respective predecessors and successors in interest, and all of their respective current and former members, officers, directors, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives; but no Non-Released Parties will be Debtor Releasees.

I.     Compromise and Settlement

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments hereunder take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan, including for substantive consolidation purposes.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, including all issues pertaining to claims for substantive consolidation (which are settled by the distributions in the Plan), are (1) in the best interests of the Debtors and their Estates, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any causes of action, claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist:  (1) between the Debtors and the Releasing Parties; (2) between the Debtors and the OEMs; and (3) as between the Releasing Parties (to the extent set forth in Article XII.C of the Plan).  As of the Effective Date, any and all such causes of action, claims and counterclaims will be settled, compromised and released pursuant to the Plan.  The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, causes of action, claims and counterclaims against each such Releasing Party and OEM that are satisfied, compromised and settled pursuant to the Plan.  Nothing in Article XII.A of the Plan, however, will compromise or settle in any way whatsoever, any Claims or Causes of Action that the Debtors or any Trust may have against the Non-Released Parties.

The Pension Benefit Guarantee Corporation (the "PBGC") has informed the Debtors that it is reserving all rights with respect to any actions that have the effect of substantively consolidating the Debtors.  The Debtors and the PBGC are currently in discussions regarding the treatment of the PBGC's claims in these cases.

J.     **Releases by the Debtors and the OEMs**

**Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by each of the Debtor Releasees, including:  (1) the discharge of claims and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the officers and directors employed by the Debtors at any time on or after November 1,**

2006, in facilitating the expeditious implementation of the transactions contemplated by the Plan, each of the Debtors will provide a full discharge and release to each of the OEMs and the Debtor Releasees (and each such OEM and Debtor Releasee so released will be deemed released and discharged by the Debtors) and the respective properties of each such OEM and Debtor Releasee from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the Debtors or either Trust would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the Debtors or any of their Estates and further including those in any way related to the Chapter 11 Cases or the Plan; provided that the foregoing provisions will not operate to waive or release any Debtor Releasee from any Causes of Action set forth on Exhibit A to the Plan.

Notwithstanding anything contained in the Plan to the contrary, except as otherwise set forth in the Customer Agreement and the OEM Excluded Claims, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by the Debtors, including the releases of the OEMs set forth in Article XII.B of the Plan, each of the OEMs will provide a full discharge and release to each of the Debtors (and each such Debtor so released will be deemed released and discharged by each of the OEMs) and the Debtors' respective properties from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the OEMs would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the OEMs and further including those in any way related to the Chapter 11 Cases or the Plan.

Notwithstanding anything contained in the Plan to the contrary, the Debtors will not have released nor be deemed to have released by operation of Article XII.B of the Plan or otherwise any of the Causes of Action set forth on Exhibit A or any other claims, causes of action, debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that they or either Trust may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases provided in Article XII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the OEMs, representing good faith settlement and compromise of the claims released herein; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) approved after due notice and opportunity for hearing; (5) a bar to the Debtors and both Trusts asserting any Claim released herein against any of the Debtor Releasees or their respective property; and (6) a bar to each of the OEMs asserting any Claim released herein against any of the Debtors or their respective property.

K.     **Third Party Release**

As of the Effective Date, in consideration for the obligations of the Debtors and the Trusts under the Plan and the Cash, other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Releasing Party will be deemed to forever release, waive and discharge all claims (including Derivative Claims), causes of action and any other debts, obligations, rights, suits, damages, actions,

interests, remedies and liabilities (other than the right to enforce the Debtors' or either Trust's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Chapter 11 Cases or the Plan that such Person has, had or may have against any Third Party Releasee and their respective property (which release will be in addition to the discharge of Claims and termination of Equity Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code).

Notwithstanding anything contained in the Plan to the contrary, the Releasing Parties will not have released nor be deemed to have released by operation of Article XII.C of the Plan or otherwise any claims or causes of action that they, the Debtors or either Trust may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the release provided under Article XII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the Releasing Parties, representing good faith settlement and compromise of the claims released; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable, and reasonable; (4) approved after due notice and opportunity for hearing; and (5) a bar to any of the Releasing Parties asserting any claim released by Article XII.C of the Plan against any of the Third Party Releasees or their respective property.

L.      **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will neither have nor incur any liability to any Person for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing or administering the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; provided that (i) the provisions of Article XII.D of the Plan will have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, (ii) each Exculpated Party will be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan, (iii) the provisions of Article XII.D of the Plan will not apply to any acts or omissions expressly set forth in and preserved by the Plan and (iv) the provisions of the Article XII.D of the Plan will have no effect on the liability of the Post-Consummation Trust that results from any such acts or omissions in connection with the Customer Agreement or the Post-Petition OEM Contracts.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will not include the Non-Released Parties, and the Plan will not exculpate nor be deemed to have exculpated any of the Non-Released Parties for any acts they have taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

As used herein, Exculpated Parties means: (a) the Debtors; (b) the Trusts; (c) the Releasing Parties and their respective predecessors and successors in interest; (d) the OEMs and (e) all of the current (and former as it relates to the Persons described in foregoing clauses (c) and (d)) officers, directors, employees, members, partners, investment advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, affiliates and representatives of each of the foregoing Persons (in each case in his, her or its capacity as such). Notwithstanding the foregoing, no Non-Released Parties will be Exculpated Parties.

M.      **Injunction**

**IF YOU ACCEPT ANY DISTRIBUTION PURSUANT TO THE PLAN, YOU WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE FOLLOWING INJUNCTIONS SET FORTH IN ARTICLE XII.E OF THE PLAN.**

**Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Equity Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding against the Debtors, either Trust or their respective property, other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, any Trust or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, any Trust or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or any Trust; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

**Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold any claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

N.      Limitation on Discharge of Pension Plan Liabilities

Notwithstanding anything contained in the Plan to the contrary, no claims, obligations, suits judgments, damages, demands, debts, rights, causes of action or liabilities whatsoever against any entity other than the Debtors, the Litigation Trust or the Post-Consummation Trust with respect to the Pension Plan (as defined in Article IV.D.2) will be released, exculpated, enjoined, discharged or otherwise affected by the Plan.

O.      Consummation of the Plan

Following Confirmation of the Plan, the Plan will be consummated on the Effective Date, which will be a Business Day selected by the Debtors after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation of the Plan have been satisfied or waived.  Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

P.      Certain Factors to Be Considered Prior to Voting

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER THE RISKS SET FORTH IN ARTICLE VII HEREIN PRIOR TO ACCEPTING OR REJECTING THE PLAN.

Q.      Voting and Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on April 19, 2007, at 10:00 a.m. prevailing Eastern Time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE DEBTORS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has approved April 9, 2007, at 5:00 p.m. prevailing Pacific Time, as the voting deadline (the "Voting Deadline") for delivering Ballots and Master Ballots with respect to the Plan. The Debtors may extend the Voting Deadline without further order of the Court, provided the Debtors document such extension in the Voting Report (as defined below). To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots must be properly executed, completed and delivered by: (1) first class mail; (2) overnight courier; or (3) personal delivery so that they are actually received no later than the Voting Deadline by the Debtors' solicitation agent, Kurtzman Carson Consultants LLC (the "Solicitation Agent") at the following address:

Collins & Aikman Ballot Processing
c/o Kurtzman Carson Consultants LLC
12910 Culver Boulevard, Suite I
Los Angeles, California 90066

The Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

If you have any questions on voting procedures, please call the Solicitation Agent at the following toll free number: (888) 201-2205.

TO BE COUNTED, BALLOTS (OR MASTER BALLOTS OF THE RESPECTIVE NOMINEE HOLDER, IF APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 5:00 P.M. PREVAILING PACIFIC TIME ON APRIL 9, 2007. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS. THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

# ARTICLE II.
## GENERAL INFORMATION

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Plan dated February 9, 2007, which is attached hereto as **Appendix A**.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, significant events that have occurred during the Chapter 11 Cases, the Debtors remaining operations and the Sale Process. This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS FACTORS TO BE CONSIDERED PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, SEE ARTICLES V AND VII HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN AND CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE SUMMARIES OF THE DOCUMENTS THAT ARE ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

A.      The Debtors' Businesses

      1.      Corporate Structure

The Debtors consist of Collins & Aikman Corporation, a Delaware corporation, Collins & Aikman Products Co., a Delaware corporation, and 36 direct and indirect wholly-owned subsidiaries of Collins & Aikman Products Co., all of which are incorporated or organized in the United States. In addition, Collins & Aikman Corporation has direct and indirect wholly-owned subsidiaries incorporated or organized in Canada and Mexico that were not included in the Debtors' Chapter 11 Cases. The Debtors also had direct and indirect subsidiaries incorporated or organized in Europe that were not included in the Chapter 11 Cases. As discussed below, substantially all of the assets of these European affiliates were sold through European restructuring proceedings and the remaining assets are being liquidated in those proceedings. The Debtors also have minority equity interests in a number of non-wholly owned subsidiaries, none of which is included in the Chapter 11 Cases.

Attached hereto as **Appendix B** is a chart reflecting the corporate structure of Collins & Aikman Corporation and its subsidiaries as of January 24, 2007.

2.      The Debtors' Businesses

      a.      Introduction

Collins & Aikman Corporation was incorporated in 1988 and conducted all of its operating activities through its wholly-owned subsidiary Collins & Aikman Products Co., predecessors of which had been in operation since 1843. The Debtors and their non-Debtor subsidiaries were combined from a series of acquisitions designed to create a competitive tier I supplier capable of supplying the major hard-trim and Soft-Trim components of a vehicle's interior. In 2001, C&A completed the following three significant acquisitions, in total, that approximately doubled the size of the Debtors:

- Becker Group L.L.C., a supplier of plastic components to the automotive industry, was acquired on May 16, 2001, at a transaction value of approximately $330 million;

- Joan Automotive Fabrics and Western Avenue Dyers, L.P., a supplier of body cloth to the automotive industry with yarn dyeing capabilities, was acquired on September 24, 2001, at a transaction value of approximately $360 million; and

- Textron Automotive Company's Trim division, one of the largest suppliers of fully-assembled cockpit modules, instrument panels and exterior trim components with operations in North America, Europe and South America, was acquired on December 20, 2001, at a transaction value of approximately $940 million.

At the time of the filing of the Chapter 11 Cases, the Debtors held leading market share positions in their primary product areas in North America. The Big 3 (collectively, DaimlerChrysler, Ford and General Motors) accounted for approximately 80% of the Debtors' revenues in 2005, while foreign-based Honda, Nissan and Toyota, together with several tier I suppliers, accounted for the remaining 20%.

      b.      Business Segments

Throughout the Chapter 11 Cases, the Debtors have operated in two business segments: Plastics and Soft Trim.

      (i)      Plastics

The Debtors manufacture a wide range of plastic-based automotive interior products, including instrument panels and instrument panel components, door panels, consoles and various other trim components. The Debtors also manufacture plastic-based automotive exterior products consisting of front and rear bumper fascias, wheel flares and cladding. In addition, the Debtors assemble and sequence the delivery of complex systems and modules that incorporate these products as well as products from other suppliers. These product assemblies included cockpits, door modules and front and rear fascia modules.

      (ii)      Soft Trim

Through their Soft Trim segment, the Debtors manufacture a variety of automotive carpet and acoustics products and convertible roof systems.

*Carpet & Acoustics.* The Debtors' carpet and acoustics products include molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems and interior insulators. The Debtors evolved from a North American carpet producer to become a market leader in a broad range of automotive floor systems, luggage compartment trim, dash insulators and other acoustic products.

*Convertible Roof Systems.* The Debtors design, engineer and manufacture all aspects of a convertible roof including the framework, trim set, backlights, well slings, tonneau covers and power actuating system. On January 13, 2006, Wilhelm Karmann GMBH filed a lawsuit against Dura Convertible Systems, Inc., an indirect, wholly-owned subsidiary of Collins & Aikman Corporation, alleging patent infringement with respect to a product manufactured by the Debtors. On March 30, 2006, ASC Incorporated filed a lawsuit against Dura Convertible Systems, Inc., alleging patent

infringement with respect to a product manufactured by the Debtors. For a discussion of the patent litigation, see Article III.I.4 herein.

B.      The Debtors' Industry

        Historically, large vehicle manufacturers operated internal divisions to provide a wide range of parts for their vehicles. More recently and on an accelerated basis, vehicle manufacturers have moved towards a competitive sourcing process for a wide range of automotive parts as they seek lower-priced, higher-technology and more innovative products. These manufacturers rigorously evaluate suppliers on the basis of product, quality, price competitiveness, technical expertise and development capability, new product innovation, reliability and timeliness of delivery, product design capability, leanness of facilities, operational flexibility, customer service and overall management.

        The Debtors faced significant competition, on an individual product basis, from a number of different suppliers in the automotive part supplier industry. The Debtors' major independent competitors in the various product markets includes ASC Incorporated, Automotive Components Holdings LLC, Cadence Innovation LLC, Delphi Corporation, Faurecia SA, HP Pelzer Automotive Systems, Inc., Johnson Controls, Inc., Lear Corporation, Magna International Inc. (Intier Automotive Interiors and Car Top Systems), Plastech Engineered Products, Inc., Rieter Holding AG, Viam Manufacturing Inc. and Visteon Corporation.

        Contributing to the stresses in the industry, many of the Debtors' major customers and competitors are implementing their own restructuring initiatives both in and outside of bankruptcy. Moreover, the following key trends have been affecting the automotive part supplier industry over the past several years:

- *Shift in market share from domestic OEMs.* The market share shift from domestic to foreign OEMs (primarily Toyota, Nissan and Honda, collectively, the "New Domestics") has had a dramatic impact on domestic automotive part suppliers. The resulting reduced vehicle volumes have directly impacted revenues and cash flows of many domestic suppliers and created significant excess manufacturing and sequencing capacity. This dynamic has led many suppliers to agree to reduced pricing on new programs so as to absorb idle capacity, further constraining already tight margins.

- *Ongoing industry consolidation.* The automotive parts industry is consolidating as suppliers seek to achieve operating synergies through business combinations, removing excess capacity, acquiring complementary technologies, building stronger customer relationships and following their customers to new locations outside of the United States as such customers restructure operations to improve their overall cost structure.

- *Increasing vehicle manufacturer demand for modules and systems.* To simplify assembly and design processes and reduce costs, vehicle manufacturers increasingly require their large-scale suppliers to provide fully-engineered systems and pre-assembled combinations of components rather than individual components. Vehicle manufacturers also increasingly require the support of multiple products on any given assembly line, driving the need for suppliers to be able to handle extremely complex modules and systems consisting of multiple components.

- *Design of several model derivatives from a single vehicle platform or architecture.* Vehicle manufacturers have moved to designing and producing multiple vehicle models from a single vehicle platform. This is accomplished by varying the design of high profile components to create different vehicle models and standardizing other components across the platform to reduce the overall cost of design and manufacture of each model.

- *Increased competitive intensity and market pressures on vehicle manufacturers.* Vehicle manufacturers are under increasing pressure to adjust to changing consumer preferences and to incorporate technological advances. As a result, they are shortening product development times to introduce vehicles and features that match prevailing consumer preferences.

- *Increased cost and pricing pressures.* Automotive suppliers have experienced increased costs and significant downward pricing pressure as a result of a number of factors. Some of the primary factors include additional

14

responsibilities that suppliers are expected to absorb related to engineering and design, warranty coverage and support for the customers' entry into new global markets while, at the same time, having to absorb the impact of year-over-year price reductions, increased raw material costs, rising health care costs and decreased vehicle volumes for the domestic OEMs.

- *Growing perceived quality and acoustical performance requirements.* The quality of surface materials and execution of manufacturing techniques in vehicles continues to improve, largely driven by demand for greater levels of craftsmanship from the end consumer. Additionally, the need to control the noise and vibration in the passenger compartment has increased for all vehicle types from luxury to entry-level.

C.      Prepetition Capital Structure of the Debtors

1.      Collins & Aikman Corporation

a.      Prepetition Facility

As of the Petition Date, the Debtors' operations were financed, in part, by a Senior Secured Credit Facility (the "Prepetition Facility") pursuant to a Senior Secured Credit Agreement, dated December 20, 2001, and amended and restated as of September 1, 2004, by and among Collins & Aikman Corporation and substantially all of its domestic direct and indirect subsidiaries (collectively the "Guarantor Parties"), and a syndicate of lending institutions led by JPMorgan Chase Bank, N.A. ("JPMorgan") as administrative agent (the "Agent"). The Prepetition Facility was secured by substantially all of the assets of Collins & Aikman Corporation, Collins & Aikman Products Co. and certain of Collins & Aikman Products Co.'s subsidiaries (each of which are Debtors).

The Prepetition Facility was comprised of a $473 million Tranche B-1 term loan with a stated maturity date of August 31, 2011, a $170 million supplemental revolving credit facility (which included $56.3 million of undrawn letters of credit as of the Petition Date) that had a stated maturity date of August 31, 2009, and a $105 million revolving credit facility that also had a stated maturity dated of August 31, 2009. As of the Petition Date, there was approximately $748 million outstanding under the Prepetition Facility (plus accrued and unpaid interest).

b.      Common Stock

As of May 17, 2005, Collins & Aikman Corporation had 83,630,087 shares of common stock outstanding.

c.      Foreign Debt

While the majority of the Debtors' foreign operations were funded through Collins & Aikman Products Co., the foreign subsidiaries (all of which are non-Debtors) had approximately $3.5 million of funded debt as of the Petition Date. In addition, under the DIP Credit Agreement, the Debtors also agreed to guaranty obligations of their European affiliates owed under an overdraft facility issued by JPMorgan. Approximately $21 million is owed under that facility.

2.      Collins & Aikman Products Co.

a.      The Indentures

On December 20, 2001, Collins & Aikman Products Co. issued $500 million in aggregate principal amount of 10 3/4% Senior Notes, due 2011 (the "Senior Notes"). BNY Midwest Trust Company serves as indenture trustee to the Senior Notes. The Guarantor Parties have guaranteed the Senior Notes on a senior unsecured basis. As of the Petition Date, there was approximately $500 million in aggregate principal amount outstanding under the Senior Notes with accrued and unpaid interest of approximately $20.7 million.

On August 26, 2004, Collins & Aikman Products Co. issued $415 million in aggregate principal amount of 12 7/8% Senior Subordinated Notes, due August 15, 2012 (the "Senior Subordinated Notes"). Law Debenture Trust Company of New York serves as indenture trustee under the Senior Subordinated Notes. The Guarantor Parties have guaranteed the Senior Subordinated Notes on a senior unsecured basis. As of the Petition Date, there was approximately $401 million in aggregate principal amount outstanding under the Senior Subordinated Notes with accrued and unpaid interest of approximately $13.4 million.

b.      Receivables Facility

Before the Petition Date, Collins & Aikman Products Co. had an agreement to sell, on an ongoing basis, the trade accounts receivable of certain business operations to Carcorp, Inc. ("Carcorp"), a wholly-owned, bankruptcy-remote, special purpose subsidiary under an accounts receivable securitization facility (the "Receivables Facility"). From time to time, subject to certain conditions, Carcorp sold an undivided fractional ownership interest in a pool of up to $250 million worth of domestic and certain Canadian receivables to a committed facility provided by General Electric Credit Corporation ("GECC"). The Receivables Facility was originally set to mature in December 2004. In December 2004, GECC and Collins & Aikman Products Co. agreed to extend the Receivables Facility until March 2006 and amend certain provisions thereof. Until the Petition Date, the Receivables Facility was an important source of ongoing liquidity to Collins & Aikman Products Co. As of the Petition Date, there was approximately $127 million outstanding under the Receivables Facility and, at such time, it was fully drawn relative to available collateral. For a description of the current status of the Receivables Facility, see Article III.H.6 herein.

c.      Preferred Stock

As of May 17, 2005, Collins & Aikman Products Co. had 56,218 shares of Series A Redeemable Preferred Stock outstanding and 143,700 shares of Series B Redeemable Preferred Stock outstanding. All shares of the Collins & Aikman Products Co. preferred stock are held by Textron Holdco Inc.

D.      Directors of Collins & Aikman Corporation

The following persons comprise the current Board of Directors of Collins & Aikman Corporation:

**Name**

Dean Robert C. Clark

Marshall A. Cohen

Stephen F. Cooper

David C. Dauch

Anthony Hardwick

Richard C. Jelinek

Timothy D. Leuliette

Leonard LoBiondo

Sen. Warren B. Rudman

On the Petition Date, Messrs. J. Michael Stepp, W. Gerald McConnell and Daniel P. Tredwell served as directors of Collins & Aikman Corporation. Mr. Stepp resigned effective April 27, 2006, and Messrs. McConnell and Tredwell resigned as of May 10, 2006. Prior to their tenure with the Debtors, each of these former directors had served in a senior management capacity with Heartland Industrial Partners LP, the company's majority shareholder, and Mr. Tredwell was one of Heartland's co-founders. Mr. Frank E. Macher resigned as of January 31, 2007.

# ARTICLE III.
## THE CHAPTER 11 CASES

A.      Events Leading to the Chapter 11 Cases

The automotive part supplier industry is characterized by significant overcapacity and fierce competition. In the period leading up to the Petition Date, a series of developments resulted in a reduction of the Debtors' liquidity position, thereby limiting its ability to meet near-term payment obligations and restricting its ability to continue to pursue necessary growth and development initiatives. The worsening liquidity problem was exacerbated by the fact that the Debtors' concentrated customer base, largely comprised of the Big 3, were in the process of scaling back production due to significant market share shifts, increasing the demands on the Debtors for further pricing concessions. This loss of

business from major customers, combined with a reduction in accelerated payment programs by customers and pricing concessions, further reduced sales and hurt liquidity. Competitive forces and pricing pressures also contributed to the Debtors' losses.

In the years immediately preceding the Petition Date, the Debtors suffered significant losses. In 2003, the Debtors incurred a net loss of $57.5 million on net sales of $4.0 billion. In 2004, the Debtors reported a net loss of $800.1 million on net sales of $3.9 billion. Reflective of a downturn in the automotive parts supplier marketplace, the Debtors' financial condition deteriorated further in the first six months of 2005 and the Debtors experienced net losses of $117.0 million for the first six months of calendar year 2005 on six month net sales of $2.0 billion.

The Debtors are significantly affected by the cyclical industry in which they compete and the level of vehicle production in North America. The Big 3, which make up a majority of the Debtors' revenues, have lost market share in recent years to foreign competition.

The Debtors believe the following significant issues, among others, substantially contributed to the deterioration of the Debtors' financial performance:

1.      Increasing Commodity Prices

The Debtors' liquidity problems were also fueled by increases in certain commodity prices from their suppliers. Many of the Debtors' sales contracts required that they provide products at predetermined prices and that, in some cases, these amounts decline over the course of the contracts. In 2004 and 2005, the Debtors experienced significant price increases of many of their raw material inputs, such as polypropylene, polyurethane, TPO, ABS, polyester and nylon. These raw material cost increases resulted in reduced margins because the Debtors were unable to pass these material cost increases on to their customers.

2.      Pressure from the Debtors' Leveraged Structure

In recent years, the Debtors made a series of debt-financed acquisitions. Due to market factors described above, leverage and the failure of these acquisitions to produce expected gains, it became increasingly difficult for the Debtors to meet their debt service obligations from their operations. Moreover, covenant restrictions in certain of their debt instruments restricted the Debtors from raising capital to fund their operations in addition to the approximately $1.6 billion of funded debt obligations as of the Petition Date.

At the same time, to secure new business in the automotive parts supplier industry, it has become increasingly important for automotive parts suppliers to expend significant amounts of capital for engineering, development, tooling and other costs and to seek to recoup these costs through pricing over time. Without the capital to finance these necessary investments, the Debtors' ability to maintain future operations became increasingly uncertain.

Moreover, in the second half of 2004, certain of the OEMs gave notice that they were terminating their accelerated payment programs for all of their suppliers, including the Debtors. The termination of these programs had a material adverse impact on the Debtors' short-term liquidity position by pushing back the dates by which the Debtors received future payments. Although the Debtors responded with greater utilization of the Receivables Facility, the termination by the OEMs nevertheless significantly affected liquidity.

3.      Difficulty Integrating Numerous Acquired Businesses

The Debtors have devoted considerable efforts beginning in 2001 to integrating numerous acquired companies. On the Petition Date, recent acquisitions accounted for 48 of the Debtors' 102 plants and facilities and approximately 50% of the Debtors' employees. A combination of factors impeded the Debtors' ability to integrate effectively these acquisitions and achieve anticipated efficiencies and economies of scale, including: (a) rapid, large and complex acquisitions; (b) geographic location of certain acquired companies in countries where the Debtors did not previously maintain operations; and (c) higher than anticipated management turnover.

4.      Pressure from Customers

An increasingly competitive vehicle production environment for domestic OEMs in recent years led to a decline in the market share and overall production of the Debtors' largest North American customers. In 2004, combined automotive production in North America by General Motors and Ford declined by approximately 10%. Because the Debtors typically supply their customers on a requirements basis, the decreased production by the Debtors' customers had a direct impact on the Debtors' revenue and cash flows. Given the Debtors' dependence on domestic OEMs, competitive pressures on domestic OEMs necessarily affected the Debtors.

Certain OEMs responded to market pressures, in part, by asking suppliers, including the Debtors, to lower prices. Throughout 2004, these OEMs in the automotive industry demanded price decreases and givebacks in the range of 3% to 4%. Certain of the Debtors' competitors, responding to overcapacity in the industry brought on by a decline in overall sales, lowered prices to maintain volume and utilization, which further pressured the Debtors to lower prices. Furthermore, in an attempt to maintain business, restore strained relations with the Debtors' customers and compete for new programs, prior management negotiated contracts with the Debtors' customers for certain programs that ultimately were determined to be uneconomical.

5.      Pressure from Market Forces

Due to their leveraged capital structure and their customers' elimination of accelerated payment programs, the Debtors relied heavily on their Receivables Facility to generate cash for their operations. In May 2005, however, Standard & Poor's simultaneously downgraded the credit ratings of Ford and General Motors to below investment grade status. This downgrade resulted in a change in the Debtors' receivables concentration limits relative to these customers and, consequently, required a partial pay-down of the Receivables Facility and reduced ongoing availability under the Receivables Facility. While the Debtors obtained a waiver and amendment to their Receivables Facility to address these immediate liquidity issues, they continued to face long-term liquidity challenges.

In addition, the Debtors were fully drawn under their Prepetition Facility and needed a similar covenant waiver under the Prepetition Facility to ultimately secure the Receivables Facility waiver. The Debtors announced that they would seek such a waiver to their Prepetition Facility and more favorable payment terms from the downgraded customers to further benefit liquidity prior to the final phase-in of the amended Receivables Facility terms, but cautioned that even with more favorable terms, the modified terms of the Receivables Facility would remain a challenge for the Debtors. Ultimately, the Debtors had insufficient liquidity to meet their imminent debt obligations.

B.      Crisis Period Surrounding the Filing of the Chapter 11 Cases

Immediately prior to the Petition Date, the Debtors had been operating with almost no working capital, had no source of liquidity and were highly leveraged. At that time, among other things, the Debtors had a negative cash balance and faced imminent interruptions in production. The Debtors' cash management systems were not reliable. Moreover, numerous vendors had stopped shipping product and inventories were nearly depleted.

Exacerbating these issues was the lack of managerial and human resource capacity to operate and manage the Debtors' extremely complex operations. The Debtors' management team had been impaired. C&A's previous CEO, David A. Stockman was fired on May 11, 2006, and replaced with interim management. The Debtors' advisors and interim management inherited a company with an organizational structure that had been flattened to the point that key personnel were absent from critical management areas and plants and business units were reporting almost directly to Mr. Stockman. In addition, the Debtors were suffering significant turnover problems at every level of their operations. In the first 10 months of 2005, the Debtors lost over 198 corporate employees. These managerial and human resource deficiencies contributed to the already existing inefficiencies and inadequacies throughout the C&A's manufacturing processes and information reporting systems.

With regard to their internal monitoring, it is well known that there were allegations of significant accounting irregularities at C&A prior to the Petition Date. These accounting irregularities created significant uncertainty as to the integrity and reliability of the Debtors' books, records, internal financial statements and previous filings with the SEC. This directly impaired the efforts of the Debtors' advisors to develop an understanding of the facts of the Debtors' financial condition, comprehensively identify and evaluate options and design strategies and action plans for the immediate stabilization and long-term rehabilitation of the Debtors' businesses.

C.     Initiation of the Chapter 11 Cases

On May 17, 2005, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors' restructuring professionals had been introduced to the Debtors' situation only 72 hours before the filings.  The Debtors continue to conduct their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.  On the Petition Date, the Bankruptcy Court entered an order jointly administering these cases pursuant to Bankruptcy Rule 1015(b).

D.     Appointment of the Creditors Committee

On May 24, 2005, the United States trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors Committee").  The members of the Creditors Committee currently include:  Barclays Capital; BNY Midwest Trust Company; Delphi Corporation; Law Debenture Trust Company of New York; the PBGC; The Brown Corporation of America; UAW;  and USWA.  The Creditors Committee retained Akin, Gump, Strauss, Hauer & Feld LLP and Butzel Long PC as its legal advisors, Alvarez & Marsal, LLC as its operational and strategic advisor and Chanin Capital Partners, LLC as its investment bankers.

Since the formation of the Creditors Committee, the Debtors have consulted with the Creditors Committee concerning all aspects of the Chapter 11 Cases.  The Debtors have kept the Creditors Committee informed about their operations and the Creditors Committee has, together with the Debtors' management and advisors, participated actively in, among other things, a review of the Debtors' business plan and operations.  Additionally, the Debtors and their advisors have met with the Creditors Committee and its advisors on numerous occasions, including in connection with the Sale Process and negotiation of the Plan.

E.     The Debtors' Initial Stabilization Initiatives

Immediately following the Petition Date, the Debtors' interim management and advisors were forced to concentrate their efforts not on the Debtors' operational and managerial problems, but instead on generating the liquidity, stability and infrastructure necessary to simply identify those problems while, at the same time, maintaining uninterrupted production.  Only then would the restructuring advisors be able to focus on pursuing restructuring initiatives to further stabilize the Debtors' operations and prepare for emergence from chapter 11 protection.  Several of these preliminary initiatives are described in further detail below.

1.     Securing Postpetition Financing

As of the Petition Date, the Debtors did not have any cash on hand and did not have any way of generating unencumbered cash to finance operations.  This made securing and obtaining approval of financing a necessary focus at the beginning of the Chapter 11 Cases.  So far, the Debtors have had to seek approval for three separate financing arrangements.  The negotiation and approval of each of these debtor-in-possession financing transactions required significant resources of the Debtors in the initial stages of these Chapter 11 Cases.

a.     DIP Credit Arrangement

Initially, on the Petition Date, the Bankruptcy Court entered an order granting the Debtors interim authority to borrow $150 million in debtor-in-possession financing from a syndicate of lenders led by JPMorgan, who also serves as the agent for the Debtors' Prepetition Facility, pursuant to the DIP Credit Agreement.  Under the DIP Credit Agreement, the Debtors also agreed to guaranty obligations of their European affiliates owed under an overdraft facility issued by JPMorgan.  Approximately $21 million is owed under that facility.  This debtor-in-possession financing was approved on a final basis on July 25, 2005, and was limited to the $150 million that the Debtors already had borrowed prior to such date.

b.     Customer Financing Arrangements

To address their further cash needs during the first weeks of the Chapter 11 Cases, on June 23, 2005, the Debtors sought authority to borrow $30 million from their largest customers under the OEM Administrative DIP Claims.

In addition, the Debtors obtained approval of that certain debtor-in-possession junior secured financing (the "OEM Subordinated DIP Loan") provided under the Price Adjustment, Non-Resourcing and DIP Financing Arrangement for Collins & Aikman and Its Affiliated Debtors, by and among Collins & Aikman Corporation, the OEMs and JPMorgan, as approved on a final basis by the Bankruptcy Court on August 11, 2005 [Docket No. 916] (the "Customer Financing Agreement"). The OEM Subordinated DIP Loan provided the Debtors with, among other things, $82.5 million in immediate price increases, $82.5 million in additional financing and a definitive timetable for the renegotiation of contracts and formulation of a business plan.

            c.        Accelerated Payment Terms

The Debtors also reached an agreement with its six largest customers establishing five-day payment terms on all outstanding invoices and future invoices for a specified period. This represented a significant acceleration of payment terms, providing further liquidity at a critical time.

        2.        Capital Expenditure, Tooling and Launch Costs

The Customer Financing Agreement provided the Debtors with the opportunity to continue to finance investment in capital expenditures and tooling with assistance from certain customers. It also presented a number of challenges because the Debtors and their customers had to develop the infrastructure and processes to request funding from an outside source that was not a part of the practices of the Debtors or their customers before the Customer Financing Agreement.

To address the situation with capital expenditure, tooling and launch costs, the Debtors and five of the six customers who are party to the Customer Financing Agreement agreed to the protocol that was documented with the final approval of the Customer Financing Agreement. This protocol was established to give the Company the liquidity to make the up-front capital investments necessary to develop customer programs. The protocol to facilitate the arrangement and the funding arrangement were unprecedented in the industry.

        3.        Establishment of Cash Management System

When the Debtors commenced the Chapter 11 Cases, they did not have adequate cash reporting capabilities. Not only did the Debtors not have the right infrastructure to produce the reports, the Debtors' treasury department was focused solely on near-term spending. The Debtors' reporting and systems did not emphasize managing accounts receivables and cash flows, including the nature of disbursements.

Continuing as a going concern and developing restructuring initiatives required an ability to track and forecast cash needs accurately to avoid cash shortfalls that might interrupt operations. The Debtors, with the help of their financial advisors, began producing a daily cash report to provide management, the treasury department and the purchasing department with an understanding of the cash flow performance and ongoing cash requirements of the businesses. This enabled the Debtors to forecast, and then adjust, their cash needs to operate in a more stable and predictable manner. While the Debtors were able to stabilize their cash management system in the short term, the Debtors' accounting systems continued to be a source of uncertainty that complicated key initiatives in the Chapter 11 Cases.

        4.        Stabilization of the Debtors' Supply Chain

The Debtors do business with over 700 vendors of raw materials and purchased parts utilized in manufacturing and sequencing operations, many on a "just-in-time" basis. After the Petition Date, many of the Debtors' vendors sought changes in business terms, including transitioning to cash on delivery or even cash in advance terms to continue shipping. Negotiating with, and resolving the concerns of, such vendors has required considerable efforts by the Debtors and their advisors. Despite these challenges, and without the benefit of any so-called critical vendor program, the Debtors were able to avoid material interruptions in production throughout the Chapter 11 Cases.

        5.        New Management Hires and Retention of Professionals

As of the Petition Date, the Debtors had insufficient human resources to engage in the difficult operational and financial restructuring necessary to create a viable enterprise. The Debtors required knowledgeable management to

assist them in restructuring their businesses and developing, negotiating and confirming a chapter 11 plan of reorganization. Accordingly, the Debtors, in consultation with their major constituencies, decided it was in their best interests to seek to retain Mr. John R. Boken as their Chief Restructuring Officer, which request the Bankruptcy Court granted on June 9, 2005.

To address operational leadership needs, with the input of the Board of Directors, Mr. Frank E. Macher was hired as President and Chief Executive Officer in July 2005. After being hired, Mr. Macher and other members of the Debtors' senior management took a critical look at the Debtors' management resources in a number of key areas and determined that they needed to rebuild the senior management team to improve the Debtors' prospects for maximizing recoveries for creditors. With the addition of several new executives, the Debtors obtained the resources necessary to ensure that they could meet their customer commitments in the short term, seek to implement cost savings, launch awarded business and work toward winning new programs.

In addition, the Debtors established a Restructuring Committee of the Board of Directors. The Board of Directors has held numerous regular meetings since the Petition Date, including special meetings to address particular issues that required more immediate attention. Additionally, individual members of the Board of Directors have focused on specific issues, including assisting with the improvement of the management team, communicating with major constituencies regarding the Debtors' activities and analyzing the Debtors' long-term options.

      6.      Renegotiation of Customer Contracts

The Debtors established an aggressive schedule for the analysis and renegotiation of unprofitable contracts. The Debtors' senior management and the Debtors' advisors dedicated extensive resources to the task of identifying the component parts that the Debtors manufacture and determining the profitability and strategic benefit to the Debtors of each of those parts.

On October 14, 2005, the Bankruptcy Court approved the Debtors' renegotiated contracts with their six largest customers. The renegotiated contracts included: price increases on existing projects; a one-time surcharge to provide interim liquidity; certain raw materials price indexing; an extension through the end of September 2006 of the customers' commitment to five-day net payment terms of accounts receivables; an extension of the customers' commitment to fund capital expenditure, tooling and launch costs as discussed above; certain continued assurances by the customers not to resource programs away from the Debtors; and assurances that the Debtors would be removed from the customers' no-bid lists.

F.      The Debtors' Aggressive Restructuring Initiatives

Due to the upheaval and state of the Company at the time of the Petition Date, it was only after several months that the Debtors had the basic infrastructure and necessary liquidity to begin even to address the restructuring initiatives and operational changes that would be needed to negotiate and consummate a chapter 11 plan. Late in 2005, the Debtors' management and advisors initiated a "dual-track" process to explore two possibilities for emergence: (1) a stand-alone reorganization and, (2) at the prompting of the Prepetition Lenders, a sale of the Debtors in whole or in part.

      1.      Development of a Business Plan

Integral to both "dual-track" processes was the development of a sustainable business plan to generate confidence in creditors, customers and potential acquirers that the Debtors could become a cost-efficient provider of automotive parts and a viable stand-alone entity. The Debtors recognized that operating their businesses based on the previous model was not a viable alternative. At the direction and under the leadership of Mr. Macher, in the fourth quarter of 2005, the Company's management team endeavored to develop a business plan that would include (a) a strategic plan for the Company, (b) a plan for operational improvements and cost cutting initiatives and (c) the development of revised financial projections reflective of the anticipated changes to the businesses.

The Debtors began a comprehensive evaluation of their entire business model, including the potential rationalization of certain operations. The Debtors believed that increased efficiency could be gained in consolidating the plant layout and centralizing the Debtors' purchasing and financial systems. At the same time, the Debtors were considering to what extent they could increase revenue in a way that also increased profits. The Debtors evaluated their competitive position and analyzed how to leverage their competitive advantages.

21

2.      Operational and Cost-Cutting Initiatives

In the process of developing a business plan, the Debtors' management identified several possible opportunities to improve the performance of their operations, increase efficiency and cut costs. The Debtors' management and financial advisors agreed that the Debtors' initiatives should be focused on fixing the Debtors' Plastics segment, which was the source of the revenue shortfalls and operational shortcomings. The infrastructure of the Debtors' Plastics segment and information reporting systems were woefully inadequate and key personnel were absent from critical management areas. In addition, the Debtors' continued to have great difficulty maintaining and hiring personnel to manage the business. The Debtors' Carpet & Acoustics business was profitable under the direction of Mr. Millard King, President of the Debtors' Soft Trim segment.

Compounding the issues in the Plastics segment, prior to the Petition Date, to raise cash, the Company had entered into numerous sale and lease-back transactions that created an enormously high fixed cost structure that thinned the profit margins in the Plastics segment. Many of the Debtors' plants were below capacity and their operating equipment was underutilized. As a result of these and other factors, a high-volume of production was required to justify the significant capital, tooling and launch required for new projects in the Plastics segment.

To address these shortcomings, the Company hires included Mr. Dennis Profitt as President of the Debtors' Plastics segment to investigate and enhance operations and Ms. Susan Armstrong as Executive Vice President of Strategic Planning to spearhead cost saving, including the consolidation and closing of plants.

3.      Revenue Enhancement Initiatives

In addition to these operational and cost-cutting initiatives, the Company aimed to repair relationships with existing customers and expand the scope of business opportunities. The Big 3 have historically accounted for the majority of the Debtors' revenue. Recently, the New Domestics have been increasing their market share in North America. As part of their key initiatives, the Debtors sought to increase business awards from the New Domestics. In addition, the Debtors sought to (a) attract certain targeted short lead-time new awards, (b) obtain awards of "takeaway" business, i.e., takeover of projects currently manufactured by competitors, (c) win-back certain programs lost in 2004 and 2005; and (d) increase business awards from the New Domestics.

4.      Financial Projections

In conjunction with the strategic and operational aspects of the business plan, the Debtors worked to generate financial projections and reports that would reflect the prospective and actual performance of the Company inclusive of its cost-cutting, revenue enhancements and other restructuring initiatives.

To facilitate the ongoing "dual-track" development of a stand-alone reorganization and M&A process and the swift timeline necessary for emergence, the Debtors' management initially developed certain "top-down" preliminary estimates summarizing the Company's expected financial results. By early 2006, the Debtors had developed a comprehensive business plan that took into account every component part they produced and included means to enhance profitability. In addition, the Debtors had prepared financial projections through 2010 (the "Initial Forecasts") for use in marketing the Debtors businesses and negotiating a plan of reorganization that superseded the initial "top-down" preliminary estimates. These Initial Forecasts took into account the expected revenue enhancements and cost savings predicted by the Debtors' management and were premised upon sustained volumes from the OEMs. The Initial Forecasts were shared with the Creditors Committee, the Agent and the OEMs, among other constituencies in the Chapter 11 Cases.

Based on the Initial Forecasts, it appeared that the Debtors would have sufficient revenue to support their pension plan and labor and certain retiree benefit costs. Thus, it did not appear at that time that the Debtors could justify renegotiating, rejecting or canceling these costs under the standards of sections 1113 or 1114 of the Bankruptcy Code.

G.      The Debtors' Attempts to Reorganize

Because of the nature and dynamic state of the automotive component parts supplier industry and the significant changes that were needed at the Company, the Debtors and their advisors had a relatively brief window of opportunity to implement their aggressive restructuring initiatives. As explained below, to maximize the value of the Estates through a

stand-alone reorganization or going concern sale, it was critical that the Debtors establish that they could become a cost-efficient provider of automotive component parts and a viable stand-alone entity in 2006.

In the automotive component parts supplier industry, programs are awarded by OEMs well in advance of the time that the supplier generates revenue from the sale of parts. This is due to the engineering, development and tooling that must be undertaken prior to initiating production. Towards the end of 2004, the Company had been placed on the OEMs' no-bid lists based on their poor financial performance. Generally, OEMs do not award business to suppliers in bankruptcy. As a result of the foregoing, the Debtors' projections forecast a significant program run-off in 2007 and 2008 as the Company's awarded programs ended and were not replaced due to the loss of quoting activity in 2004 and 2005 for programs in 2007 and 2008. This projected program run-off would lead to a steep decline in revenue and concomitant inability to fund or finance operations unless the Debtors were able to realize their planned revenue enhancements, including attracting short lead-time new awards, obtaining "takeaway" business and winning back certain programs lost in 2004 and 2005. In the Plastics segment, this decline in revenue was especially significant. The engineering, development and tooling for Plastics programs are more capital intensive and can take as long as three years before such programs begin to generate revenue, far longer than programs in the Debtors' Soft Trim segment.

To obtain revenue enhancements for 2007 and 2008, the Debtors needed to establish to the OEMs that they would be able to complete the programs and deliver the product in a timely fashion, which, in turn, required significant progress towards viability and emergence from chapter 11 protection, including a plan of reorganization, by the third quarter of 2006. Further emphasizing the need to expedite the process, many of the favorable terms of the Customer Financing Agreements and renegotiated customer contracts were set to expire at the end of September 2006. At the same time that management began implementing their operational and cost-cutting initiatives and seeking revenue enhancements, the Debtors and their advisors turned their attention to reorganization alternatives.

1.       The M&A Process and Plan Negotiations in Early 2006

In December 2005, the Debtors initiated a process to sell the company "in whole or in part" as part of its dual-track restructuring process (the "M&A Process"). The Debtors' four primary businesses, for purposes of the M&A Process, included the following: (a) Plastics; (b) Carpet & Acoustics; (c) Convertible Roof Systems; and (d) Fabrics. Carpet & Acoustics, Convertible Roof Systems and Fabrics comprised the Soft Trim segment. Prior to contacting potentially interested parties, the Debtors and their advisors expended significant efforts preparing financial forecasts, an electronic data room stocked with financial and legal documents, information memoranda (including a 103-page information memorandum providing a comprehensive overview of the Debtors' businesses) and other materials. The evaluation materials were prepared to allow potential buyers to assess an acquisition of the consolidated entity as well as the individual businesses. The Debtors and their advisors developed lists of qualified, potentially-interested parties comprised of strategic buyers, including both domestic and foreign automotive suppliers, and financial buyers, including private equity firms and hedge funds. The Debtors and their advisors solicited input on potential buyers from parties-in-interest including the agents to the Prepetition Facility and the DIP Facility (the "Agents") and the Creditors Committee. The Debtors' advisors contacted over 45 parties potentially interested in purchasing the consolidated entity and numerous parties interested in one or more of the four primary businesses. Nineteen of the parties interested in the consolidated entity signed confidentiality agreements and received a draft information memorandum containing preliminary estimates summarizing the Company's expected financial results. In February 2006, the Debtors provided supplemental financial information including the Initial Forecasts for the period 2007 through 2010.

In March 2006, the Debtors sought and received preliminary, non-binding indications of interest and engaged in active negotiations with six interested parties. The initial indications of interest received included a purchase of the Debtors on a consolidated basis, the purchase of individual businesses and an equity investment in the form of a plan of reorganization with an equity sponsor. After reviewing each of the indications of interest, the Debtors, in consultation with the Agents and the Creditors Committee, determined to permit certain of the interested parties to advance to the next stage of the M&A Process. The Debtors allowed a number of interested parties to conduct comprehensive due diligence, which included  management presentations, access to the electronic data room and plant tours. Concurrently with the extensive due diligence efforts of the interested parties, the Debtors entered into negotiations with certain parties whose indications of interest appeared to have the highest likelihood to maximize the value of the Debtors' Estates. To assist in the negotiation and evaluation of the indications of interest, the Debtors, in consultation with the Agents and the Creditors Committee, drafted and circulated, among other things, a detailed term sheet template to the interested parties.

The Debtors and their advisors conducted extensive negotiations with certain parties, which resulted in the exchange of numerous term sheets. In addition, the Debtors' advisors began drafting and negotiating prospective plans of reorganization.

2.       Shortfalls and Development of Forecasts

In late Spring 2006, the Debtors and their advisors endeavored to strike a deal that would pave the way for emergence. Unfortunately, at the same time, the Debtors discovered that their actual results for the first four months of 2006 were below the projections in the Initial Forecasts. The root causes of the shortfalls, which stemmed from the Plastics segment, were not immediately apparent. It became clear that the M&A Process would not be able to be consummated based upon the Initial Forecasts and, at the same time, a plan of reorganization could not be supported by the Initial Forecasts. Furthermore, the Debtors were attempting to secure revenue enhancements to support their business plan by winning takeaway business. Winning this takeaway business required the Debtors to achieve their forecasts and the inability to do so further stalled the Debtors' reorganization efforts.

Considering the Debtors' brief window of opportunity for reorganization or sale as a going concern and the considerable progress that had been made at that time along the dual-track towards emergence, the Debtors management prepared a new set of interim forecasts based upon actual results for the first several months of 2006 and the previously developed business plan. Because of the brief window of opportunity available to reorganize and emerge, the revised interim forecasts were based on preliminary assumptions while related analyses and support materials were still being validated. These forecasts reflected lower EBITDA than the Initial Forecasts. Certain parties continued to be interested in acquiring the Debtors' businesses, however, and it appeared that the Debtors may be able to achieve a sale of the entire business or a stand-alone reorganization. In addition, the Debtors continued to negotiate with customers regarding revenue enhancements, including a significant opportunity from one of the OEMs for takeaway business. Throughout this process, the Debtors shared financial information, including the revised forecasts, and sought input from the Creditors Committee, the Agent and the OEMs regarding restructuring initiatives. In addition, for the majority of the case, the advisors to the Creditors Committee and the OEMs were on the ground at the Debtors offices with access to volumes of information. The Debtors and their advisors continued to work with the Creditors Committee, the Agent and the OEMs in this fashion and aggressively negotiate and pursue dual-tracks for emergence.

Also, based on the reductions in EBITDA reflected in the revised forecast, the Debtors analyzed the potential to achieve labor and retiree benefit concessions pursuant to negotiated resolutions, which were preferred, or resort to exercising the Debtors' rights under sections 1113 and 1114 of the Bankruptcy Code and cancellation the Debtors' pension plan. Pursuit of these alternatives ultimately led the Debtors to (i) terminate certain post-retirement life insurance, medical and dental coverage for non union retirees in early 2006, (ii) amend their Pension Plan to cease future benefit accruals for non-union participants after June 2006 and (iii) cease making minimum funding contributions to the Pension Plan beginning in July 2006.

The Debtors' performance in May and June 2006 continued to fall short of the revised expectations as a result of a number of factors. For one, the business plan assumed consistent volumes by the OEMs, but production volumes declined, especially on platforms in the Debtors' Plastics segment. In addition, the cost reductions assumed in the forecasts were not materializing. Shortly thereafter, Mr. Profitt's employment was terminated as President of the Plastics operation. Mr. Profitt was replaced by Mr. James Wynalek. The magnitude of the issues made it apparent that the Debtors' projections would need to be revised and that a turnaround of the Plastics business would take longer than had previously been expected.

3.       Depressed Outlook for the Debtors' Plastics Division

Much of the shortfall in financial performance was experienced in the Debtors' Plastics segment. The volume of business for the Plastics segment was decreasing and opportunities to grow the business were limited. At the same time, the engineering, development, tooling and other up-front costs are greater for the products produced in the Plastics division and this requires substantial up-front capital to fund new business. Exacerbating these dynamics was the general outlook of investors and lenders in the North American auto-industry that have been more and more resistant to fund these up-front costs.

Three factors produced a significant decline in the current and future business that the Debtors could expect for the Plastics segment. First, the Debtors had not received awards of new business since late 2004 and this lack of quoting

activity led to an absence of long-term agreements with the OEMs for production in the years 2007 and beyond. Second, through the beginning of 2006, the OEMs had been reducing volumes and cutting back on platforms serviced by the Debtors' Plastics segment. Finally, the market for Plastics' component parts was shrinking. The market share of the New Domestics was and is increasing in comparison to the domestic OEMs that support the lion's share of the Debtors' Plastics production. With regard to the type of products produced by the Debtors' Plastics segment, the New Domestics often transplant their own keiretsu suppliers, leaving less business for North American suppliers. For these reasons, several of the Debtors' competitors in the Plastics industry are scaling back their operations or ceasing operations entirely with respect to these products.

As a result of these developments, continuing operational issues and the high fixed costs across the Plastics segment and low profit margins for assembling and sequencing projects, the pay-off for investing up-front capital was diminished and it became increasingly difficult for the Debtors to justify the expenditure of the up-front capital needed to develop new business.

4.     Revised Projections and Decision to Pursue Stand-Alone Plan

In June 2006, parties continued to be interested in acquiring the Debtors' remaining assets. The Debtors' management appeared close to a deal for a significant portion of takeaway business that would provide revenue to stabilize operations in the second half of 2006 and 2007. Also, significant progress had been made towards negotiating a plan of reorganization acceptable to the Debtors' creditors and parties in interest. At the same time, however, the Debtors' financial performance continued to fall below forecasts.

In late June and early July 2006, the Debtors received revised indications of interest from several interested parties. Nevertheless, all offers had numerous conditions to closing that presented significant execution risk, including: (a) agreements with the OEMs that would provide long term business arrangements; (b) receiving significant modifications to labor related expenses, including to collective bargaining agreements, retiree benefits and pension obligations; (c) negotiating an alternative resin supply agreement that would result in significant material cost savings; and (d) achieving financial metrics with respect to cash, working capital and EBITDA that the Debtors were very unlikely to achieve in light of current operational performance and results. Moreover, even if the transactions could close, all of the offers for the Debtors valued the Debtors below the par value of the Prepetition Facility Claims.

Given that the proceeds of such a sale would be entirely subject to the Prepetition Lenders' secured claims, the Debtors sought the input of the Prepetition Lenders regarding the path forward. After reviewing the latest forecasts and the substantial information available regarding the Debtors' businesses and engaging in direct negotiations with interested parties regarding their indications of interest, the agent for the Prepetition Lenders and the informal steering committee for Prepetition Lenders (the "Steering Committee"), expressed their belief that the Debtors could obtain a higher return by filing a stand-alone plan of reorganization that exchanged the Prepetition Facility Claims for equity in a reorganized enterprise if (a) appropriate revisions could be obtained in the Debtors' component parts contracts with its major customers, (b) the Debtors' major customers did not suffer additional sales volume deterioration and (c) adequate exit financing could be obtained. To give the Debtors as strong an opportunity as possible to turnaround the Plastics business and become viable competitors, the Prepetition Lenders, the Agent and the Steering Committee indicated support for a stand-alone plan of reorganization under which the claims of the Prepetition Lenders would be converted entirely into equity of the reorganized Debtors if the conditions to the Plan were satisfied. As the Debtors needed the Prepetition Lenders' support to confirm a plan in light of the latest indications of interest, after deliberation, the Debtors agreed that filing a plan would achieve a better result for all creditors.

5.     The Stand-Alone Plan

At the end of July and beginning of August 2006, the Debtors' advisors assiduously worked with the Debtors' management and the Prepetition Lenders to negotiate and prepare a stand-alone plan of reorganization and related disclosure statement with the goal of filing of such documents by the end of August 2006. Concurrently, the Debtors' management began preparing revised financial projections to demonstrate the feasibility of the stand-alone plan and support a valuation of the Debtors as a going concern to be prepared by the Debtors' advisors.

By the end of August 2006, a stand-alone plan and related disclosure statement had been drafted. As discussed above, the stand-alone plan required support from the Prepetition Lenders to obtain confirmation. To provide this support, the Prepetition Lenders required certain conditions to be satisfied, including, among other things, (a) long term

deals with the OEMs that included assurances of revenue and profitability factors (such as raw material indexing and price-down limitations), non-resourcing commitments and other assurances that would be significant departures from industry practice and (b) exit financing that would provide sufficient working capital and capital expenditure requirements for new business. The Debtors and the Prepetition Lenders also sought the support of the Creditors Committee and continued to negotiate the treatment of unsecured claims under a stand-alone plan. To maintain a path to emergence targeted to the end of 2006, on August 30, 2006, the Debtors filed their Joint Plan of Reorganization of Collins & Aikman Corporation and Its Debtor Subsidiaries [Docket No. 3234] (the "Stand-Alone Plan") and related disclosure statement [Docket No. 3233] without the supporting financial projections and valuation.

To obtain arrangements with the OEMs consistent with the Prepetition Lenders' requirements, the Debtors distributed draft agreements to each of the Debtors' major customers on August 28, 2006. While negotiations with the OEMs proceeded, the Debtors, the Prepetition Lenders and the Creditors Committee and their advisors also met on a number of occasions and attended countless telephone conferences to negotiate a distribution to unsecured creditors under the Stand-Alone Plan that would garner the support of the Creditors Committee.

With negotiations taking place in earnest that would impact final projections and feasibility, the Debtors targeted mid-October 2006 for the filing of the financial projections to support the Stand-Alone Plan and incorporate the new customer agreements. During September and early October 2006, however, the foundations for the Debtors' projections continued to fluctuate as a result of the reductions in the customers' projected volumes, continued production shortfalls and customer negotiations. Further, the negotiations with the OEMs were proving unsuccessful despite the best efforts of all parties.

At this time, the Debtors and their advisors prepared revised projections incorporating known problems and "risk adjusting" for the uncertainty of the outcome of the OEM negotiations, raw material supply arrangement and several additional variables that influenced the outlook for their businesses. The projections reflected a substantial risk that the Debtors would not be able to sustain operations without even greater concessions from the OEMs than earlier expected. The Prepetition Lenders and the Debtors agreed to reengage the OEMs, this time seeking even more concessions. Again, despite the parties' willingness to explore alternatives, no agreement could be reached. In addition, it had become increasingly clear that exit financing would be difficult to achieve given the historical operating performance and many uncertainties in the financial projections. At this time, the Debtors and their major constituencies each agreed that the Stand-Alone Plan was not feasible and the Debtors should seek to monetize their assets through the Sale Process.

6.      Wind-Down of the Debtors' Fabrics Business

Early in 2006, the Debtors and their advisors determined that the Fabrics business was not a core business and, further, that a sale of the Fabrics business was preferable to the continued combination of Fabrics with their other operations. As a result, the Debtors pursued a sale of the Debtors' Fabrics business. Based on the initial market response, however, the Debtors and their advisors quickly realized that a liquidation was the only feasible option. The financial performance of the Fabrics business had been deteriorating for some time due both to firm-specific and industry pressures. From 2003 to 2005, revenue declined by 37% and was forecast to continue to decline. In addition, the Fabrics business generated negative EBITDA and cash flow in 2005. The Debtors' advisors had contacted approximately 40 potentially interested parties, 13 of whom signed confidentiality agreements and received an information memorandum. The Debtors received a number of non-binding indications of interest but, after conducting additional due diligence on the Fabrics business, including meetings with management and participating in plant visits, each potentially interested party notified the Debtors that they were not interested in pursuing an acquisition of the Fabrics business on a going-concern basis. On June 1, 2006, the Bankruptcy Court entered an order authorizing the Debtors to wind-down the Fabrics business. In accordance therewith, the Debtors began the process of conducting an orderly wind-down of the Fabrics segment. As of December 20, 2006, the Debtors have realized proceeds of approximately $13 million and expect additional proceeds of at least $4 to $6 million.

As part of the wind-down of the Fabrics business, the Debtors provided severance and retention payments to the employees of the Fabrics business as recognition of the importance of their efforts in the orderly wind-down. Additionally, to minimize administrative claims, the Debtors established expedited procedures to reject or assume and assign the executory contracts and unexpired leases entered into for the Fabrics business. To facilitate the sale of certain assets of the Fabrics business, the Debtors also received court approval to increase the overall limit on sales of de minimis assets with a selling price equal to or less than $1 million from $30 million to $50 million.

7.     Uncertainty Regarding the Debtors' Convertible Roof Systems Business

In November 2005, the Debtors had also initiated an M&A Process for their Convertible Roof Systems business, contacting 36 potentially interested parties, 19 of whom signed confidentiality agreements and received an information memorandum describing the business. On or about January 6, 2006, the Debtors received indications of interest from four potentially interested parties who subsequently engaged in substantial due diligence on the business, including management presentations and plant visits. On or about March 17, 2006, the Debtors received firm written offers from three interested parties, but, based on the undesirable level of consideration offered, the Debtors determined that a sale of the Convertible Roof Systems business was not likely to maximize value for the Estates.

On January 13, 2006, and March 30, 2006, respectively, Wilhelm Karmann GMBH and ASC Incorporated filed lawsuits against Dura Convertible Systems, Inc., an indirect, wholly-owned subsidiary of Collins & Aikman Corporation, alleging patent infringement with respect to products manufactured by the Convertible Roof Systems business. For a discussion of the patent litigation, see Article III.I.4 below.

Despite these problems, the Debtors have continued to market the Convertible Roof Systems business and reinitiated contact with potentially interested parties, providing updated information and continuing the due diligence process, however, the Debtors have not been able to sell the business, due, in large part, to the uncertainty arising from the patent infringement litigation.

H.     Certain Administrative Matters in the Chapter 11 Cases

1.     Management Retention Initiatives

To retain those employees who had skill sets deemed essential to the future success of the Debtors' businesses, the Debtors developed a key employee retention plan (the "KERP"). On December 16, 2005, the Bankruptcy Court granted the Debtors authority to implement the KERP. The KERP was comprised of a retention component (the "Retention Plan") and a success sharing component (the "Success Sharing Plan").

The Retention Plan provided payments to encourage key employees to continue their employment with the Debtors through the Chapter 11 Cases. The Debtors identified approximately 220 employees who would be eligible to participate in the Retention Plan. Pursuant to the Bankruptcy Court's order, total payments under the Retention Plan cannot exceed $9.3 million, save costs associated with the plant closing portion of the Retention Plan. Two installments totaling 50% of the retention payments have been paid and the final 50% is due to employees either 45 days after the Effective Date or upon effectuation of a sale transaction of the subject employee's business unit. The Retention Plan also established a discretionary pool of $250,000 for employees not otherwise covered by the KERP. This discretionary pool allowed the Debtors to address retention needs that arose after implementation of the KERP.

The Retention Plan also contained a separate allocation for employees who were affected by plant closings. This component of the Retention Plan authorizes the Debtors to provide severance benefits of no more than twelve weeks of base salary and continued medical benefits to salaried employees. Total payments to such employees are not to exceed $3.5 million. Participants in the plant-closing portion of the Retention Plan were not eligible for participation in the other provisions of the KERP.

The Success Sharing Plan contemplated payments to encourage officers and other highly-ranked management personnel to continue their employment with the Debtors. The Success Sharing Plan consists of three primary components: (a) payment of up to 12 months of base pay for severance (according to an employee's Court-approved employment agreement or at the discretion of the Chief Executive Officer and the Board of Directors); (b) an annual bonus program; and (c) a bonus consisting of a success sharing pool (the "Success Sharing Pool") payable upon confirmation of a plan or effectuation of sale transactions involving substantially all of the Debtors' assets. Each Success Sharing Plan participant is entitled to an annual bonus of up to 50% of base salary, paid semi-annually, guaranteed for the first year following approval of the KERP and thereafter based on achievement of EBITDA levels as agreed by the Debtors, the Committee and the Steering Committee. Funding for the Success Sharing Pool requires either that (y) the Debtors' reorganized enterprise value or (z) the proceeds received from a sale of substantially all of the Debtors' assets is more than $1.2 billion. The Debtors do not expect that the Success Sharing Pool will be funded as a consequence of the Plan.

2.      Executory Contracts and Unexpired Leases

*Executory Contract and Lease Rejections.*  As of the Petition Date, the Debtors were parties to thousands of Executory Contracts and Unexpired Leases.  The Debtors have reviewed the Executory Contracts and Unexpired Leases of personal property to which they are counterparties.  The Debtors have sought to reject approximately 225 of the Executory Contracts and Unexpired Leases.  In addition, the Debtors' have rejected approximately 20 real property leases as part of their decision to discontinue or consolidate certain business operations.

*Section 365(d)(4) Deadline.*  By order dated July 8, 2005, the Bankruptcy Court extended the time within which the Debtors must assume or reject unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including January 16, 2006, and by order dated January 6, 2006, the Bankruptcy Court further extended the time within which the Debtors must assume or reject the vast majority of the unexpired leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including the date a plan of reorganization is confirmed in the Chapter 11 Cases.  For certain real property leases, however, the Debtors agreed to make the decision on whether to assume or reject real property leases before the confirmation date.  On December 14, 2006, the Court extended the deadline for the Debtors to assume or assign some of these leases until March 14, 2007, and the Debtors have reserved their rights to further extend these deadlines.

In connection with the Sale Process, the Debtors expect that favorable Executory Contracts and Unexpired Leases will be assumed and assigned to purchasers to maximize the recovery to the estate.  To the extent that Executory Contracts and Unexpired Leases are unfavorable or relate to businesses or assets that are liquidated or wound-down, the Debtors expect that such contracts and leases will be rejected.

3.      Exclusivity

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan.  If the debtor files a plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan.  Section 1121(d) of the Bankruptcy Code also permits a bankruptcy court to extend these exclusivity periods "for cause."  Without further order of the Bankruptcy Court, the Debtors' initial exclusivity period to file a plan would have expired on September 14, 2005.  However, by orders dated September 12, 2005, January 6, 2006, April 12, 2006, May 11, 2006, July 13, 2006, September 27, 2006, October 24, 2006, December 14, 2006, and January 11, 2007, the Bankruptcy Court extended the periods of the Debtors' exclusive authority.  The current date for the Debtors to file a plan of reorganization is through and including March 28, 2007, and the current date to seek acceptance of a plan is through and including March 28, 2007.  The Debtors have reserved their rights to further extend these deadlines.

4.      Avoidance Actions

The Debtors are currently investigating prepetition transfers that may be avoided under Chapter 5 of the Bankruptcy Code or relevant and applicable state law, such as the Uniform Fraudulent Transfer Act.  Among other things, the Debtors are looking at transfers made to insiders, transfers for which the Debtors may not have received reasonably equivalent value in exchange for the transfer and transfers made while the Debtors were insolvent or by which the Debtors became insolvent as a result of the transfer.

As a preliminary matter, the Debtors have identified numerous significant transfers made by the Debtors in the years preceding the bankruptcy petition.  In particular, the Debtors believe that various mergers and acquisitions, along with numerous sale-leaseback transactions may be avoidable under applicable law.

With respect to potential actions under section 547 of the Bankruptcy Code, in the ninety days preceding the filing of the Chapter 11 Cases, the Debtors made approximately 96,000 payments totaling approximately $618 million to approximately 3,900 different parties.  Approximately 210 of the 3,900 parties each received total payments in excess of $500,000 during that period, amounting to payments of approximately $486 million (or 78.6% of payments during the 90-day period).  With respect to payments to insiders during the one-year period preceding the filing of the Chapter 11 Cases, the Debtors made payments totaling approximately $7.4 million to approximately 32 entities.  Also during this one-year period, the Debtors transferred $244 million among various Debtor and non-Debtor affiliates.

The Debtors are continuing and will continue to investigate the facts and circumstances of each of these transfers. To the extent that the Debtors believe that any transfers are likely to be avoidable through litigation, the Debtors anticipate that such potential claims may be pursued by the Litigation Trust or the Post-Consummation Trust. A non-exhaustive list of Retained Causes of Action that may be pursued after Confirmation of the Plan, along with prospective defendants or other adversaries to such actions, will be provided in Exhibit A to the Plan. See Article V.C.5 hereof for a more detailed description of the Retained Causes of Action.

5.      Claims

On August 12, 2005, the Debtors filed their schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules") with the Bankruptcy Court. Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, 211 West Fort Street, Suite 1825, Detroit, Michigan 48226 or by visiting www.kccllc.net/collinsaikman.

On August 11, 2005, the Bankruptcy Court entered an order setting a claims bar date on March 22, 2006, for substantially all entities to file proofs of claim. When the Debtors committed to initiating a sale process for their businesses along with continuing to pursue a viable stand-alone plan of reorganization, it became apparent that accelerating the bar date would enhance the Debtors' ability to make progress. On November 22, 2005, the Bankruptcy Court entered an order setting the bar date on January 11, 2006, for substantially all entities to file proofs of claim (the "Bar Date"). Pursuant to the procedures approved in the order, the Debtors served notices of the Bar Date with customized proofs of claim to more than 10,000 entities listed on the Schedules, served notices of the Bar Date with blank proofs of claim to more than 110,000 additional entities and published notice of the Bar Date in the Wall Street Journal, USA Today (National Edition) and the Detroit Free Press/Detroit News.

*Claims Estimates*. As of January 24, 2007, the Debtors' Claims Agent had received approximately 9,246 Claims. The total amounts of Claims filed against one or more of the Debtors were as follows: (1) 1,037 Secured Claims in the total amount of $3,176,773,827; (2) 44 Administrative Claims in the total amount of $2,380,409; (3) 910 Priority Claims in the total amount of $7,887,323,690; and (4) 7,255 Unsecured Claims in the total amount of $42,756,485,600. The Debtors believe that many of the filed proofs of Claim are invalid, untimely, duplicative and/or overstated. Therefore, the Debtors are in the process of objecting to such Claims. Through withdrawal of claims and disallowance by the Bankruptcy Court after objection, 556 claims totaling $4,414,393,899 have been expunged.

The Debtors estimate that, at the conclusion of the Claims objection, reconciliation and resolution process, the aggregate amount of claims will be as follows: (1) Allowed Administrative Claims will be approximately $74 million; (2) Allowed Secured Claims will be approximately $827 million; (3) Allowed Priority Claims will be approximately $12 million; (4) Allowed Senior Note Claims will be approximately $521 million; (5) Allowed Senior Subordinated Note Claims will be approximately $428 million; and (6) Allowed General Unsecured Claims will be approximately $539 million. The estimate of Allowed Administrative Claims includes, among others, the final payment due under the KERP, payments contemplated by a new key employee retention plan, severance expenses, professional fees, cure costs from the assumption of executory contracts to be assigned to potential purchasers (which may or may not be paid by such purchasers), property taxes, early termination penalties under postpetition contracts and certain Administrative Claim requests reflected on the Claims Register and docket for which the Debtors reasonably expect there to be a distribution. Pursuant to the Customer Agreement (as defined and discussed more fully in Article IV.A), the Agent for the Prepetition Lenders has consented to the use of their cash collateral to pay, among other things, certain Administrative Claims. The Debtors believe that the Administrative Claims included in the estimate of $74 million fall within the range of consent. The Administrative Claim estimate does not include $26 million of OEM Administrative DIP Claims, payment of which is expected to be waived by the OEMs pursuant to the Customer Agreement at the time and in exchange for a release in the form set forth in the Plan pursuant to the Plan. Further, the estimate of Allowed Secured Claims does not include the OEM Subordinated DIP Loan in the amount of $82.5 million, payment of which is expected to be waived by the OEMs pursuant to the Customer Agreement at the time and in exchange for a release in the form set forth in the Plan pursuant to the Plan.

The estimates set forth herein are approximate and based upon numerous assumptions and there is no guarantee that the ultimate amount of Claims will conform to these estimates. Numerous Claims have been asserted in unliquidated amounts. Further, additional Claims may be filed or identified during the Claims objection, reconciliation and resolution process that may materially affect the foregoing estimates. Although the Debtors believe that certain

Claims are without merit and intend to object to all such Claims, there can be no assurance that these objections will be successful.

6.    Properties Subject to Ongoing Environmental Remediation

The Debtors own or lease certain properties that are the subject of ongoing environmental investigation or remediation activities under environmental laws, for which a prospective buyer has not yet been identified. The properties are located in Mancelona, Michigan, Dover and Farmington, New Hampshire, and Zanesville, Ohio. During the Chapter 11 Cases, the Debtors believe they have fulfilled their commitments to environmental agencies at these properties, modified in some instances by the Debtors to reflect the Debtors' reduced resources. Certain environmental authorities believe the Debtors have not fulfilled their commitments and may have future environmental obligations for such properties.

The Debtors' ongoing management of such properties and the ultimate disposition thereof will be in accordance with applicable law, including the Bankruptcy Code and relevant federal and state environmental statutory and case law. No later than 18 calendar days before the Voting Deadline and the deadline to object to the Confirmation Hearing, the Debtors will supply relevant local, state and federal environmental agencies with any additional information that exists regarding the Debtors' plans at such time for disposition of the properties. The alternatives for disposition under the Plan are:  (a) as to the owned properties (i) sale or transfer to entities that will assume responsibility for environmental investigation and cleanup, (ii) where sale or transfer is not possible before the Effective Date, transfer to a residual trust with details of any such trust agreement, including a budget  as it relates to environmental matters (which shall include a description of any insurance proceeds or pending insurance claims upon which the budget is based), to be supplied to the relevant local, state and federal agencies no later than 12 calendar days before the Voting Deadline and the deadline to object to the Confirmation Hearing, and (iii) as the least preferred alternative, abandonment, if found by the Bankruptcy Court after notice and hearing to be permissible under applicable law; (b) as to any leased properties, rejection of applicable leases; and (c) as to owned or leased properties, some other potential resolution under applicable law.

The Debtors will continue to seek agreement with environmental agencies and others with concerns regarding the disposition of the properties. The Debtors and the relevant environmental agencies are continuing efforts to seek the most beneficial outcome and, therefore, the Plan does not specify the ultimate disposition. The Customer Agreement does not waive any claims for environmental remediation or other environmental claims the Debtors may have against other parties to the Customer Agreement.

The State of Michigan believes that if any of the Debtors' properties located in Michigan that are the subject of ongoing environmental investigation or remediation activities are sold, any environmental responsibility language in agreements documenting such sales should be subject to the approval of the Michigan Department of Environmental Quality, and the Debtors reserve all of their rights with respect thereto. The State of Michigan believes that if any of the Debtors' properties located in Michigan that are the subject of ongoing environmental investigation or remediation activities are abandoned, the State of Michigan should be named as beneficiaries to any insurance proceeds or pending insurance claims related to such properties, and the Debtors reserve all of their rights with respect thereto.

7.    Receivables Facility Pay-down

As set forth in Article II.C.2.b herein, the Debtors utilized the Receivables Facility as a source of liquidity prepetition. As of the Petition Date, there was approximately $127 million outstanding under the Receivables Facility. Postpetition, the Debtors have not sold receivables to Carcorp, and have repaid these obligations as they receive payments on account of the receivables sold to Carcorp prepetition. The Debtors serviced, administered and collected the receivables on behalf of Carcorp and GECC. After the Petition Date, the Debtors and GECC worked together to collect the prepetition accounts receivable. As the receivables were converted to cash through payments by customers, and no new receivables are added to the pool, the outstanding balance under the Receivables Facility was eliminated. On October 13, 2006, the Court entered an order approving the stipulation between the Debtors and GECC fixing the amount of the final payoff and resolving all claims under Receivables Facility. The Debtors have no further obligations under the Receivables Facility.

8.      European Operations

As of the Petition Date, the Debtors had several foreign subsidiaries and affiliates located throughout Europe. The European Debtors were experiencing severe financial difficulties and, on July 15, 2005, the European Debtors commenced the UK Proceedings.  As part of the UK Proceedings, the English court appointed the UK Administrators to act in the best interests of the creditors of the European Debtors.  Because the simultaneous Chapter 11 Cases and the UK Proceedings presented numerous jurisdictional issues, including as a result of the intercompany creditors and intercompany, cross-border debt, the United States Bankruptcy Court and the English bankruptcy court each approved an insolvency protocol designed to:  (a) promote the orderly and efficient administration of the two insolvency proceedings; (b) harmonize and coordinate activities undertaken and information exchanged in connection with the insolvency proceedings; (c) honor the independence and integrity of the United States and English courts; and (d) promote international cooperation and respect for comity among the United States and English courts.

The UK Administrators marketed the European Debtors' assets in connection with a potential sale of such assets in accordance with the usual practice, procedure and timescale for fulfilling such a strategy in an English law-governed administration.  In particular, the sale process focused on (a) a sale of a "core group" of twelve plants and (b) multiple sales of certain individual sites.

On July 29, 2005, the UK Administrators publicly advertised the potential sales in the Financial Times and contacted numerous potential buyers.  The UK Administrators held discussions with over 100 interested parties, including potential buyers for:  (a) substantially all of the European business as a going concern; (b) groups of plants by country; (c) groups of plants by product type; and (d) individual plants.

On August 10, 2005, first round bids were received from a number of interested parties and, on October 21, 2005, second round bids were received.  The UK Administrators received two bids for the "core group" of assets and several bids for single sites and small groups of sites.  On November 4, 2005, the final round of bids were received.  Following discussions with the two major bidders for the "core group" of assets, the UK Administrators concluded that IAC Acquisition Corporation Limited (an entity funded by WL Ross & Co. LLC and Franklin Mutual Advisers LLC) was the successful bidder of the "core group" of assets.

The UK Administrators then reviewed all of the bids received for single sites and small groups of sites and determined that such bids were all less favorable on a site-by-site basis than the bid received from IAC Acquisition Corporation Limited for the "core group" of assets.  Therefore, the UK Administrators proceeded with IAC Acquisition Corporation Limited regarding a sale of the European Debtors' "core group" of assets in a series of transactions and, on November 28, 2005, executed a master sale agreement for the sale of substantially all of the European Debtors' assets for a purchase price in excess of $100 million.  The sale transactions closed on March 3, 2006.

As part of the sale, the Debtors agreed to transfer and license certain of their intellectual property rights to the European Debtors for the benefit of IAC Acquisition Corporation Limited.  Specifically, the Debtors entered into a transition services agreement for the continuation of certain information technology support and related services traditionally provided by the Debtors to the European Debtors, an intellectual property license agreement relating to the license of certain intellectual property used for the conduct of one of the European Debtor's foreign subsidiaries and an assignment and license agreement relating to the assignment and license of certain intellectual property used by the European Debtors in the conduct of their business.  To assist in determining and negotiating a fair value for these intellectual property rights, the Debtors engaged Consor, Inc., an internationally recognized expert in valuing intellectual property.  The Debtors received approximately $12.5 million in aggregate consideration for the licensed and transferred intellectual property.

During 2001, Collins & Aikman acquired 100% of the voting shares of a holding company owning 56.5% of the economic interest in Plascar Industria de Componentes Plasticos Ltda. ("Plascar"), a Brazilian manufacturer of interior trim parts.  The acquisition of Plascar was structured such that Collins & Aikman Europe S.A. ("Luxco") owned 99.99% of the holding company and Collins & Aikman International Corporation owned the remaining 0.01%.  Plascar fell under the control of the UK Administrators via the Administrators appointment over Luxco.  The UK Administrators led a process to solicit bids for Luxco's interests in Plascar.  Ultimately, Plascar was sold to International Automotive Components Group Brazil, a joint venture between WL Ross & Co. LLC and Franklin Mutual Advisers, LLC.

9. European Intercompany Claims and Interests

The Debtors asserted approximately $350 million of claims against nineteen European Debtors, as summarized in the following table. Additionally, the Debtors have equity interests in the European Debtors for which the Debtors may receive a recovery, to the extent such European Debtors are solvent.

| European Debtor Name | Claim Filed |
| --- | --- |
| Collins & Aikman Automotive Company Italia, S.r.l. | $252,567 |
| Collins & Aikman Automotive Fabrics Limited | 87,899 |
| Collins & Aikman Automotive Floormats Europe B.V. | 25,420 |
| Collins & Aikman Automotive Holding Gmbh | 233,758 |
| Collins & Aikman Automotive Limited | 496,185 |
| Collins & Aikman Automotive s.r.o. | 1,718,138 |
| Collins & Aikman Automotive Systems AB | 1,018,431 |
| Collins & Aikman Automotive Systems S.L. | 5,801,163 |
| Collins & Aikman Automotive Systems, GmbH | 3,734,426 |
| Collins & Aikman Automotive Trim B.V. | 8,915,425 |
| Collins & Aikman Automotive Trim B.V.B.A. | 1,213,731 |
| Collins & Aikman Automotive Trim GmbH | 1,872,505 |
| Collins & Aikman Automotive Trim Limited | 219,808 |
| Collins & Aikman Europe B.V. | 7,579,940 |
| Collins & Aikman Europe S.A. | 247,261,305 |
| Collins & Aikman Holding AB | 229 |
| Collins & Aikman Holdings B.V. | 67,510,279 |
| Collins & Aikman Products, GmbH | 2,356,111 |
| Dura Convertible Systems GmbH | 106,357 |
| **Total** | **$350,403,450** |

Conditioned upon acceptance of the claims in the administration process, the Debtors preliminarily estimate an aggregate recovery of approximately $58 to $70 million from the above claims, with over 90% of that amount coming from Collins & Aikman Europe S.A., Collins & Aikman Holdings B.V. and Collins & Aikman Automotive Trim B.V. The Debtors do not expect to receive any value from their directly or indirectly held equity interests in the European Debtors. The Debtors anticipate that an initial distribution on account of claims against the European Debtors will be made on or before December 31, 2006, with the final distribution being made on or before June 30, 2007.

Claims against Collins & Aikman Europe S.A. arise primarily from intercompany promissory notes held by Debtor Collins & Aikman Products Co. A specific intercompany promissory note accounts for approximately $85 million of the total estimated claims. The remaining claims arise from a master intercompany note agreement. Claims arising from this master intercompany note agreement likely will not be settled prior to the initial distribution. The claim against Collins & Aikman Holdings B.V. arises from a specific intercompany note held by Collins & Aikman Products Co. The claims against Collins & Aikman Automotive Trim B.V. and the remainder of the smaller claims arise from corporate overhead allocations substantiated by corporate overhead agreements and trade receivables substantiated by trade invoices.

The foregoing estimates are approximate and based upon multiple assumptions regarding the timing and outcome of the claims process in the UK Proceedings. There is no guarantee that the timing or amounts of actual recoveries will conform to the estimates stated herein.

10. Mexican Operations

C&A operates five manufacturing facilities in Mexico — through its non-Debtor subsidiaries organized in Mexico — to support its North American customers with facilities in the region. The Mexican operations' capabilities include Plastics and Soft Trim, including convertible roof systems. Primary customers include Ford, General Motors, DaimlerChrysler and Volkswagen. C&A's operations in Hermosillo, Mexico support the Ford CD388 platform (currently producing the Ford Fusion, Mercury Milan and Lincoln Zephyr) exclusively from a supplier park adjacent to

32

Ford's assembly plant. From this location C&A supplies a full range of interior products. The Debtors are marketing their interests in their non-Debtor subsidiaries in Mexico in conjunction with the Sale Process.

11.    Canadian Operations

C&A currently operates twelve manufacturing and sequencing facilities in Canada — through its non-Debtor subsidiaries organized in Canada — to support its North American customers with facilities in the region. The Canadian operations provide plastic material processing and molding, as well as, carpet and acoustics manufacturing capabilities. Primary customers include Ford, General Motors, DaimlerChrysler and Honda.

The Debtors' Canadian non-Debtor subsidiaries and their Debtor-equity holder have been assessed by the Canadian revenue authorities for non-resident withholding tax on certain payments made in 1994 and 1995 by the Canadian non-Debtor subsidiaries to their Debtor-parent. In issuing the assessments, the Canadian revenue authorities relied upon a general anti-avoidance rule in the Canadian tax legislation to seek to recharacterize the returns of capital made by the Canadian non-Debtor subsidiaries as dividends subject to withholding tax. The assessments were for an aggregate amount of approximately C$17 million, including interest. The assessments are currently under appeal to the Tax Court of Canada.

12.    Deferral of Adequate Protection Payments

Pursuant to the final order approving the DIP Facility [Docket No. 809] (the "Final DIP Order"), the Court approved the payment of certain adequate protection obligations (the "Adequate Protection Payments") to the Prepetition Lenders. Specifically, the Final DIP Order provides that the Debtors shall pay to the Prepetition Lenders on a monthly basis, among other things, accrued but unpaid interest and all accrued but unpaid letter of credit and other fees. The Adequate Protection Payments are approximately $7.2 million per month.

By motion dated August 22, 2006, the Debtors sought Court approval to defer a certain portion of the Debtors' obligation to make the Adequate Protection Payments for the months of September through December 2006 until January 1, 2007. The Court approved the motion by order dated August 29, 2006 [Docket No. 3214]. The payments deferred by this order and a portion of the Adequate Protection Payments for January 2007 were deferred to August 1, 2007, pursuant to an order entered by the Court on January 11, 2007 [Docket No. 3891]. Provided that the Effective Date is on or before August 1, 2007, these deferred payments will be resolved when the Holders of the Prepetition Facility Claims receive distributions under the Plan.

13.    Sales Engineering Letter of Credit

As of the Petition Date, Collins & Aikman Plastics, Inc., one of the Debtors, was a defendant in a pending lawsuit brought by Sales Engineering, Inc. in the Oakland County Circuit Court, Case No. 99-014804-CK. Prior to the Petition Date, Sales Engineering, Inc. had received a default judgment against Collins & Aikman Plastics, Inc. in the aforementioned proceeding. Collins & Aikman Plastics, Inc. appealed the default judgment. Pending Collins & Aikman Plastics, Inc.'s appeal, Collins & Aikman Plastics, Inc. issued a letter of credit for the benefit of Sales Engineering, Inc. through one of its lenders, JP Morgan Chase Bank pursuant to a stipulated order. Pursuant to an opinion and order of the Court of Appeals, the default judgment was reversed, in part, on appeal, and the matter is to be remanded to the trial court for further proceedings. Further proceedings have been stayed as a result of Collins & Aikman Plastics, Inc.'s bankruptcy filing. The letter of credit remains in place.

14.    The RLI Bonds

Notwithstanding anything to the contrary in the Plan, the third party releases set forth in Article XII.C of the Plan, the exculpation set forth in Article XII.D of the Plan, the injunction set forth in Article XII.E of the Plan or any other provision of the Plan are not intended to and do not limit the rights, if any, of RLI Insurance Company to seek and receive a distribution from the letters of credit issued by JPMorgan (previously known as Chase Manhattan USA, N.A.) (or any replacements or renewals of said letter of credit) to RLI Insurance Company with respect to the RLI Bonds. Without any prejudice to the rights of RLI Insurance Company, on or before the Effective Date, the Debtors will advise RLI Insurance Company of the Debtors' intentions with respect to the RLI Bonds.

I.      Litigation and Investigations

1.      Automatic Stay

The filing of the bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the commencement or continuation of all collection efforts and actions by Holders of Claims, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. The automatic stay remains in effect until the Debtors' emergence from chapter 11 protection.

*In re Collins & Aikman Corp. Securities Litigation*. Four purported class actions were filed between April and June 2005 in the United States District Court for the Southern District of New York against the Debtors and their former and current senior officers and/or directors, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. These cases include the following: *Hanna Kleinpeter-Fleck v. Collins & Aikman Corp.*, *David A. Stockman*, *J. Michael Stepp and Bryce M. Koth*, Civ. No. 05-CV-3791 (MBM); *K.J. Egleston v. Jerry L. Mosingo, David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-04950 (MBM); *Akerman v. Collins & Aikman Corp., David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-5098 (MBM) and *Gariddi v. Jerry L. Mosingo, David A. Stockman, J. Michael Stepp, and Bryce M. Koth*, Civ. No. 05-CV-5251(MBM). Upon the commencement of the Chapter 11 Cases, the cases naming the Debtors as a defendant were stayed as against the Debtors. The proposed lead plaintiff K.J. Egleston, however, indicated his intention to continue to prosecute the cases as against the remaining non-debtor defendants. Accordingly, plaintiff K.J. Egleston filed a motion to consolidate the pending actions and to be appointed lead plaintiff for the purported class.

Pursuant to an order issued by Judge Mukasey of the United States District Court for the Southern District of New York on November 22, 2005, the proposed lead plaintiff K.J. Egleston filed a consolidated class action complaint on January 13, 2006, on behalf of all plaintiffs who purchased the common stock of Collins & Aikman Corporation between May 15, 2003 and March 17, 2005, entitled *In re Collins & Aikman Corporation Securities Litigation*, Civ. No. 05-CV-03791 (MBM). The consolidated complaint does not name the Debtors as a defendant, but instead names only certain former officers and directors of the Debtors including David A. Stockman, J. Michael Stepp, Bryce M. Koth and Jerry L. Mosingo. The consolidated complaint also names as defendants Heartland Industrial Partners LP and Heartland, LLC. The court's order also required defendants to file any motions to dismiss by March 3, 2006, and stayed all discovery pending further order of the court. In response, the defendants filed both motions to dismiss and a motion to transfer venue, pursuant to 28 U.S.C. § 1404(a), to the Eastern District of Michigan. The Court granted the defendants' motion to transfer venue on July 11, 2006, and the case is now pending before the Honorable Arthur J. Tarnow and Magistrate Judge Steven D. Pope in the United States District Court for the Eastern District of Michigan. The defendants' motions to dismiss are still pending.

*MacKay Shields Litigation*. On July 8, 2005, plaintiff MacKay Shields LLC ("MacKay Shields") filed a state court action in the State of Michigan, Circuit Court of Wayne County, captioned *MacKay Shields LLC v. Heartland Industrial Partners, L.P., et al.*, File No. 05-520229CZ, against Heartland Industrial Partners, L.P., Heartland Industrial Associates, L.L.C. and various former and current officers and directors of Collins & Aikman Corporation and Heartland LLC, including David A. Stockman, J. Michael Stepp, Timothy D. Leuliette, Daniel P. Tredwell, W. Gerald McConnell, Samuel Valenti, III, John A. Galante, Bryce M. Koth and Robert Krause. The action alleges that, between August 2004 and May 2005, the defendants made a series of materially false and misleading statements regarding the Debtors' financial statements and operating condition, which induced MacKay Shields to purchase $153 million face amount of the Debtors' debt. On November 9, 2005, the action was removed to the United States District Court for the Eastern District of Michigan. On October 17, 2006, the action was dismissed without prejudice.

*Debtors' Adversary Proceeding*. On February 1, 2006, the Debtors instituted an adversary proceeding in the Bankruptcy Court seeking a declaration that, pursuant to section 362(a)(1), (3) of the Bankruptcy Code, the automatic stay is extended to stay the continued prosecution of the *In re Collins & Aikman Corp. Securities Litigation* and the *MacKay Shields* litigation described above and the commencement of any similar securities-related claims against the non-Debtor directors and officers of the Debtors during the pendency of the Chapter 11 Cases. Alternatively, to the extent prosecution of the court actions is not automatically stayed by operation of section 362 of the Bankruptcy Code, the Debtors requested the entry of a supplemental injunction, pursuant to section 105 of the Bankruptcy Code, prohibiting both the continued prosecution of the court actions and the commencement of any similar securities-related

claims against the non-debtor directors and officers during the pendency of the Chapter 11 Cases. In May 2006, the Bankruptcy Court denied the Debtors' motion without prejudice to seek a stay of the securities-related actions once discovery in those cases begins.

*Patterson Litigation.* On March 23, 2004, plaintiffs filed a second amended complaint in the case of *Wanda Patterson et al. v. Heartland Industrial Partners, LLP et. al.*, United States District Court for the Northern District of Ohio, Eastern Division (the "District Court"), Case No. 5:03-CV-1596, against several defendants, including Collins & Aikman Corporation, Collins & Aikman Products Co. and Collins & Aikman Accessory Mats, Inc., each of which is a Debtor. In this action, the nominal plaintiffs are employees at the Debtors' Holmsville, Ohio facility. The second amended complaint alleges that neutrality agreements entered into by certain of the Debtors and the United Steel, Paper, and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW"), a labor organization, violate section 320 of the Labor-Management Relations Act, 29 U.S.C. § 186. In particular, plaintiffs make the novel claim that the neutrality agreements provide a "thing of value" to the USW in violation of the anti-bribery provisions of 29 U.S.C. § 186 because such agreements allegedly amount to valuable organizing assistance to the USW. Upon the commencement of the Chapter 11 Cases, this action was stayed in its entirety. At the time, the parties' summary judgment motions were almost fully briefed.

On or around September 13, 2005, plaintiffs filed a motion in the Bankruptcy Court seeking relief from the automatic stay so that the parties could complete summary judgment briefing and proceed with prosecution of their action. The Debtors filed an objection on September 28, 2005, and defendant USW filed a Joinder of Motion for Relief from Automatic Stay on October 3, 2005. On October 13, 2005, the parties entered into a stipulation whereby the automatic stay was modified for the limited purpose of allowing the filing and briefing of the dispositive summary judgment motions in the District Court to be completed, allowing the District Court to rule on such motions, permitting the filing of any subsequent appeals on any dispositive summary judgment ruling made by the District Court, if necessary, and allowing the District Court to rule on a disputed protective order pending before it. The automatic stay remains in place as to any other proceedings in this action and specifically prevents the reopening of discovery or any advancement to trial in this action.

*In re Collins & Aikman Corporation Securities Litigation.* On March 24, 2003, plaintiff Stanley Sved filed a class action complaint in federal court in the Eastern District of Michigan, captioned *Stanley Sved v. Collins & Aikman Corp., et al.*, Case No. 03-71173, against Collins & Aikman Corporation, Heartland Industrial Partners, L.P. and various former and current officers and directors of Collins & Aikman Corporation and Heartland Industrial Partners, L.P., including Thomas E. Evans, Jerry Mosingo, Marshall A. Cohen, Cynthia Hess, Timothy D. Leuliette, W. Gerald McConnell, J. Michael Stepp, David A. Stockman, Daniel P. Tredwell and Samuel Valenti, III. The complaint was filed on behalf of Mr. Sved and all other purchasers of Collins & Aikman securities between August 7, 2001 and August 2, 2002, and alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. On August 4, 2003, Judge Rosen granted a motion to consolidate the *Sved* case with several other securities class actions (Case Nos. 03-71304, 03-71870, 03-71913 and 03-71914) and a Consolidated and First Amended Complaint was filed thereafter on November 14, 2003. A Motion to Dismiss the Consolidated Complaint was filed by all defendants on January 30, 2004. That motion is currently pending, and the Court has not held a hearing on the motion nor otherwise given any indication as to when it may rule on the pending motion. Under the Private Securities Litigation Reform Act ("PSLRA"), discovery remains stayed while that motion is pending.

*Lawson Litigation.* On various dates before the Petition Date, plaintiffs filed a number of civil and/or class actions before the Court of Common Pleas in the State of South Carolina captioned as *T.J. Lawson and Tammy Lawson, James M. Reid and Renee F. Reid, Bennie Skates and Cathy Skates, Robert A. Price, and David Swofford and Karen Swofford, Individually and on Behalf of a Class of Person Similarly Situated v. Healthtex, Inc., f/k/a Health-Tex, Inc., f/k/a HT Contracting Corporation; Collins & Aikman Corporation, f/k/a C&A Fashion Knits, Inc.*, and *Collins & Aikman Products Co.; Spartanburg County Industries, Inc.; Chesebrough-Ponds, Inc.; VF Corporation; VF Playwear Inc.; Harold Waddell; Ed Justice;* and *Ronnie Coggins*, Case No. 2003-CP-42-4231 and *T.J. Lawson, Tammy Lawson; individually,* and *Tammy Lawson as Guardian ad Litem for Brandon Lawson, Amber Lawson* and *Joshua Lawson vs. Healthtex, Inc., f/k/a Health-Tex, Inc., f/k/a HT Contracting Corporation; Collins & Aikman Corporation, f/k/a C&A Fashion Knits, Inc.,* and *Collins & Aikman Products Company; VF Corporation; VF Playwear Inc.; Ed Justice* and *Ronnie Coggins*, Case No. 2004-CP-42-3810. The plaintiffs' actions allege that the Debtors directly or indirectly owned and operated the Healthtex plant site in Cowpens, South Carolina between 1970 and 1981, and that during the Debtors' operations, numerous and extensive amounts of hazardous substances, pollutants and contaminants used and handled by

35

the Debtors were released into the environment. The plaintiffs further allege that the resulting contamination of the groundwater and surrounding areas was due to the Debtors' negligence, recklessness, gross negligence and wanton and willful behavior. The plaintiffs seek monetary damages for related property damages.

Prior to the Petition Date, significant fact discovery had taken place. However, various discovery and pre-trial proceedings had yet to be conducted including, *inter alia*, the completion of class certification briefing and hearing, dispositive motions, additional depositions of former and current Debtors' employees, expert discovery and trial. Upon the Debtors' chapter 11 filings, the plaintiffs' actions were stayed in their entirety. On or around August 23, 2005, plaintiffs filed a motion seeking relief from the automatic stay. On September 9, 2005, the Debtors filed an objection. Argument was heard on plaintiffs' motion before the Bankruptcy Court on October 24, 2005. The Court denied plaintiffs' motion.

2.     Internal Investigations

On March 17, 2005, the Debtors publicly announced that during the course of finalizing their financial statements for their fiscal year ended December 31, 2004, they had identified certain accounting for supplier rebates that resulted in revenue recognition that was premature or inappropriate or that was inconsistent with relevant accounting standards and their policies and practices. At that time, the Debtors also announced that they had initiated an internal review of these matters and that they expected certain restatements of their financial results would be required. The Debtors further stated that they would not be able to file their Annual Report on Form 10-K containing fiscal 2004 audited financial statements with the SEC on time. The Debtors stated that they required additional time to complete the review of the accounting issues described above, their financial reporting process and their controls over financial reporting.

In connection with the Company's discovery of these accounting issues, the Audit Committee of C&A commenced an independent investigation into these matters and retained independent counsel from the law firm of Davis Polk & Wardwell ("DPW") to assist them in the investigation. During the course of the Audit Committee's investigation, it was determined that the scope of the investigation would also include the Debtors' forecasts for the first quarter of 2005, as well as other matters concerning accounts receivable. The Audit Committee's independent counsel, DPW, has been assisted by forensic accountants from Ernst & Young in seeking to determine the facts surrounding, the extent, and the cause of any accounting or other financial irregularities within the scope of the Audit Committee's investigation.

In connection with the Audit Committee's investigation and inquiries from the SEC and Department of Justice ("DOJ") as described below, extensive work has been performed by the Audit Committee's independent counsel and forensic accountants relating to the retrieval, archival, review and analysis of information, documents, and data from the Debtors, in both electronic and paper format. To date, over two million pages of documents have been reviewed. In addition, over 70 witnesses have been interviewed by independent counsel for the Audit Committee at various locations around the United States.

3.     Government Investigations

On June 20, 2005, the Debtors received a voluntary document request from the SEC relating to certain aspects of the Debtors' accounting practices and financial reporting. At that time, the SEC requested certain documents, files and records pertaining to these matters. A formal subpoena subsequently was issued by the SEC in September 2005 requiring additional documents relating to the Debtors' accounting practices, financial statements and related financial information, and customer and vendor relationships. From the outset of the SEC's investigation, the Audit Committee has kept the SEC informed as to the scope and progress of the Audit Committee's investigation.

On or about August 5, 2005, the Debtors received a grand jury subpoena from the United States Attorney's Office for the Southern District of New York, seeking documents and information relating to the Debtors' financial statements and reporting, accounts receivable, and supplier and customer rebates. The Debtors have been and continues to fully cooperate with the SEC and DOJ in these investigations, which are ongoing.

The Bankruptcy Court has entered orders approving stipulations by and between the Debtors and the SEC extending the Bar Date for the SEC to file a proof of claim in the Chapter 11 Cases, with the most recent order dated

December 13, 2006, approving an extension until January 15, 2007. The SEC has not filed a proof of claim and no further extension has been negotiated.

4.  Patent Litigation

*Wilhelm Karmann Litigation.* On December 2, 2005, Wilhelm Karmann GMBH ("Karmann") filed a motion in the Bankruptcy Court seeking relief from the automatic stay to pursue a patent infringement action in the United States District Court for the Eastern District of Michigan against one of the Debtors, Dura Convertible Systems, Inc. ("Dura") for alleged pre- and postpetition infringement. In its motion, Karmann alleged that Dura's convertible top system for the 2005 Ford Mustang, a program that constitutes one of Dura's largest programs for 2005, infringes Karmann's '474 patent, which relates to a folding top for a passenger car with a convertible folding roof. The Bankruptcy Court denied Karmann's motion in its entirety. On January 13, 2006, Karmann filed a complaint for patent infringement in the Bankruptcy Court seeking an injunction and damages against Dura for its alleged pre- and postpetition infringement of Karmann's '474 patent. Dura answered and counterclaimed on March 10, 2006.

The parties completed fact and expert discovery. The parties filed cross motions for summary judgment on the issues of invalidity and infringement, initiated by Dura's filing of its motion for summary judgment of the asserted claims of the '474 patent on June 6, 2006. The Bankruptcy Court conducted oral arguments on the parties' summary judgment motions on June 13, 2006, and issued an oral preliminary claim construction ruling on July 18, 2006, but has yet to issue a final ruling on the parties' summary judgment motions. The Bankruptcy Court requested additional briefing on the issue of invalidity by August 1, 2006. The Bankruptcy Court previously had set a trial date of July 18, 2006, but vacated that date to allow time to evaluate and rule on the parties' summary judgment motions. On October 10, 2006, the District Court denied plaintiff's request to withdraw the reference from the Bankruptcy Court. The parties are currently in settlement discussions.

*ASC Litigation.* On March 30, 2006, ASC, Inc. ("ASC") filed a complaint in the Bankruptcy Court against Dura. ASC alleges infringement of four patents and charges Dura's convertible tops for the Dodge Viper and 2005 Ford Mustang of infringement. On June 21, 2006, Dura answered and counterclaimed for non-infringement and invalidity of the asserted patents. The Bankruptcy Court held an initial scheduling conference on August 14, 2006 and, on August 15, 2006, entered an order setting a trial date of January 9, 2007. Dura and ASC have reached a settlement of the litigation that will allow the Debtors to continue to manufacture convertible tops for the Dodge Viper and 2005 Ford Mustang under the patents licensed from ASC. The Debtors filed a motion to approve the settlement with the Court on December 13, 2006 [Docket No. 3738], which was approved by order dated January 5, 2007 [Docket No. 3847].

5.  Financing Arrangements with General Electric Capital Corporation

Beginning in 2001, Collins & Aikman Products Co. ("C&A Products") entered into three so-called 'master lease agreements' (dated August 7, 2001, the "GECC Phase I Agreement," dated December 20, 2001, the "GECC Phase II Agreement," dated June 25, 2004, the "GECC Phase III Agreement," and collectively, the "GECC Financing Arrangements") with GECC.

C&A Products entered into the GECC Phase I Agreement and GECC Phase II Agreement to raise capital to fund a series of significant corporate acquisitions. The parties structured the GECC Financing Arrangements as 'sale-leaseback' transactions. Under these sale-leaseback transactions, C&A Products 'sold' to GECC equipment essential to their operation. GECC subsequently 'leased' such equipment back to the Debtors. At no point did the equipment ever leave C&A Products' possession. Moreover, despite the lease obligations having a present valuation of more than $47 million, the fair market value of the equipment sold was approximately $12.5 million.

The GECC Phase III Agreement was similar in structure to the GECC Phase I Agreement and GECC Phase II Agreement, but it was necessitated by different circumstances. In 2004, C&A Products was experiencing serious financial problems. As a result, C&A Products used the Phase III Agreement to raise capital to sustain its businesses. Again, C&A Products 'sold' equipment vital to its operations to GECC and subsequently 'leased' the equipment back from GECC. Just as with the GECC Phase I Agreement and GECC Phase II Agreement, C&A Products 'leased' the equipment and obligated itself to lease payments with a present value that was far more than the fair market value of the equipment; agreeing to lease payments with a present value of approximately $20 million for equipment fairly valued at just over $6 million.

37

*GECC's Motion to Compel Payments.* The Debtors believed that after applying the facts of the GECC Financing Arrangements to the relevant law, the GECC Financing Arrangements did not constitute 'leases' under section 365 of the Bankruptcy Code and therefore the Debtors did not make payments under the GECC Financial Arrangements after filing for bankruptcy.

On April 18, 2006, GECC filed a motion in the Bankruptcy Court to compel the Debtors to pay rent and taxes under the terms of the GECC Financing Arrangements. In its motion, GECC alleged that under section 365, the Debtors were obligated to make payments pursuant to the terms of the GECC Financing Arrangements until such time as the Debtors rejected such 'leases' pursuant to section 365.

On May 5, 2006, the Debtors opposed GECC's motion arguing that the GECC Financing Arrangements, despite their designation as 'master lease agreements,' are, in fact, sale transactions not subject to the provisions of section 365 of the Bankruptcy Code. To address GECC's motion, the Bankruptcy Court scheduled a limited evidentiary hearing to consider the likelihood that the Bankruptcy Court, after a full determination of the issue in the Recharacterization Litigation (as defined herein), would find that the GECC Financing Arrangements were lease transactions subject to section 365 of the Bankruptcy Code. The Bankruptcy Court reasoned that (a) if it were more likely than not that the arrangements were financings, the Debtors would not be compelled to make payments while the Recharacterization Litigation was adjudicated, and (b) if it believed the GECC Financing Arrangements were more likely than not to be true leases, then GECC was entitled to payments in a manner consistent with the obligations under the GECC Financing Arrangements. On June 1, 2006, the Bankruptcy Court heard arguments and reviewed factual evidence related to GECC and the Debtors' respective positions. After a preliminary review of the facts at issue in the dispute, the Bankruptcy Court held "that it is more likely than not that the GECC Financing Arrangements will be recharacterized as secured financing agreements." On June 9, 2006, the Bankruptcy Court entered the order denying GECC's motion to compel payments under the GECC Financing Arrangements in its entirety.

On the same day, GECC appealed the decision. The Debtors opposed GECC's right to appeal arguing that the Bankruptcy Court's order is not final and, further, that the appeal could not satisfy the necessary prerequisites to justify an interlocutory appeal. On August 30, 2006, the District Court found that the Bankruptcy Court's order was not final and denied leave to appeal the interlocutory order and dismissed GECC's appeal.

*Recharacterization Litigation.* On April 19, 2006, the Debtors filed a complaint seeking to recharacterize the GECC Financing Arrangements as sale and financing transactions. If the Debtors are successful, section 365 of the Bankruptcy Code will be inapplicable to the Debtors' obligations under the agreements and the transactions with GECC will be treated as financing arrangements between GECC and the Debtors. If this were to occur, GECC may be entitled to a claim against the Debtors for obligations owing by the Debtors to GECC, a portion of which may be secured by the value of the equipment that is the subject of the GECC Financing Arrangements.

On May 19, 2006, GECC filed its answer to the Debtors' complaint. In subsequent part, GECC restated its belief that the GECC Financing Arrangements constitute 'leases' to be paid under section 365 of the Bankruptcy Code. After conducting some discovery, GECC and the Debtors agreed to a stay of the proceedings while they pursue a negotiated resolution. The parties have now resumed conducting discovery while settlement discussions continue. The Debtors expect that certain of the subject equipment will be transferred to purchasers as part of the Sale Process.

6.     Textron Equipment Agreement

Textron Financial Corporation ("Textron") and certain of the Debtors are parties to a document titled "Equipment Lease" dated as of December 18, 2001 (as amended and modified from time to time, the "Textron Equipment Agreement"). Textron alleges that the Textron Equipment Agreement is secured by the personal property that is the subject of the Textron Equipment Agreement and certain real property owned by the Debtors.

The Debtors and Textron disagree about the legal determination of whether the Textron Equipment Agreement is, in fact, an unexpired personal property lease or, in fact, an agreement evidencing a sale or a financing arrangement. On November 21, 2005, Textron filed a motion seeking to require the Debtors to cure all postpetition defaults and timely perform all postpetition obligations under the Textron Equipment Agreement that Textron contends are due and owing under the Textron Equipment Agreement [Docket No. 1794] (the "Textron Motion"). The Debtors indicated that they oppose the relief requested in the Textron Motion. Textron and the Debtors have entered into a stipulation [Docket No. 2067], which was approved by the Court on January 23, 2006 [Docket No. 2094], and several interim

agreements providing for monthly adequate protection payments to Textron, while all parties reserve their respective rights, claims and defenses with respect to the Textron Motion and the Textron Equipment Agreement.

As of the date of the filing of this Disclosure Statement, the Debtors and Textron are attempting to negotiate mutually acceptable treatment of Textron's claims and rights with respect to the Textron Equipment Agreement. The Debtors anticipate that a consensual agreement will be reached with Textron with respect to the Textron Equipment Agreement and all parties continue to reserve their respective rights, claims and defenses.

7.      The Debtors' Operations in Hermosillo, Mexico

Collins & Aikman Automotive Hermosillo S.A. de C.V. ("C&A Hermosillo") is a non-Debtor indirect subsidiary of the Debtors. C&A Hermosillo operates a plant in Hermosillo, Mexico that manufactures interior parts for automobiles.

On November 8, 2004, one of GECC's indirect subsidiaries, GE Capital de Mexico, S. de R. L. de C.V. ("GE Mexico"), entered into a series of agreements, including a construction agency agreement ("Construction Agency Agreement"), with C&A Hermosillo for GE Mexico to provide the initial financing for the C&A Hermosillo plant and equipment.

GE Mexico and GECC (collectively, the "GE Entities") contend that the filing of the Chapter 11 Cases was an event of default under the Construction Agency Agreement. Shortly after the Petition Date, the Debtors and the GE Entities entered into a series of standstill agreements that precluded the GE Entities from taking any action with respect to C&A Hermosillo. Those standstill agreements expired on October 15, 2005. Seven months later, on May 19, 2006, GE Mexico sent C&A Hermosillo a letter threatening "to commence any legal or other action" and "to exercise any or all rights and remedies provided for" by the Construction Agency Agreement and related agreements with respect to C&A Hermosillo. On May 31, 2006, the Debtors commenced an adversary proceeding in the Bankruptcy Court and filed a motion seeking to enjoin the GE Entities from taking any action with respect to C&A Hermosillo.

A hearing was held on June 19, 2006. At that hearing, the Bankruptcy Court raised several evidentiary questions to be addressed at a hearing scheduled on June 27, 2006. After discussions with the GE Entities and before the June 27, 2006 hearing, the Debtors voluntarily withdrew their adversary proceeding and the motion without prejudice as the Debtors intended to resolve the issues related to the adversary proceeding in conjunction with the sale of the Hermosillo operations as contemplated in the Sale Process.

8.      Litigation Regarding Certain Property Taxes for Leased Real Property

On or about February 9, 2006, Fabric (DE) GP ("Fabric-Lessor") filed a motion to compel payment of unpaid taxes seeking the allowance and payment of an administrative expense claim on account of the Debtors' alleged failure to pay certain taxes pursuant to a lease agreement dated June 27, 2002. Fabric-Lessor argued that the taxes must be paid by the Debtors as postpetition expenses, pursuant to section 365(d)(3) of the Bankruptcy Code because they were billed to the Debtors after the Petition Date. The Debtors objected to the motion, arguing that the taxes at issue were assessed by the relevant taxing authorities, either partially or entirely, for a prepetition period and therefore not entitled to administrative expense claim status. Under such circumstances, the Debtors argued that Fabric-Lessor should only be entitled to payment of the portion of the taxes that accrued postpetition.

On April 6, 2006, the Bankruptcy Court granted Fabric-Lessor's motion and ordered that the Debtors pay the taxes "billed to the Debtor[s] after the bankruptcy was file[d]," pursuant to section 365(d)(3), even though such taxes were assessed, either entirely or partially, for a prepetition period. The Debtors timely filed an appeal to the United States District Court for the Eastern District of Michigan on April 28, 2006, seeking reversal of the Bankruptcy Court's order. The appeal was fully briefed as of June 21, 2006, and on June 23, 2006, the Creditors Committee filed a motion for leave to file a brief amicus curiae in support of the Debtors' position. On September 22, 2006, the Debtors notified the District Court that the parties were currently engaged in settlement negotiations that would resolve the appeal and requested that this Court withhold issuing any ruling or judgment on the until such negotiations have concluded. The appeal is pending.

39

9.      Litigation Regarding Alleged Asbestos Related Liabilities

The Debtors are parties to lawsuits alleging personal injury from exposure to asbestos containing materials used in boilers manufactured by the Debtors as part of their former boiler operations, which were sold in 1966.  As of the Petition Date, the Debtors were parties to approximately 1,400 pending cases alleging liability in connection with the boiler business.  Historically, the Debtors have paid $3.9 million in total defense costs and $2.1 million in total indemnity claims.  The average historical settlement amount is de minimis.  These defense and indemnity costs have been substantially covered by the Debtors' primary insurance carriers under a claims handling agreement that expires in August 2006; however, the claims handling agreement is subject to an evergreen clause that extends the term of the claims handling agreement indefinitely absent notice of termination.  No party to the claims handling agreement has served any notice of termination, so the claims handling agreement remains in effect as of the date of this Disclosure Statement.  The Debtors have primary, excess and umbrella insurance coverage for various periods available for asbestos-related boiler and other claims.  Under the current claims handling agreement, the Debtors' primary carriers have agreed to cover approximately 82% of certain defense and settlement costs up to a limit of approximately $73 million for all claims made, subject to reservations of rights.  The excess insurance coverage, which varies in availability from year to year, is approximately $619 million in aggregate for all claims made.

The Debtors have had preliminary discussions with counsel for certain of the primary insurance carriers who are parties to the claims handling agreement concerning whether the Debtors will assume the claims handling agreement.  While the parties need to continue these discussions, the Debtors are optimistic that they and the primary carriers will be able to agree to a resolution which will include, among other things, modifying and assuming the claims handling agreement.

If the Debtors and primary carriers cannot reach a resolution, the Debtors may reject the claims handling agreement.  In addition, absent such a resolution, there is a risk that the primary carriers will, among other things (i) object to the plan on the ground that their contractual rights under their insurance policies are impaired and/or (ii) contend that coverage under their policies for Tort Claims is limited or unavailable.

# ARTICLE IV.
## THE SALE PROCESS

The Debtors' management, in consultation with key constituencies in the Chapter 11 Cases, including the Prepetition Lenders, the OEMs and the Creditors Committee, have determined that the stand-alone reorganization of the Debtors is not feasible.  To maximize the value that can be realized from the Debtors' businesses and assets, the Debtors have embarked on a sale process (the "Sale Process") that contemplates, among other things:  (i) a going concern sale of the Carpet & Acoustics business in the Debtors' Soft Trim segment; (ii) going concern sales of certain plants or divisions in the Debtors' Plastics business segment; (iii) an orderly wind-down of the Debtors' non-salable business operations in cooperation with the OEMs; (iv) sales of all remaining assets; and (v) preservation of the Debtors' working capital assets and mitigation of administrative claims and other wind-down costs to the extent possible.  The Debtors believe that the Sale Process will be substantially complete within eight months.  Due to the significant number of variables affecting the Sale Process, the Debtors cannot predict the amount, if any, of net recoveries from the disposition of those assets.

A.      Customer Agreement with the OEMs

In furtherance of each of the goals of the Sale Process, the Debtors worked diligently with the Agents and the OEMs throughout November and early December to negotiate a comprehensive agreement (the "Customer Agreement") outlining their respective roles and responsibilities in the Sale Process and forming the basis of the Plan.  The Debtors filed a motion seeking Court approval of the Customer Agreement on December 12, 2006 [Docket No. 3720].  The Customer Agreement was approved on a final basis by the Bankruptcy Court on January 11, 2007 [Docket No. 3890].

A copy of the Customer Agreement is attached to the Plan as Exhibit G.[2]  The principal terms of the Customer Agreement are as follows:[3]

---

[2]      Certain exhibits to the Customer Agreement are not attached to the Plan due to the sensitive commercial information in such exhibits.  These exhibits were filed under seal pursuant to a protective order entered by the Bankruptcy Court on December 13, 2006 [Docket No. 3731].

- *Parties*: The parties to the Customer Agreement (the "Parties") include, among others: (i) the Debtors and other relevant non-Debtor subsidiaries and affiliates, but, for the avoidance of doubt, expressly excluding Collins & Aikman Automotive Hermosillo, S.A. de C.V.; (ii) certain of the Debtors' major customers (the "Customers"), including (a) General Motors Corporation, for itself and on behalf of GM de Mexico s. de R.L. de C.V. and GM of Canada Limited, (b) DaimlerChrysler Corporation, for itself, DaimlerChrysler Canada, Inc. and DaimlerChrysler Motor Company, LLC, (c) Ford Motor Company and (d) AutoAlliance International, Inc.; and (iii) the Agents.

- *Effective Date of the Customer Agreement*: The Customer Agreement is effective as of November 26, 2006.

- *Plan*: The Debtors shall file a plan and accompanying disclosure statement that conforms with the term sheet attached to the Customer Agreement (the "Plan Term Sheet") and is otherwise consistent with the provisions of the Customer Agreement. The Parties agree to support such a plan so long as the plan contains the claims treatment and releases set forth in the Plan Term Sheet. The Debtors believe that the Plan satisfies these requirements.

- *Plastics & Convertible Roof Systems Payments*: From the effective date of the Customer Agreement through certain agreed upon dates, certain Customers agree to pay certain costs incurred in the operation of certain plants in the Debtors' Plastics and Convertible Roof Systems segments in accordance with a funding protocol and budget.

- *Administration Expenses; Supplier's and Agents' Professional Fees and Expenses*: From the effective date of the Customer Agreement through certain agreed upon dates, certain Customers agree to fund administration expenses in accordance with a funding protocol and budget. From the effective date of the Customer Agreement through certain agreed upon dates, certain Customers agree to fund a portion of the Debtors' Estates professional fees and expenses and the professional fees and expenses and the professional fees and expenses of the Agents and their advisors pursuant to a funding protocol and budget. In addition, the Prepetition Lenders have consented to the use of cash collateral to fund certain administrative and priority claims to certain prescribed limits.

- *Retention*: Certain Customers agree to fund retention bonuses for certain employees and officers of the Debtors.

- *Limitation of Setoffs*: The Customers agree not to exercise any setoff or reductions against postpetition accounts payable, other than certain ordinary course setoffs subject to certain other restrictions.

- *Treatment of Customer Claims*: In consideration of, among other things, the releases in favor of the Customers, each of the Customers agrees that: (i) any claim arising from any rights to its repayment approved by the Bankruptcy Court for (a) the launch costs paid by the Customers during the Chapter 11 Cases (other than launch costs incurred in connection with the Debtors' Hermosillo, Mexico plant), (b) claims arising under the OEM Subordinated DIP Loan and (c) the OEM Administrative DIP Claims will be waived and discharged; (ii) any claim for cap-ex shall be treated as provided by the agreements relating to such cap-ex funding and the Court order(s) approving such agreements or as set forth in the Plan Term Sheet (other than in the case of Hermosillo, which shall be treated in accordance with a separate Hermosillo agreement); (iii) it will not assert a claim against the Debtors in the Chapter 11 Cases for special or consequential damages and such claims shall be waived and discharged; (iv) any other administrative expense claim against the Debtors for damages, including the November surcharge and, if applicable, the December/January surcharge, the amounts paid pursuant to the Customer Agreement and all other special or consequential damages arising out of or in any way relating to the Debtors' inability to perform, or breach of performance, under the Debtors' production and service contracts relating to the Plastics and Convertible Roof Systems plants will be waived and discharged;

---

[3]   The summary provided in this Disclosure Statement is for the convenience of the Bankruptcy Court and parties in interest only and is subject in every respect to the Customer Agreement. In the event of a conflict between the Customer Agreement and this summary, the Customer Agreement shall govern.

and (v) any other claim that would otherwise have to be paid in cash in full (absent agreement to different treatment by the holder thereof) pursuant to section 1129(a)(9)(A) of the Bankruptcy Code under a confirmed chapter 11 plan will be waived and discharged.

- *Sale Process*:  Until certain agreed upon target sale closing dates, the Customers agree to support the Sale Process with respect to certain plants and divisions listed on an exhibit to the Customer Agreement.

- *Inventory Purchase*:  On the fifth business day following entry of an order approving the Customer Agreement on a final basis, certain Customers shall purchase certain inventory from the Debtors.

- *Resourcing*:  Each of the Customers agrees not to resource its programs currently subject to an issued purchase order and in production at the Debtors' plants set forth on an exhibit to the Customer Agreement until certain agreed upon dates.

B.      Sale of Carpet & Acoustics

1.      Description of the Operations

The Debtors' Carpet & Acoustics segment is profitable and generates significant cash flow.  It benefits from broad product offerings and significant product development capabilities.  Carpet & Acoustics enjoys a reputation for high-quality products and is a low-cost provider in the industry.  The manufacturing operation actively practices LEAN Manufacturing modeled after the Toyota Production Systems, and there is significant vertical integration throughout the value chain.  These and other factors have contributed to the Carpet & Acoustics segment holding a leading market share in the carpet and acoustics supply industry.

Specifically, the Carpet & Acoustics segment produces molded non-woven and tufted carpet, alternative molded flooring, accessory mats and acoustics systems consisting of absorbing materials, damping materials, engine compartment noise vibration and harshness systems and interior insulators.  While acoustical products are often combined with molded floor carpet to provide complete interior floor systems, there are four separate carpet and acoustics product categories:

- *Molded Floor Systems.*  Molded floor systems consist of thermoformed compression molded carpets.  These carpets are provided with a barrier or an absorptive noise, vibration and harshness (NVH) system.  The barrier system includes polyethylene, barrier back and a fiber underlay system or a foam-in-place system.  Additional products include Tuflor™, a durable and washable proprietary thermoplastic flooring product.  The products in molded floor systems are highly-engineered and their manufacture requires a high degree of precision.  The Debtors are the number one producer of molded floor and acoustic systems in the North American market.

- *Luggage Compartment Trim.*  The other major carpeted area of the vehicle is the luggage compartment, which includes one-piece molded trunk systems and assemblies, wheelhouse covers and center pan mats, seatbacks, tireboard covers and other trunk trim products.  The Debtors are a leading supplier of luggage compartment trim in the North American market.

- *Accessory Floormats.*  The Debtors manufacture automotive accessory floormats and cargo mats by adhering rubber backing to tufted carpet and adding aesthetic and practical features such as the appearance of hand-sewn edges and patented moisture trapping construction.  Largely due to this product differentiation, the Debtors have become the largest fully-integrated automotive floormat producer in North America.

- *Acoustical Products.*  Acoustical products include:  interior dash insulators that insulate the passenger compartment from engine compartment noise and heat; damping materials that control noise in the floor, overhead systems and sides of the vehicle; and engine compartment NVH systems.  Consumer demand for increased performance and quality improvements has driven the need for enhanced acoustical properties and better sound-field engineering across all vehicle segments.

2.      Sale Process for Carpet & Acoustics

Based on the extensive M&A Process conducted during the Chapter 11 Cases, the Debtors expect that the sale of the Carpet & Acoustics assets will yield a significant recovery for the Estates.  The Debtors intend to provide the maximum recovery to the Debtors' Estates from the Carpet & Acoustics assets through an expedited sale process to prevent any loss of value from the uncertainties and pressures surrounding the Sale Process.  Coincident with this, the Debtors will segregate the positive cash flow generated by Carpet & Acoustics ' operations while the sale is pending and segregate the proceeds of the sale of the operations for the benefit of creditors in the Chapter 11 Cases.  In conjunction with the Customer Agreement, the Debtors obtained long term non-resourcing commitments from the OEMs for the Carpet & Acoustics business and obtained OEM support for the expedited sale process, which will enhance the value achieved in the sale.

In mid-October 2006, the Debtors and their advisors initiated the sale process for the Carpet & Acoustics business as a stand-alone entity.  Given the brief window of opportunity to pursue a sale of the Debtor's businesses and the results of the previous M&A Process, the Debtors and their advisors approached 13 potentially interested parties to submit an indication of interest by November 6, 2006.  Potentially interested parties were provided a 144 page management presentation, access to management and plant tours.  The Debtors received five indications of interest on November 6, 2006 and negotiated with each party to improve the terms of their interest.  The Debtors and their advisors received three revised indications of interest that were then shared with the Agents and the Steering Committee.  The Steering Committee together with the Debtors selected a final bidder subject to that bidder further revising their indication of interest to incorporate certain additional concessions.  In early December, the Debtors and their advisors completed negotiating the revised indication of interest and, upon approval from the Steering Committee, the Debtors accepted the indication of interest.  As described in a press release issued on December 13, 2006, the indication of interest is subject to due diligence and the negotiation of definitive documentation among other items.  The final executed indication of interest was heavily negotiated by the Debtors and their advisors and represented a significant improvement in terms versus the original indication of interest submitted on November 6, 2006.

C.      Sale of Plastics

1.      Segmentation of Plastics' Business

As described in Article III.G.3, the Debtors Plastics segment continues to suffer due to declining volumes, an inability to achieve forecast cost saving initiatives, high up-front capital costs and an inability to achieve significant targeted take-away business.  Because no potentially interested party had expressed interest in the Plastics segment as a whole for a value in excess of liquidation value, the Debtors, in consultation with the advisors to the Prepetition Lenders and the OEMs, divided the Plastics business into five operating segments in order to maximize value through the sales process.   The five operating segments are as follows: (i) Interiors, (ii) Exteriors, (iii) Precision Small Parts, (iv) Hermosillo and (v) Other.  The "Other" category includes individual plants that may be sold or closed through an orderly wind-down process.

2.      Sale Process for Plastics

In November and December 2006, the Debtors and their advisors generated information packages on each of the five operating segments and contacted over 70 potentially interested parties, many of whom had been previously contacted through the M&A Process, to solicit interest.  To coordinate the sale of the numerous Plastics plants on an expedited timetable, the Debtors, with the support of the Steering Committee, have retained additional investment bankers with specific and considerable knowledge and expertise in the automotive parts supply industry.

D.      Labor, Pension and Retiree Benefits

1.      Nonqualified Plan Benefits for Active and Retired Employees

Prior to the Petition Date, the Debtors maintained various nonqualified deferred compensation plans.  The Debtors (or their predecessors) established certain "rabbi" trusts from which many of these benefits were paid.  Pursuant to the terms of the nonqualified plans, associated rabbi trusts and applicable law, any amounts in trust remained subject to the general creditors of the Debtors.  The Debtors stopped making payments under these plans effective soon after the

43

Petition Date. The Debtors estimate claims regarding these benefits in the aggregate amount of approximately $34 million. All such nonqualified plans are expected to be terminated as part of the Sale Process.

2.      The Debtors' Pension Plan

The Debtors maintain one consolidated tax-qualified United States defined benefit pension plan entitled the Collins & Aikman Pension Plan ("Pension Plan"). The Debtors amended the Pension Plan to cease future benefit accruals for non-union participants effective June 30, 2006. The cessation of future benefit accruals will result in an approximate $7 million reduction in benefit accruals. In conjunction with the cessation of benefit accruals under their United States qualified defined benefit plan, the Debtors authorized an enhanced matching contribution under the Debtors' defined contribution plan of up to 4% effective as of July 1, 2006 for non-union employees.

The Debtors ceased making minimum funding contributions to the Pension Plan in July 2006 and anticipate that no further contributions will be made to the Pension Plan. The Debtors have failed to meet the minimum funding standard for the 2005 plan year and an accumulated funding deficiency has been incurred. Outside of bankruptcy, under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Internal Revenue Code, a lien arises in favor of the PBGC when unpaid minimum funding contributions exceed $1 million. In bankruptcy, however, the automatic stay prevents the PBGC from perfecting and enforcing its alleged liens against the Debtors. Notwithstanding the automatic stay, it is possible that the PBGC could attempt to perfect such liens against non-Debtor entities. In addition, because an accumulated funding deficiency has occurred, the Debtors and each controlled group member will be jointly and severally liable for an excise tax to the Internal Revenue Service in the amount of 10% of the outstanding missed contribution for the 2005 plan year. If the accumulated funding deficiency is not corrected within the required period, the Debtors and each controlled group member will be jointly and severally liable for an additional 100% excise tax. The excise taxes will be general, unsecured claims against the Debtors; however, the Internal Revenue Service could seek to hold non-Debtor entities liable for such excise taxes as well.

As part of the Sale Process, the Debtors believe the Pension Plan will be terminated. The Pension Plan may only be terminated in accordance with Title IV of ERISA in an involuntary termination by the PBGC or a voluntary termination by the Debtors that is approved by the PBGC. The PBGC is currently investigating whether the Pension Plan meets the criteria for an involuntary termination.

3.      Other Post-Employment Benefits for Retired Employees

Because of the need to reduce costs, the Debtors addressed their obligations to provide medical and life insurance benefits to retirees. Pursuant to the terms of such benefits, the Debtors enacted several changes to their non-vested other post-employment benefits ("OPEB") for non-union retired employees (and their dependents), effective February 28, 2006. The Debtors terminated post-retirement life insurance coverage for all non-union retirees and post-retirement medical and dental and Medicare supplemental coverage for non-union retirees (and their dependents) who have attained Medicare eligibility. Certain retirees (and their dependents) who are under age-65 may continue to purchase medical, dental and vision insurance, but they must pay 100% of the cost of such coverage.

Under section 1114 of the Bankruptcy Code, a debtor in possession generally must timely pay and may not modify vested retiree benefits unless the Bankruptcy Court orders such modifications or the debtor and the retirees' authorized representative agree to the modification of such benefits. Section 1114 of the Bankruptcy Code does not apply, however, to situations in which a debtor chooses to terminate non-vested retiree benefits pursuant to its contractual rights. In such cases, a debtor may unilaterally terminate retiree benefits. The Debtors have unilaterally terminated non-union, non-vested retiree welfare benefits pursuant to the terms of such benefits.

4.      The Debtors Intend to Negotiate with Union Retirees Where OPEB Liabilities Exist

Certain former employees of the Debtors and former employees of entities to which the Debtors are successors were covered by collective bargaining agreements that provided retiree medical benefits. As of the date of the filing of this Disclosure Statement, the Debtors have not sought to modify such benefits. As part of the Sale Process, however, the Debtors intend to yet negotiate with union representatives for the retirees regarding modifications of such benefits as the Debtors will be liquidating and it is very unlikely that a purchaser would assume such obligations. To the extent such benefits are not vested, the Debtors intend to modify the benefits pursuant to their terms. To the extent the retiree benefits are vested, the Debtors may pursue modifications to such benefits under section 1114 of the Bankruptcy Code.

44

If the Debtors seek to modify vested retiree benefits, the Debtors will be committed to working constructively with the representative of the retirees to reach a consensual resolution.

# ARTICLE V.
## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, THE TRUSTS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

The purpose of the Plan is to fairly and expeditiously liquidate and distribute the proceeds realized from the Sale Process consistent with the Bankruptcy Code. The Debtors believe that the the Plan is in the best interests of Holders of Claims and parties in interest. If the Plan is not confirmed, the Debtors believe that they will be forced either to file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. Under these alternative scenarios, the Debtors believe that the Holders of Claims would realize a less favorable distribution of value, or, in certain cases, none at all.

A.     Overview of Chapter 11

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any holder of claims of or holder of equity interests in the debtor, whether or not such holder of claims or equity interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or equity interests in certain classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, the Debtors need not solicit votes from the holders of claims or equity interests in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any Claims in Classes that are receiving a distribution of property under the Plan but which are not "unimpaired" will be solicited to vote to accept or reject the Plan.

45

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the debtor's holders of claims and equity interests. In compliance therewith, the Plan divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Equity Interests into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

MacKay Shields has objected to the treatment of creditors in Classes 5, 6 and 7, who do not vote to accept the Plan (such creditors are not entitled to receive any distribution under the Plan, while those members of these Classes who vote in favor of the Plan will receive a distribution). MacKay Shields maintains that such treatment violates section 1123(a)(4) of the Bankruptcy Code, which requires that the claims of members of a particular class shall be treated the same. The Debtors dispute MacKay Shields' position. The parties reserve their rights with respect to this issue for the Confirmation Hearing.

B.      Classification and Treatment of Claims and Equity Interests

Except for unclassified Administrative Claims and Priority Tax Claims, the Plan divides all Claims against and Equity Interests in the Debtors into various Classes. Except for Class 3 Prepetition Facility Claims, a Claim or Equity Interest is classified in a particular Class only to the extent that such Claim or Equity Interest qualifies within the description of that Class and, is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of another Class.

All payments and other distributions stated in this Article to be made by the Debtors will, (a) if made on or before the Effective Date, be made by the Debtors and (b) if made after the Effective Date, be made by the Post-Consummation Trust or the Litigation Trust, as applicable.

1.      Administrative Claims

Administrative Claims include Claims for costs and expenses of administration of the Chapter 11 Cases allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the respective Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises), including Claims under the DIP Credit Agreement, incurred after the Petition Date; (b) compensation for legal, financial advisory, accounting and other services rendered after the Petition Date, and reimbursement of expenses incurred in connection therewith, awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-30.

Except as provided in the following subsections regarding statutory fees, ordinary course liabilities, DIP Facility Claims and Administrative Claims of Indenture Trustees, and subject to the bar date provisions summarized below, unless otherwise agreed by the Holder of an Administrative Claim and the applicable Debtor or the Post-Consummation Trust, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim either (i) on the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, no more than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the Post-Consummation Trust and the Holder of the Administrative Claim.

### a. Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash equal to the amount of such Administrative Claims. After the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Post-Consummation Trust in accordance therewith until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

### b. Ordinary Course Liabilities

Subject to the bar dates for administrative claims discussed below, Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business will be paid by the Debtors or the Post-Consummation Trust pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims or, if and to the extent that such ordinary course obligations are assumed by the purchaser (or purchasers) in connection with the Soft-Trim Sales Transaction or any Remaining Sales Transactions, by such purchaser (or purchasers), in each case, without any further action by the Holders of such Administrative Claims.

### c. DIP Facility Claims

DIP Facility Claims include all DIP Obligations, as defined in the Final DIP Order [Docket No. 809], outstanding as of the Effective Date under that certain debtor-in-possession senior, secured credit facility entered into pursuant to (a) that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement (the "DIP Credit Agreement"), dated as of July 28, 2005, as it may be subsequently amended and modified, by and among Collins & Aikman Products Co., as borrower, substantially all of the domestic direct and indirect subsidiaries of Collins & Aikman Corporation, as guarantors, the DIP Agent, and certain other lenders named therein; (b) all amendments and restatements thereto and extensions thereof; and (c) all security agreements, other agreements and instruments related to the documents identified in (a) and (b) (the "DIP Credit Agreement"). Under the DIP Credit Agreement, the Debtors also agreed to guaranty obligations of their European affiliates owed under an overdraft facility issued by JPMorgan.

All DIP Facility Claims will be Allowed in full. On the Effective Date, the DIP Agent, on its own behalf and on behalf of the DIP Lenders, will receive cash in an amount equal to 100% of the unpaid DIP Facility Claims (including cash collateral to be held and applied in accordance with the DIP Credit Agreement in respect of all undrawn letters of credit outstanding as of the Effective Date under the DIP Facility).

### d. Administrative Claims of Indenture Trustees

The fees and expenses of the Indenture Trustees and their counsel, to the extent such fees and expenses are deemed reasonable by a Final Order of the Bankruptcy Court, will be Allowed as Administrative Claims and be paid in accordance with the provisions of Article III.A.1 of the Plan in an aggregate amount not to exceed $850,000. The Indenture Trustees each reserve the right to exercise their charging liens, but only to the extent that (i) any challenge is brought to the payment of such Indenture Trustee's Administrative Claims or (ii) the Senior Note Indenture Trustee or the Senior Subordinated Note Indenture Trustee incurs expense or loss of the kind described in Section 7.7(iii) of the Senior Note Indenture or the Senior Subordinated Note Indenture, respectively.

### e. Bar Dates

Except as provided in the following paragraphs, unless previously Filed, requests for payment of Administrative Claims that arise on or before the Effective Date must be Filed and served on the Debtors no later than thirty days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Trusts or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Post-Consummation Trust and the requesting party by the later of (a) 180 days after the Effective Date and (b) 90 days after the Filing of the applicable request for payment of Administrative Claims.

Holders of DIP Facility Claims and Administrative Claims based on trade or vendor liabilities incurred by a Debtor in the ordinary course of its business will not be required to File or serve any request for payment of such Administrative Claims.

Professionals or other Persons asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Post-Consummation Trust and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 30 days after the Effective Date; however, (i) any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order and (ii) any Professional that is entitled pursuant to the Plan or an order of the Bankruptcy Court to receive payment from the Estates for fees and expenses incurred after the Effective Date in connection with the Chapter 11 Cases may be compensated by the Post-Consummation Trust without further application to the Bankruptcy Court. Objections to any Fee Claim must be Filed and served on the Post-Consummation Trust and the requesting party by the later of (a) 60 days after the Effective Date and (b) 30 days after the Filing of the applicable request for payment of the Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims.

2.    Priority Tax Claims

Priority Tax Claims include any and all Claims of a governmental unit of the kind specified in section 507(a)(7) of the Bankruptcy Code.

Each Holder of an Allowed Priority Tax Claim will receive 100% of the unpaid Allowed amount of such Claim in Cash, on or as soon as practicable after the Effective Date or, at the sole option of the Post-Consummation Trust, Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the rate equal to the underpayment rate specified in 26 U.S.C. § 6621 (determined without regard to 26 U.S.C. § 6621(c)) as of the Effective Date, in equal semi-annual installments, commencing six months after the Effective Date and concluding six years after the date of assessment of such Allowed Priority Tax Claim. Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim may receive such other less favorable treatment as to which the Holder of such Allowed Priority Tax Claim and the Debtors or the Post-Consummation Trust, as applicable, have agreed upon in writing.

3.    Class 1 - Other Secured Claims

Other Secured Claims include any and all Secured Claims against the Debtors other than Prepetition Facility Claims, Intercompany Claims or Claims of the Indenture Trustees. Other Secured Claims also includes, to the extent they are secured, all Allowed Claims held by each of the OEMs, Nissan North America Inc. and Toyota Engineering & Motor Manufacturing North America, Inc. under Section 22 of the Customer Agreement and Section 2.05 of the July 8, 2005 Agreement (the terms of which may have been amended and/or extended in subsequent agreements with the Debtors) approved by court order dated August 11, 2005 [Docket No. 916], as applicable, for costs incurred, or cash payments made, after the effective date of the Customer Agreement or the effective date of the July 8, 2005 Agreement, as applicable, including: (a) costs or payments for installation and commissioning of newly-acquired equipment and plant and equipment set-up expenses and rearrangement; and (b) relocation and refurbishment costs for existing plant, property and equipment that are pre-approved by the applicable party (the "OEM Cap-Ex Claims").

Class 1 is Unimpaired and deemed to accept the Plan. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive, in full and final satisfaction of such Allowed Class 1 Claim, one of the following treatments, in the sole discretion of the Plan Administrator: (i) the Debtors or the Plan Administrator will pay in full (in Cash) any such Allowed Other Secured Claim; (ii) the Debtors or the Plan Administrator will satisfy any such Allowed Other Secured Claim by delivering the collateral securing any such Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iii) the Debtors or the Plan Administrator will otherwise treat any such Allowed Other Secured Claim in any other manner such that the Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

4.    Class 2 - Other Priority Claims

Other Priority Claims include any and all Claims accorded priority in right of payment under sections 507(a)(4), (5), (6)or (7) of the Bankruptcy Code.

Class 2 is Unimpaired and deemed to accept the Plan. The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claims and the Debtors or the Plan Administrator, each Holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of such Allowed Class 2 Claim, one of the following treatments, in the sole discretion of the Debtors or the Plan Administrator: (i) the Debtors or the Plan Administrator will pay the Allowed Other Priority Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; but Other Priority Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Other Priority Claims become due and owing in the ordinary course of business; or (ii) the Debtors or the Plan Administrator will otherwise treat any such Allowed Other Priority Claim in any other manner such that the Claim will be rendered Unimpaired.

5.      Class 3 - Prepetition Facility Claims

Prepetition Facility Claims means the total amount outstanding under the Prepetition Facility as of the Effective Date.

Class 3 is Impaired. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 3 Claim will receive from the Debtors or the Plan Administrator, in full and final satisfaction of such Claim, the following treatment: (i) its Pro Rata share of the Debtors' cash as of the Effective Date (including any cash of or recoveries from non-Debtor affiliates that is available to the Debtors), after giving effect to or making provision for the (a) cash payments required under the Plan, including the amount of cash required to be included in the Remaining Assets transferred to the Post-Consummation Trust and (b) cash needed to be retained to enable the Debtors to comply with the Customer Agreement.; (ii) its Pro Rata share of the beneficial interests in the Post-Consummation Trust, which interests will entitle the holders thereof to continuing distributions by the Post-Consummation Trust of the proceeds recovered from the liquidation of the Post-Consummation Trust Assets, including but not limited to, the distribution of the net proceeds recovered on account of the Remaining Sales Transactions; (iii) its Pro Rata share of 100% of the Tranche A Litigation Recovery Interests; (iv) retention of all adequate protection payments made in respect of the Prepetition Facility, including payment of all fees and professional fees payable under the Final DIP Order accrued through the Effective Date (other than adequate protection payments deferred pursuant to Bankruptcy Court order, which will be deemed satisfied by the treatment provided in the Plan for Prepetition Facility Claims; (v) payment of the reasonable fees and expenses of the Agent's attorneys and financial advisor incurred in connection with the consummation, administration and enforcement of the Plan; and (vi) the applicable releases and exculpation contained in Article XII the Plan.

The Prepetition Facility Claims will be Allowed in full. The unsecured portions of Prepetition Facility Claims, if any, will not be separately classified under the Plan, and the Holders of Prepetition Facility Claims will not be entitled to vote on the Plan or receive any additional distributions under the Plan on account of such unsecured Claims.

6.      Class 4 - OEM Claims

OEM Claims include: (a) any Claim held by an OEM arising from any rights to repayment approved by the Bankruptcy Court for (i) the launch costs paid by the OEMs during the Chapter 11 Cases (other than launch costs incurred in connection with the Debtors' Hermosillo, Mexico plant), (ii) junior secured claims (i.e., claims arising from or relating to the $82.5 million aggregate amount junior secured debtor in possession loan claims and (iii) the $30 million aggregate amount administrative loans; (b) any Claim held by an OEM for special or consequential damages; (c) any other Claim held by an OEM for damages, including any prior surcharges, the amounts paid pursuant to the Customer Agreement and all other special or consequential damages arising out of or in any way relating to the Debtors' inability to perform, or breach of performance, under production and service contracts relating to the Debtors' Plastics segment and Convertibles business; and (d) any other Claim held by an OEM that would otherwise have to be paid in Cash in full (absent agreement to different treatment by the Holder thereof) pursuant to section 1129(a)(9)(A) of the Bankruptcy Code under a confirmed chapter 11 plan. However, OEM Claims do not include (a) Nissan North America, Inc.'s portion of the $30 million administrative loans described above; (b) any Claims held by an OEM relating to Ordinary Course Setoffs (as defined in the Customer Agreement) up to the 3% limitation set forth in Section 8 of the Customer Agreement; (c) any administrative expense claims held by an OEM for damages up to $25 million in the aggregate arising from shipments after the effective date of the Customer Agreement of component parts manufactured by the Debtors' carpet & acoustics business segment that are expressly permissible under Section 9 of the Customer

Agreement; (d) OEM Cap-Ex Claims but solely to the extent they constitute Secured Claims; and (e) any other Claims held by an OEM not specifically mentioned as waived, paid or discharged in the Customer Agreement.

Class 4 is Impaired. On the Effective Date, all OEM Claims will be satisfied pursuant to Section 9 of the Customer Agreement. Notwithstanding anything to the contrary in the Plan, the Customer Agreement will remain in full force and effect after the Effective Date without modification by the Plan.

      7.      Class 5 - General Unsecured Claims

General Unsecured Claims include any and all Claims that are not: (a) Administrative Claims; (b) DIP Facility Claims; (c) Priority Tax Claims; (d) Other Secured Claims; (e) Other Priority Claims; (f) Prepetition Facility Claims; (g) OEM Claims; (h) PBGC Claims; (i) Senior Note Claims; (j) Senior Subordinated Note Claims; (k) Equity Interests; (l) Subordinated Securities Claims; or (m) Intercompany Claims.

Class 5 is Impaired. Although under the absolute priority rule the Holders of General Unsecured Claims are not entitled to any distributions, to facilitate a consensual Plan, each Holder of an Allowed General Unsecured Claim will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan.

      8.      Class 6 - Senior Note Claims and PBGC Claims

Senior Note Claims include any and all Claims for principal or interest arising under those certain 10-3/4% unsecured senior notes due 2011 issued pursuant to that certain indenture, dated as of December 20, 2001, by and among Collins & Aikman Products Co., as issuer, substantially all of the domestic direct and indirect subsidiaries of Collins & Aikman Corporation, as guarantors, and BNY Midwest Trust Company, as indenture trustee, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

PBGC Claims include any and all Claims of the PBGC relating to the Pension Plan, including any and all Claims arising from the termination of the Pension Plan; but, PBGC Claims do not include any Administrative Claims or Priority Claims that may be held by the PBGC.

Class 6 is Impaired. Although under the absolute priority rule the Holders of Allowed Senior Note Claims and PBGC Claims are not entitled to any distributions, to facilitate a consensual Plan, each Holder of an Allowed Senior Note Claim or Allowed PBGC Claim will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of such Allowed Senior Note Claim and PBGC Claim its Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan.

      9.      Class 7 - Senior Subordinated Note Claims

Senior Subordinated Note Claims include any and all Claims for principal or interest arising under those certain 12-7/8% senior subordinated notes due August 15, 2012, issued pursuant to that certain indenture, dated as of August 26, 2004, by and among Collins & Aikman Products Co., as issuer, substantially all of the domestic direct and indirect subsidiaries of Collins & Aikman Corporation, as guarantors, and BNY Midwest Trust Company, as indenture trustee, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

Class 7 is Impaired. Although under the absolute priority rule the Holders of Allowed Senior Subordinated Note Claims are not entitled to any distributions, to facilitate a consensual Plan, each Holder of an Allowed Senior Subordinated Note Claim will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of such Allowed Senior Subordinated Note Claim its Pro Rata share of the percentage of the Tranche B Litigation Recovery Interests that is set forth on Exhibit J to the Plan.

In accordance with the subordination provisions of the Senior Subordinated Note Indenture, distributions on account of Class 7 Claims will first be distributed to the Holders of Allowed Senior Note Claims on a Pro Rata basis until such Allowed Senior Note Claims have been paid in full.

K&E 11625375.1

10.    Class 8 - Equity Interests

Equity Interests include all equity interests in any of the Debtors, including all issued, unissued, authorized or outstanding shares of stock, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

Class 8 is Impaired and deemed to reject the Plan. On the Effective Date, all Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and Holders thereof will not receive a distribution under the Plan in respect of such Equity Interests.

11.    Class 9 - Subordinated Securities Claims

Subordinated Securities Claims include Claims of the type described in, and subject to subordination under, section 510(b) of the Bankruptcy Code, including any and all Claims whatsoever, whether known or unknown, foreseen or unforeseen, currently existing or hereafter arising, arising from rescission of a purchase or sale of a security of the Debtors or an affiliate of the Debtors, for damages arising from the purchase, sale or holding of such securities, or for reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

Class 9 Claims are Impaired and deemed to reject the Plan. On the Effective Date, Subordinated Securities Claims will be canceled, and the Holders thereof will not receive a distribution under the Plan in respect of such Claims.

12.    Class 10 - Intercompany Claims

Intercompany Claims include any and all Claims and Equity Interests of a Debtor against and in another Debtor.

Class 10 is Impaired and deemed to reject the Plan. On the Effective Date, Intercompany Claims will be canceled, and the Holders thereof will not receive a distribution under the Plan in respect of such Claims; however, Claims of a European Debtor against a Debtor arising from intercompany transactions with the Debtor will be deemed Allowed General Unsecured Claims only to the extent that such Debtor's intercompany claims against such European Debtor are deemed allowed in such European Debtor's respective administration proceedings pending under English Insolvency Law.

C.    Means for Implementation of the Plan

1.    Sale of Assets

Both prior to and subsequent to the Effective Date, the Debtors and the Post-Consummation Trust, as applicable, will consummate the Remaining Sales Transactions.

2.    The Post-Consummation Trust

a.    Establishment of the Post-Consummation Trust

On the Effective Date, the Debtors, on their own behalf and on behalf of the Holders of Allowed Prepetition Facility Claims, will execute the Post-Consummation Trust Agreement and take all other steps necessary to establish the Post-Consummation Trust pursuant to the Post-Consummation Trust Agreement. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Post-Consummation Trust all of their rights, title and interests in all assets of the Debtors that are not divested prior to the Effective Date or transferred to the Litigation Trust including, but not limited to, as a result of the Soft-Trim Sales Transaction or any Remaining Sales Transactions that are consummated prior to the Effective Date, but excluding any Residual Trust Assets being transferred to the Residual Trust on the Effective Date (the "Remaining Assets"); however, the assets securing the OEM Cap-Ex Claims that are transferred to the Post-Consummation Trust will be transferred subject to the OEM Cap-Ex Claims and all other rights and remedies of the OEMs with respect to the OEM Cap-Ex Claims set forth in the Customer Agreement and the July 8, 2005 Agreement. In connection with the transfer of the Remaining Assets, including rights and Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the

51

Post-Consummation Trust will vest in the Post-Consummation Trust and its representatives, and the Debtors and the Post-Consummation Trust will be authorized to take all necessary actions to effectuate the transfer of such privileges.

b.      Funding Expenses of the Post-Consummation Trust

Except as set forth in Article IV.B.1 of the Plan, the Debtors will not be obligated to provide any funding with respect to the Post-Consummation Trust after they transfer the Remaining Assets to the Post-Consummation Trust. As more fully described in the Post-Consummation Trust Agreement, any Cash in the Post-Consummation Trust will be applied in accordance with the terms of the Post-Consummation Trust Budget, first, to the fees, costs, expenses (each of the foregoing in amounts not to exceed amounts approved pursuant to the Post-Consummation Trust Budget) and liabilities of the Plan Administrator, second, to satisfy any other administrative and Wind-Down Expenses of the Post-Consummation Trust (each of the foregoing in amounts not to exceed amounts approved pursuant to the Post-Consummation Trust Budget) and, third, to the distributions provided for pursuant to the Plan

c.      Appointment of the Plan Administrator

On the Effective Date and in compliance with the provisions of the Plan the Plan Administrator, as designated by the Agent, in consultation with the Prepetition Lenders and the Creditors Committee, will be appointed in accordance with the Post-Consummation Trust Agreement and the Post-Consummation Trust will be administered by the Plan Administrator in accordance with the Post-Consummation Trust Agreement.

d.      Obligations under the Customer Agreement

On and after the Effective Date, the Post-Consummation Trust will assume and perform all of the obligations of the Debtors under the Customer Agreement without releasing the Debtors from any of their obligations thereunder.

e.      Termination of the Post-Consummation Trust and Plan Administrator

The Post-Consummation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; but, on or prior to the date six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Post-Consummation Trust for a finite period if such an extension is necessary to liquidate the Post-Consummation Trust Assets or to complete any distribution required under the Plan. Multiple extensions may be obtained so long as (i) Bankruptcy Court approval is obtained at least six months prior to the expiration of each extended term and (ii) the Plan Administrator receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Post-Consummation Trust as a grantor trust for federal income tax purposes.

The duties, responsibilities and powers of the Plan Administrator will terminate in accordance with the terms of the Post-Consummation Trust Agreement.

**f.      Exculpation; Indemnification**

**The Plan Administrator, the Post-Consummation Trust, the professionals of the Post-Consummation Trust, the Post-Consummation Advisory Trust Board and their representatives will be exculpated and indemnified pursuant to the terms of the Post-Consummation Trust Agreement.**

g.      Insurance

The Post-Consummation Trust will maintain customary insurance coverage for the protection of Persons serving as administrators and overseers of the Post-Consummation Trust on and after the Effective Date.

3.      The Litigation Trust

a.      Establishment of the Litigation Trust

On the Effective Date, the Debtors, on their own behalf and on behalf of the Holders of Allowed Claims entitled to Litigation Trust Recovery Interests pursuant to the Plan, will execute the Litigation Trust Agreement and take all other steps necessary to establish the Litigation Trust pursuant to the Litigation Trust Agreement. On the Effective Date, and

in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Litigation Trust all of their rights, title and interests in all of the Litigation Trust Assets, as identified in the Litigation Trust Agreement, including any Causes of Action arising under chapter 5 of the Bankruptcy Code that are not released under the Plan or other Bankruptcy Court-approved settlements, but not including (a) Causes of Action of the Debtors or their Estates against any of the OEMs or (b) unless the Debtors, the Agent and the Committee agree otherwise, (i) any Cause of Action of the Debtors or their Estates that is the subject of a pending contested matter on or before January 25, 2007, but excluding any such Cause of Action that is not settled as of the Effective Date, or (ii) any Cause of Action of the Debtors or their Estates that is settled to allow for the consummation of the Soft Trim Sales Transaction or a Remaining Sales Transaction. (the "Litigation Trust Claims").  In connection with the transfer of such assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust will vest in the Litigation Trust and its representatives, and the Debtors and the Litigation Trust will be authorized to take all necessary actions to effectuate the transfer of such privileges.

      b.      Prosecution of Litigation Trust Claims

Litigation Trust Claims may only be prosecuted or settled by the Litigation Trust.  The Debtors will not prosecute or settle any Litigation Trust Claims, including Causes of Action arising under chapter 5 of the Bankruptcy Code that are not released under the Plan or other Bankruptcy Court-approved settlements. The Litigation Trust Claims will be transferred to the Litigation Trust as of the Effective Date.  To the extent that any proceeds of any claim that would have constituted a Litigation Trust Claim following the Effective Date becomes available prior to the Effective Date, the Debtors will hold such proceeds in a separate interest-bearing account for the benefit of the Holders of Allowed Claims entitled to Litigation Trust Recovery Interests pursuant to the Plan.

      c.      The Litigation Trust Committee

The Litigation Trust Committee is the committee to be formed on the Effective Date pursuant to the Litigation Trust Agreement to govern and manage the Litigation Trust.  As more fully described in the Litigation Trust Agreement, on the Effective Date, the Litigation Trust Committee will be formed and constituted.  The Litigation Trust Committee will initially consist of three members, two selected by the Agent and the third selected by the Creditors Committee, whose identities will be disclosed to the Bankruptcy Court at the Confirmation Hearing.  Upon payment in Cash of 80% of the amount of the Allowed Class 3 Claims (which, for this purpose, will include interest accrued through the Effective Date on the Prepetition Facility Claims at the non-default contractual interest rate based on a spread above the Alternate Base Rate) including from, for the avoidance of doubt, distributions (a) by the Debtors prior to the Effective Date, (b) by the Debtors under the Plan, (c) by the Post-Consummation Trust and/or (d) by the Litigation Trust (but excluding any distributions or other revenues received by any Holder of Prepetition Facility Claims in respect of any investment made by such Holder pursuant to a co-investment right offered to such Holder), the governance of the Litigation Trust Committee will change such that two members of the Litigation Trust Committee will be Creditors Committee appointees and the third member will be appointed by the Agent.  The Litigation Trust Committee will at all times have the authority to change the appointed Litigation Trust Administrator upon an affirmative vote by two-thirds of the Litigation Trust Committee members.  After the Tranche A Termination Date, all three (3) members of the Litigation Trust Committee will be Creditors Committee appointees.  The mechanisms by which the Agent and the Creditors Committee will appoint Litigation Trust Committee members will be set forth in the Litigation Trust Agreement.

      d.      Funding Expenses of the Litigation Trust

On the Effective Date, the Debtors will deposit with the Litigation Trust $3 million in Cash to cover the reasonable costs of the Litigation Trust as more fully set forth in the Litigation Trust Agreement.  The Litigation Trust will have no obligation to and will not repay the $3 million to the Debtors or the Post-Consummation Trust.  As more fully described in the Litigation Trust Agreement, any Cash in the Litigation Trust will be applied, first, to the fees, costs, expenses and liabilities of the Litigation Trust Administrator and the members of the Litigation Trust Committee and, second, to pay the distributions provided for pursuant to the Plan.

      e.      Appointment of the Litigation Trust Administrator

On the Effective Date and in compliance with the provisions of the Plan, the Litigation Trust Administrator, as designated by the Agent, in consultation with the Prepetition Lenders and the Creditors Committee, will be appointed in accordance with the Litigation Trust Agreement and the Litigation Trust will be administered by the Litigation Trust

Administrator in accordance with the Litigation Trust Agreement. The Litigation Trust Administrator will prepare and make available to Holders of Litigation Trust Recovery Interests, on a semi-annual basis, a written report detailing, among other things, the litigation status of claims or Causes of Action transferred to the Litigation Trust, any settlements entered into by the Litigation Trust, the proceeds recovered to date from the Litigation Trust Assets, and the distributions made by the Litigation Trust. The Litigation Trust Administrator may make such reports available to Holders by posting the same on an internet website.

   f.  Authority to Enforce Litigation Trust Assets

   The Litigation Trust Administrator will consult, in good faith, with the Litigation Trust Committee with respect to any proposed course of action in connection with the Litigation Trust Assets as set forth in the Litigation Trust Agreement and, in connection with a proposed course of action:

     (i)  if the proposed course of action is in connection with a Litigation Trust Asset that has an asserted value of less than $2.5 million, the Litigation Trust Administrator will be authorized and empowered to take such action, after at least five (5) days' notice to the members of the Litigation Trust Committee and either (a) no objection is received by any member of the Litigation Trust Committee or (b) with the consent of at least 2 members of the Litigation Trust Committee, without further notice to any party;

     (ii)  if the proposed course of action is in connection with a Litigation Trust Asset that has an asserted value of equal to or more than $2.5 million but less than $10 million, the Litigation Trust Administrator will be authorized and empowered to take such action, with the unanimous consent of the members of the Litigation Trust Committee, without further notice to any party; and

     (iii)  if the proposed course of action is in connection with a Litigation Trust Asset that has an asserted value of equal to or greater than $10 million, the Litigation Trust Administrator will be authorized and empowered to take such action, upon five (5) Business Days' written notice to the Litigation Trust Committee and upon receipt of Bankruptcy Court approval of such action.

   If any objection is interposed by a member of the Litigation Trust Committee to any proposed action of the Litigation Trust Administrator with respect to the Litigation Trust Assets within the foregoing prescribed time periods and the Litigation Trust Administrator is not authorized to settle as a result of such objection, then (a) if the Litigation Trust Committee member(s) withdraws for any reason its objection to the proposed action, the Litigation Trust Administrator may pursue the proposed action in accordance with the procedures outlined above or (b) if the Litigation Trust Committee member(s) does not withdraw its objection, the Litigation Trust Administrator will have the option of (1) foregoing the proposed course of action that is the subject of the Litigation Trust Committee member(s)' objection, (2) modifying the proposed course of action in a way that results in the Litigation Trust Committee member(s) withdrawing its objection or (3) following five (5) Business Days' written notice to the Litigation Trust Committee, seeking an order of the Bankruptcy Court authorizing the Litigation Trust Administrator to pursue the proposed course of action over the Litigation Trust Committee member(s)' objection.

   g.  Termination of the Litigation Trust and the Litigation Trust Administrator

   The Litigation Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; but, on or prior to the date six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period if such an extension is necessary to liquidate the Litigation Trust Claims. Notwithstanding the foregoing, multiple extensions may be obtained so long as (i) Bankruptcy Court approval is obtained at least six months prior to the expiration of each extended term and (ii) the Litigation Trust Administrator receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a grantor trust for federal income tax purposes.

   The duties, responsibilities and powers of the Litigation Trust Administrator will terminate in accordance with the terms of the Litigation Trust Agreement.

K&E 11625375.1

05-55927-swr  Doc 4160  Filed 02/20/07  Entered 02/20/07 15:48:21  Page 59 of 96

**h.** **Exculpation; Indemnification**

**The Litigation Trust Administrator, the Litigation Trust, the professionals of the Litigation Trust and their representatives will be exculpated and indemnified pursuant to the terms of the Litigation Trust Agreement.**

i.      Insurance

The Litigation Trust will maintain customary insurance coverage for the protection of Persons serving as administrators and overseers of the Litigation Trust on and after the Effective Date.

4.      The Residual Trust

The Residual Trust will be established in accordance with Article IV.D of the Plan and the Residual Trust Agreement to pay or otherwise resolve, to the extent they are not Class 5 Claims, certain environmental-related Claims, liens or rights arising from the ownership and operation of the Residual Trust Assets or, in the case of insurance that is a Residual Trust Asset, a right to payment or claim against such insurance (the "Residual Trust Rights"). The Residual Trust Assets will include those assets listed on Exhibit I to the Plan, which will be filed and mailed to the Holders of Residual Trust Rights no later than twelve days before the Voting Deadline (as defined below), and such Post-Consummation Trust Assets as may be designated as Residual Trust Assets by the Plan Administrator after the Effective Date.

The Debtors, in consultation with the Agent, prior to the Effective Date, or the Post-Consummation Trust, on or and after the Effective Date, will have the authority to establish the Residual Trust in accordance with the Residual Trust Agreement to pay or otherwise resolve any Residual Trust Rights. The sole right to recover on account of the Residual Trust Rights will be limited to the Residual Trust Assets. The Residual Trust Assets, Cash and the Debtors' rights in any third party indemnifications relating to the Residual Trust Assets will be transferred to the Residual Trust in accordance with the Residual Trust Agreement. The Residual Trust expenses will be paid by the Residual Trust. Upon satisfaction of any Residual Trust Rights, any residual assets remaining in the Residual Trust will be distributed to the Post-Consummation Trust.

5.      Corporate Action

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or the Debtors' boards of directors. To the extent such action has not been completed prior to the Effective Date, the Debtors (and their boards of directors) will dissolve or otherwise terminate their existence following the Effective Date and are authorized to dissolve or terminate the existence of wholly-owned non-Debtor subsidiaries following the Effective Date as well as any remaining health, welfare or benefit plans.

6.      Preservation of Rights of Action

a.      Maintenance of Causes of Action

Pursuant to the Plan, and except as otherwise provided therein or in any Final Order with respect to any Causes of Action that are barred, waived, relinquished, released, settled or compromised, on the Effective Date, all of the Debtors' rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal in an adversary proceeding or contested matter Filed in one or more of the Chapter 11 Cases, including the following actions and any Causes of Actions specified on Exhibit A to the Plan, will be transferred to the Litigation Trust: (a) objections to Claims under the Plan; and (b) any other litigation or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations or otherwise affecting the Debtors, including possible claims against the following types of parties, both domestic and foreign, for the following types of claims: (i) Causes of Action against vendors, suppliers of goods or services, or other parties for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities or setoff; (ii) Causes of Action against utilities, vendors, suppliers of services or goods, or other parties for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (iii) Causes of Action against vendors, suppliers of goods or services, or other

55

parties for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection of the subject contracts; (iv) Causes of Action for any liens, including mechanic's, artisan's, materialmen's, possessory or statutory liens held by any one or more of the Debtors; (v) Causes of Action for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, lessor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (vi) Causes of Action against any current or former director, officer, employee or agent of the Debtors arising out of employment related matters, including Causes of Action regarding intellectual property, confidentiality obligations, employment contracts, wage and benefit overpayments, travel, contractual covenants, or employee fraud or wrongdoing; (vii) Causes of Action against any professional services provider or any other party arising out of financial reporting; (viii) Causes of Action arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (ix) Causes of Action against insurance carriers, reinsurance carriers, underwriters or surety bond issuers relating to coverage, indemnity, contribution, reimbursement or other matters; (x) counterclaims and defenses relating to notes, bonds or other contract obligations; (xi) Causes of Action against local, state, federal and foreign taxing authorities for refunds of overpayments or other payments; (xii) Causes of Action against attorneys, accountants, consultants or other professional service providers relating to services rendered; (xiii) contract, tort or equitable Causes of Action that may exist or subsequently arise; (xiv) any intracompany or intercompany Causes of Action; (xv) Causes of Action of the Debtors arising under section 362 of the Bankruptcy Code; (xvi) equitable subordination Causes of Action arising under section 510 of the Bankruptcy Code or other applicable law; (xvii) turnover Causes of Action arising under sections 542 or 543 of the Bankruptcy Code; (xviii) Causes of Action arising under chapter 5 of the Bankruptcy Code, including preferences under section 547 of the Bankruptcy Code; (xix) Causes of Action against any union arising from, among other things, state or federal law or under a collective bargaining agreement, including any wrongful or illegal acts, any wrongful termination, suspension of performance, defamation or failure to meet other contract or regulatory obligations; and (xx) Causes of Action for unfair competition, interference with contract or potential business advantage, conversion, infringement of intellectual property or other business tort claims.

The Litigation Trust will be transferred the foregoing Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Debtors' Chapter 11 Cases. In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan (including Article XII.B of the Plan), any claims, rights and Causes of Action that the respective Debtors may hold against any Person will vest in the Litigation Trust. The Litigation Trust, through its authorized agents or representatives, will have and may exclusively enforce any and all such claims, rights or Causes of Action transferred to it, and all other similar claims arising pursuant to applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession pursuant to the Bankruptcy Code in accordance with the provisions of the Litigation Trust Agreement. The Litigation Trust will have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any and all such claims, rights and Causes of Action transferred to it, and to decline to do any of the foregoing in accordance with the terms of the Litigation Trust Agreement.

The Litigation Trust will be transferred all of the Litigation Trust Claims and all other Causes of Action as of the Effective Date. Notwithstanding anything to the contrary in the Plan, the Post-Consummation Trust will own and control any causes of action or claims arising after the Effective Date in respect of any Post-Consummation Trust Asset. To the extent that any proceeds of any claim that would have constituted a Litigation Trust Claim following the Effective Date becomes available prior to the Effective Date, the Debtors will hold such proceeds in a separate interest-bearing account for the benefit of the Holders of Allowed Claims entitled to Litigation Trust Recovery Interests pursuant to the Plan. The Post-Consummation Trust will have the right to object to all administrative expenses and Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Post-Consummation Trust and the Litigation Trust will have the right to object to all Claims other than Prepetition Facility Claims which, if Allowed, would entitle the Holder thereof to payments or other distributions from the Litigation Trust.

      b.       Preservation of All Causes of Action Not Expressly Settled or Released

Unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action in the Plan for later adjudication by the Litigation Trust and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or

laches will apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order.  In addition, the Litigation Trust expressly reserves the right to pursue or adopt any claims not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person, including the plaintiffs or co-defendants in such lawsuits.  Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer or transaction may be reviewed by the Litigation Trust subsequent to the Effective Date and may, to the extent not theretofore expressly waived, relinquished, released, compromised or settled, be the subject of an action after the Effective Date, whether or not: (a) such Person has Filed a proof of claim against the Debtors in the Chapter 11 Cases; (b) such Person's proof of claim has been objected to; (c) such Person's Claim was included in the Debtors' Schedules; or (d) such Person's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

      7.      Certain Employee, Retiree and Workers' Compensation Benefits

      a.      Employee Benefits

On the Effective Date, except as otherwise set forth in the Plan or in the Customer Agreement, the Debtors existing employee benefit policies, plans and agreements that are not identified on Exhibit D to the Plan and have not been terminated by the Debtors prior to the Effective Date will terminate pursuant to the Plan.  The Pension Plan, however, may only be terminated in accordance with Title IV of ERISA.

      b.      Retiree Medical Benefits

From and after the Effective Date, neither the Debtors nor the Trusts will be obligated to pay retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) or any similar health and medical benefits in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits.

      c.      Pension Plan

From and after the Effective Date and except with respect to the Pension Plan, neither the Debtors nor the Trusts will be obligated to pay any benefits in accordance with the terms of any pension plans.  The obligation to pay benefits under the Pension Plan will continue until the Pension Plan is terminated in accordance with Title IV of ERISA.

      d.      Workers' Compensation Benefits

From and after the Effective Date, except as otherwise set forth in the Customer Agreement, neither the Debtors nor the Trusts will continue to pay workers' compensation benefits in accordance with the Workers' Compensation Order.

      e.      Implementation of the KERP and Success Sharing Plan

To the extent the Debtors have not already implemented all or part of the KERP or the Success Sharing Plan prior to the Effective Date, on and after the Effective Date the Post-Consummation Trust will implement the KERP and the Success Sharing Plan and perform any and all obligations thereunder, including the payment of performance bonuses and severance amounts contemplated thereby.

      8.      Limitations on Amounts to Be Distributed to the Holders of Allowed Insured Claims

Distributions under the Plan to each Holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the Holder thereof under any pertinent insurance policies and applicable law.  Nothing in Article IV.H of the Plan constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any Person may hold against any other Person, including the Debtors' insurance carriers.

9.      Cancellation and Surrender of Instruments, Securities and Other Documentation

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, the DIP Facility, the Prepetition Credit Facility, the Senior Note Indenture, the Senior Subordinated Note Indenture, the Senior Notes, the Senior Subordinated Notes and the Equity Interests will be canceled and of no further force and effect, without any further action on the part of any Debtor or either of the Trusts; except as otherwise provided in the Plan in connection with the charging liens of the Indenture Trustees, the provisions of the Senior Note Indenture and Senior Subordinated Note Indenture governing the rights of the Indenture Trustees with respect to their respective Holders will remain enforceable as between the Indenture Trustees and the Holders. The Holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

No distribution under the Plan will be made to or on behalf of any Holder of an Allowed Claim evidenced by Senior Notes or Senior Subordinated Notes unless and until such instruments or securities are received by the Litigation Trust to the extent required in Article VI.I of the Plan.

10.      Creation of Professional Escrow Account

On the Effective Date, the Plan Administrator will establish the Professional Escrow Account and transfer the amounts necessary (based on estimates of Accrued Professional Compensation as of the Effective Date provided by each Professional to the Debtors immediately before the Effective Date) to ensure the payment of (i) all Accrued Professional Compensation through the Effective Date and (ii) all Accrued Professional Compensation associated with the Chapter 11 Cases incurred after the Effective Date. Additionally, on the Effective Date, all amounts in the Carve Out Account will be transferred to and deposited in the Professional Escrow Account. Any amounts remaining in the Professional Escrow Account after payment of all Accrued Professional Compensation through the Effective Date will (i) to the extent any such amounts were funded by the OEMs, be returned to the respective OEMs in accordance with the same allocation pursuant to which such amounts were to be funded under Section 5 of the Customer Agreement or (ii) otherwise become Post-Consummation Trust Assets and be available to the Post-Consummation Trust for distribution to its Beneficiaries in accordance with the Post-Consummation Trust Agreement.

11.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the Post-Consummation Trust and its successors and assigns. Nothing in Article IV.K of the Plan will operate as a release of any statutory lien on tooling until such time as said lien is satisfied pursuant to the Plan, and any such lien will remain in full force and effect in the same priority and to the same extent and validity as existed immediately prior to the Effective Date until such time as said lien is satisfied pursuant to the Plan.

12.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Post-Consummation Trust, the Litigation Trust and the Residual Trust will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Plan Administrator, the Litigation Trust and the Residual Trust, the Secretary of each Debtor and/or any Assistant Secretary of each Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax or similar tax: (1) the making or assignment of any lease or sublease; or (2) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction pursuant to the Plan.

D.    Treatment of Executory Contracts and Unexpired Leases

    1.    Executory Contracts and Unexpired Leases to Be Assumed or Assumed and Assigned

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume and assign to the Post-Consummation Trust or the applicable purchaser of the Debtors' assets under the Soft-Trim Sales Transaction or the Remaining Sales Transaction, if indicated, each of the Executory Contracts and Unexpired Leases listed on Exhibit E. Each contract and lease listed on Exhibit E will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit E does not constitute an admission by a Debtor or the Post-Consummation Trust that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or the Post-Consummation Trust has any liability thereunder.

Each Executory Contract and Unexpired Lease listed on Exhibit E to the Plan includes any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Exhibit E to the Plan, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Article V.C to the Plan.

As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or another surviving, resulting or acquiring corporation in an applicable Restructuring Transaction, will be deemed assigned to the applicable Person, pursuant to section 365 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the assumption or conditional assumption of the Executory Contracts and Unexpired Leases to be assumed under the Plan as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease that is assumed will vest in and be fully enforceable by the Post-Consummation Trust or any applicable assignee in accordance with its terms, except as may be modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption, or applicable law.

    2.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor assuming such contract or lease or the assignee of such Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim; (b) the ability of the Post-Consummation Trust or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption. For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Debtor assuming such contract may cure any monetary default (a) by treating such amount as either a direct or indirect contribution to capital or distribution (as appropriate) or (b) through adjusting an intercompany account balance accordingly in lieu of payment in Cash.

    3.    Executory Contracts and Unexpired Leases to Be Rejected

Except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Article V.A, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date will be rejected pursuant to section 365 of the Bankruptcy Code on the Effective Date or as of the date set forth on Exhibit F. The Executory Contracts and Unexpired Leases to be rejected will include the Executory Contracts and Unexpired Leases listed on Exhibit F. Each contract and lease listed on Exhibit F will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit F will not constitute an admission by a Debtor or the Post-Consummation Trust that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or the

Post-Consummation Trust has any liability thereunder. Any Executory Contract and Unexpired Lease not listed on Exhibit F and not previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court (other than those Executory Contracts and Unexpired Leases identified on Exhibit E) will be rejected on the Effective Date irrespective of whether such contract is listed on Exhibit F and the Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

4. Bar Date for Rejection Damages

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant to Article V.C of the Plan, gives rise to a Claim (including any Claims arising from those indemnification obligations described in Article V.E of the Plan) by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors, either of the Trusts, their respective successors or their respective properties unless a proof of Claim is Filed and served on the Post-Consummation Trust, pursuant to the procedures specified in the notice of the Effective Date or an order of the Bankruptcy Court, no later than 30 days after the Effective Date.

5. Obligations to Indemnify Directors, Officers and Employees

The obligations of each Debtor to indemnify any person serving as one of its directors, officers or employees as of or following the Effective Date will, to the extent constituting an executory contract, be deemed rejected as of the Effective Date. Neither the Debtors nor either of the Trusts will have any obligation on or after the Effective Date to pay or perform such indemnification obligations. Notwithstanding the foregoing, such directors, officers and employees will have the benefit of any and all directors' and officers' liability insurance policies that may be in effect, but neither the Debtors nor either of the Trusts will have any obligation on or after the Effective Date to pay premiums thereunder.

6. Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will either (i) be performed by the Debtors or the Post-Consummation Trust in the ordinary course of its business; or (ii) terminated, with the relevant counterparty required to file a Claim asserting any alleged damages within the applicable Bar Date.

7. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any Exhibit to the Plan constitutes an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Post-Consummation Trust, or their respective Affiliates, has any liability thereunder. Nothing in the Plan waives, excuses, limits, diminishes, or otherwise alters any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Post-Consummation Trust under any executory or non-executory contract or any unexpired or expired lease. Nothing in the Plan increases, augments, or adds to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Post-Consummation Trust under any executory or non-executory contract or any unexpired or expired lease.

In the Plan, the Debtors and the Post-Consummation Trust reserve the right to alter, amend, modify, or supplement Exhibit E to the Plan and/or Exhibit F to the Plan, at any time through and including ninety (90) days after the Effective Date.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan provides that the Debtors will have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

8. Post-Petition OEM Contracts

The Post-Petition OEM Contracts include, collectively, (a) the Customer Agreement, (b) any contracts between an OEM and a Debtor entered into before the Petition Date that were amended and treated as postpetition contracts by a Final Order of the Bankruptcy Court and (c) any contracts between an OEM and a Debtor entered into after the Petition Date.

Notwithstanding anything to the contrary in the Plan, nothing in Article V.A, B, C, D, F or G of the Plan will apply to or have any effect on the Post Petition OEM Contracts. The Post-Petition OEM Contracts (as the same may be amended, modified or supplemented from time to time by the parties thereto in accordance with their terms) will remain in full force and effect without modification by the Plan and, on and after the Effective Date, will be performed by the Post-Consummation Trust in the ordinary course of its business in accordance with the terms and conditions thereof. For greater clarity, nothing in the Plan, including Article XII.B and Article XII.E, is intended, nor will it, discharge, release or enjoin the enforcement of any unmatured, unliquidated or contingent Claim of any OEM under any Post-Petition OEM Contract. Except to the extent otherwise provided in the Customer Agreement, no such Claim will give rise to an Administrative Claim. Notwithstanding anything to the contrary in the Plan, including Article V.H of the Plan, the Post-Consummation Trust will have no obligation to pay or perform any Claim that (i) is released pursuant to the Customer Agreement or the Plan; or (ii) arises from any breach of a purchase order, supply contract, the Customer Agreement or any other obligations of the Debtors (including any such obligations that may be assumed by the Post-Consummation Trust) related to manufacturing component parts for the Customers (as such term is defined in the Customer Agreement), excluding Hermosillo, except to the extent, if any, that such Customers would be entitled to an administrative claim against the Debtors for such Claim in accordance with Section 9 of the Customer Agreement. The Post-Consummation Trust may assign any of the Post-Petition OEM Contracts only in accordance with the terms of the Customer Agreement.

E.      Provisions Governing Distributions

1.      Time of Distributions

Except as otherwise provided in Article VI of the Plan and as to DIP Facility Claims and Prepetition Facility Claims, distributions of Cash to be made on the Effective Date to Holders of Claims that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (i) 90 days after the Effective Date and (ii) 90 days after such later date when the applicable conditions of Article V.B of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Article VI.D.2 of the Plan (regarding undeliverable distributions) or Article VI.I of the Plan (regarding surrender of canceled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Articles VI.G and VII.C of the Plan.

On each Quarterly Distribution Date, distributions also will be made, pursuant to Article VII.C of the Plan, to Holders of Disputed Claims as of the Effective Date that were Allowed during the preceding calendar quarter and to Holders of Allowed Claims entitled to post-Consummation payments from the Post-Consummation Trust or the Litigation Trust, as applicable, pursuant to the Plan. Such quarterly distributions will be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

2.      Method of Distributions to Holders of Claims

The Post-Consummation Trust, or such Third Party Disbursing Agents as the Post-Consummation Trust may employ in its sole discretion, will make all distributions required under the Plan on behalf of Administrative Claims, Priority Claims, Other Secured Claims, Other Priority Claims and Prepetition Facility Claims (to the extent the Plan provides such distributions are to come from the Post-Consummation Trust). The Litigation Trust, or such Third Party Disbursing Agents as the Litigation Trust may employ in its sole discretion, will make all distributions required under the Plan on behalf of Prepetition Facility Claims (to the extent the Plan provides such distributions are to come from the Post-Consummation Trust) and Claims in Classes 5, 6 and 7. Notwithstanding the foregoing, the Litigation Trust will employ the Senior Note Indenture Trustee and the Senior Subordinated Note Indenture Trustee as Third Party Disbursing Agents with respect to any distributions to the Holders of the Senior Notes and the Holders of Senior Subordinated Notes, respectively, if such Indenture Trustees have offered to provide such services on reasonable and customary commercial terms. Each Disbursing Agent and Third Party Disbursing Agent will serve without bond, and any Disbursing Agent and Third Party Disbursing Agent may employ or contract with other Entities to assist in or make the distributions required by the Plan.

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Trust that employs it reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services without Bankruptcy Court approval. These payments will be made on terms agreed to with the employing Trust.

3.      Delivery of Distributions Generally

Except as provided in Article VI.D.1(b) of the Plan, distributions to Holders of Allowed Claims will be made (i) to the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims; (ii) to the addresses set forth in any written certification of address change delivered to the relevant Disbursing Agent (including pursuant to a letter of transmittal delivered to the relevant Disbursing Agent) after the date of Filing of any related proof of Claim; or (iii) to the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the relevant Disbursing Agent has not received a written notice of a change of address.

4.      Distributions to Holders of the Prepetition Facility Claims

Distributions of Cash to Holders of Prepetition Facility Claims will be made on the Effective Date by the Plan Administrator, the Post-Consummation Trust or a Disbursing Agent to the Agent, JPMorgan, for the Pro Rata benefit of the Holders of Prepetition Facility Claims.  Distributions to Holders of Prepetition Facility Claims will be effected by wire transfer of immediately available funds.

5.      Distributions to Holders of the Senior Note Claims and Senior Subordinated Note Claims

Subject to the requirements of Article VI.I of the Plan, distributions to Holders of Allowed Senior Note Claims and Senior Subordinated Note Claims, if any, will be made by a Disbursing Agent to the record holders of the Senior Notes or Senior Subordinated Notes, as applicable, as of the Distribution Record Date as identified on a record holder register to be provided to the Disbursing Agent by the Senior Note Indenture Trustee or the Senior Subordinated Note Indenture Trustee, as applicable, within five Business Days after the Distribution Record Date.  This record holder register will provide the name, address and holdings of each respective registered Holder of Senior Notes or Senior Subordinated Notes, as applicable, as of the Distribution Record Date.

6.      Undeliverable Distributions Held By Disbursing Agents

If any distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified by written certification of such Holder's then-current address.  Undeliverable distributions will remain in the possession of the applicable Disbursing Agent until such time as a distribution becomes deliverable.  Undeliverable Cash will be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds.  Any Disbursing Agent holding undeliverable cash will invest such cash in a manner consistent with the investment and deposit guidelines of the Post-Consummation Trust or the Litigation Trust, as applicable.

On each distribution date provided for in the Post-Consummation Trust Agreement and Litigation Trust Agreement, as the case may be, the applicable Trust or applicable Disbursing Agents will make distributions to the Beneficiaries of such Trust in accordance with the Plan and relevant Trust Agreement.  Each such distribution will include, to the extent applicable, a Pro Rata share of the net yield earned by the applicable Disbursing Agent from the investment of any undeliverable cash from the date that such distribution would have first been due had it then been deliverable to the date that such distribution becomes deliverable.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by a Disbursing Agent within two years after the later of (i) the Effective Date and (ii) the last date on which a distribution was deliverable will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Post-Consummation Trust or its respective property.  Unclaimed Cash originating from the Post-Consummation Trust will become Post-Consummation Trust Assets and transferred to the Post-Consummation Trust, free of any restrictions thereon, and any such Cash held by a Third Party Disbursing Agent will be returned to the Post-Consummation Trust.  Unclaimed Cash originating from the Litigation Trust will become Litigation Trust Assets and transferred to the Litigation Trust, free of any restrictions thereon, and any such Cash held by a Third Party Disbursing Agent will be returned to the Litigation  Trust.  Nothing contained in the Plan or the law will require any Debtor, any Trust or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

7.      Distribution Record Date

The Distribution Record Date will be the date set by the Bankruptcy Court for determining the Holders of Claims entitled to vote on the Plan.  As of the close of business on the Distribution Record Date, the respective transfer registers for the Senior Notes and the Senior Subordinated Notes, as maintained by the Debtors or the Indenture Trustees, will be closed.  The applicable Disbursing Agent will have no obligation to recognize the transfer or sale of any Senior Note Claim or Senior Subordinated Note Claim that occurs after the close of business on the Distribution Record Date, and any Disbursing Agent will be entitled for all purposes herein to recognize and make distributions only to those Holders of Senior Note Claims and Senior Subordinated Note Claims who are Holders of such Claims as of the close of business on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims in Classes 3, 5, 6 and 7 that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

8.      Means of Cash Payments

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the applicable Debtor or the applicable Trust or, at the option of the applicable Debtor or the applicable Trust, by wire transfer from a domestic bank; however, Cash payments to foreign Holders of Allowed Claims may be made, at the option of the applicable Debtor or the applicable Trust, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Cash payments made pursuant to the Plan on behalf of DIP Facility Claims and Prepetition Facility Claims will be made to the respective administrative agent on the Effective Date and future distribution dates by wire transfer of immediately available funds.

9.      De Minimis Distributions

No Disbursing Agent will distribute Cash to the Holder of an Allowed Claim in an Impaired Class if the amount of Cash to be distributed on account of such Claim is less than $25.  Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against any Trust or its respective property.

10.     Tax Matters

To the extent applicable, each Disbursing Agent will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  Each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, each Person receiving a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other tax obligations.

For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claims with any excess allocated to unpaid interest that accrued on such Claims.

11.     Setoffs

Except with respect to claims of a Debtor or a Trust released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Trust or, as instructed by the applicable Debtor or applicable Trust, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that any Debtor or the applicable Trust may hold against the Holder of such Allowed Claim; but neither the failure to effect a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the applicable Debtor or the applicable Trust of any claims, rights and Causes of Action that the Debtor or the applicable Trust may possess against Holder of a Claim.

63

12.     Surrender of Canceled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by Senior Notes or Senior Subordinated Notes, the Holder of such Claim must surrender, in accordance with the provisions of Article II.I of the Plan, the applicable Senior Notes or Senior Subordinated Notes to the Litigation Trust or Disbursing Agent, together with any letter of transmittal required by the Litigation Trust or Disbursing Agent. Pending such surrender, any distributions pursuant to the Plan on account of any such Claim will be treated as an undeliverable distribution pursuant to Article VI.D.2 of the Plan. Notwithstanding the foregoing, the Litigation Trust or the Disbursing Agent may use such other procedure as they may reasonably deem appropriate to facilitate distributions to Holders of Senior Note Claims or Holders of Senior Subordinated Note Claims.

F.     Procedures for Resolving Disputed Claims

1.     Objections to Claims

All objections to Claims must be Filed by the Claims Objection Bar Date, and (a) if Filed prior to the Effective Date, such objections will be served only on the Holders of such Claims and the parties on the then-applicable service list in the Chapter 11 Cases; and (b) if Filed after the Effective Date, such objections will be served only on the Holders of such Claims and the United States trustee. If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.

2.     Authority to Prosecute Objections

After the Effective Date, except as provided in the following paragraph, only the Debtors or the Post-Consummation Trust will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims. After the Effective Date, the Post-Consummation Trust may settle or compromise any Disputed Claim without approval of the Bankruptcy Court if (a) the Post-Consummation Trust promptly Files with the Bankruptcy Court a written notice of any settlement or compromise of a Claim with a Face Amount in excess of $1,000,000 and (b) the Agent and the United States trustee are authorized to contest the proposed settlement or compromise by Filing a written objection with the Bankruptcy Court and serving such objection on the Post-Consummation Trust within 20 days of the service of the settlement notice. If no such objection is Filed, the applicable settlement or compromise will be deemed final without further action of the Bankruptcy Court, however, the Post-Consummation Trust will be authorized, but not required, to file a certification of no objection and file an order to the Bankruptcy Court on account of such settlements and compromises.

The Debtors will continue to reconcile Class 5, 6 and 7 Claims through the Effective Date. Following the Effective Date, objections to and reconciliation of Class 5, 6 and 7 Claims will be performed by the Litigation Trust under the supervision and direction of the Litigation Trust Committee member appointed by the Creditors Committee.

3.     Treatment of the Disputed Claims

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

G.     Conditions Precedent to Confirmation and Consummation of the Plan

1.     Conditions to Confirmation

The following are conditions precedent to Confirmation of the Plan that must be (i) satisfied or (ii) waived in accordance with Article X of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Agent.

64

(b)       The Plan and Exhibits thereto (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to the Debtors and the Agent, in consultation with the Prepetition Lenders.

(c)       The order approving the Customer Agreement on a final basis [Docket No. 3918] shall not have been vacated or stayed by the Bankruptcy Court.

(d)       The Debtors shall have consummated the Soft-Trim Sales Transaction.

(e)       The Bankruptcy Court shall have entered an order or the Debtors shall have entered into an agreement with the PBGC, either of which shall provide that the Collins & Aikman Pension Plan and other pension obligations for the Debtors' United States employees are terminated.

(f)       The Bankruptcy Court shall have entered an order (which shall not have been vacated or stayed), which shall provide that the Post-Consummation Trust has no OPEB Liability, or the Confirmation Order shall provide for such relief.

2.       Conditions Precedent to Consummation

The following are conditions precedent to Consummation of the Plan that must be (i) satisfied or (ii) waived in accordance with Article VIII.C of the Plan:

(a)       All conditions to Confirmation of the Plan set forth in Article X.A shall remain satisfied.

(b)       Each order of the Bankruptcy Court referred to in Article X.A shall have become a Final Order.

(c)       The Post-Consummation Trust Agreement and all related agreements shall have been executed

(d)       The Remaining Assets shall have been transferred to the Post-Consummation Trust and the Remaining Assets shall include no less that $3 million in Cash.

(e)       The Litigation Trust Agreement, in form and substance satisfactory to the Agent and the Creditors Committee, and all related agreements shall have been executed.

(f)       The Litigation Trust Assets shall have been transferred to the Litigation Trust.

(g)       The Professional Escrow Account shall have been funded.

(h)       All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

3.       Waiver of Conditions

The Debtors, in the Debtors' discretion and with the consent of the Agent, in consultation with the Prepetition Lenders, may waive any of the conditions to Confirmation of the Plan set forth in Article X.A of the Plan or Consummation of the Plan set forth in Article X.B of the Plan at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

4.       Effect of Non-Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against, or

any Equity Interests in any Debtor; (b) prejudice in any manner the rights of any Debtor or any other party; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor in any respect.

5. Notice of Effective Date to The PIC Group, Inc.

The Debtors will provide notice of the Effective Date to The PIC Group, Inc. within fifteen (15) business days after the Effective Date

H. Cramdown

The Debtors expect to request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.

I. Settlement, Release, Injunction and Related Provisions

1. Compromise and Settlement

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments under the Plan take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised and released pursuant to the Plan, including for substantive consolidation purposes. The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan, including all issues pertaining to claims for substantive consolidation (which are settled by the distributions in the Plan), are (1) in the best interests of the Debtors and their Estates, (2) fair, equitable and reasonable, (3) made in good faith and (4) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the allowance, classification and treatment of Allowed Claims take into account any causes of action, claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (1) between the Debtors and the Releasing Parties; (2) between the Debtors and the OEMs; and (3) as between the Releasing Parties (to the extent set forth in Article XII.C of the Plan). As of the Effective Date, any and all such causes of action, claims and counterclaims will be settled, compromised and released pursuant to the Plan. The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, causes of action, claims and counterclaims against each such Releasing Party and OEM that are satisfied, compromised and settled pursuant to the Plan. Nothing in Article XII.A of the Plan, however, will compromise or settle in any way whatsoever, any Claims or Causes of Action that the Debtors or any Trust may have against the Non-Released Parties.

The PBGC has informed that the Debtors that it is reserving all rights with respect any actions that have the effect of substantively consolidating the Debtors. The Debtors and the PBGC are currently in discussions regarding the treatment of the PBGC's claims in these cases.

2. **Releases by the Debtors and the OEMs**

**Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by each of the Debtor Releasees, including: (1) the discharge of claims and all other good and valuable consideration paid pursuant to the Plan; and (2) the services of the officers and directors employed by the Debtors at any time on or after November 1, 2006, in facilitating the expeditious implementation of the transactions contemplated by the Plan, each of the Debtors will provide a full discharge and release to each of the OEMs and the Debtor Releasees (and each such OEM and Debtor Releasee so released will be deemed released and discharged by the Debtors) and the respective properties of each such OEM and Debtor Releasee from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or**

66

omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the Debtors or either Trust would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the Debtors or any of their Estates and further including those in any way related to the Chapter 11 Cases or the Plan; provided that the foregoing provisions will not operate to waive or release any Debtor Releasee from any Causes of Action set forth on Exhibit A to the Plan.

Notwithstanding anything contained in the Plan to the contrary, except as otherwise set forth in the Customer Agreement and the OEM Excluded Claims, on the Effective Date and effective as of the Effective Date and immediately prior to the transfer of the Litigation Trust Assets and the Litigation Trust Claims to the Litigation Trust, for the good and valuable consideration provided by the Debtors, including the releases of the OEMs set forth in Article XII.B of the Plan, each of the OEMs will provide a full discharge and release to each of the Debtors (and each such Debtor so released will be deemed released and discharged by each of the OEMs) and the Debtors' respective properties from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those that any of the OEMs would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Person would have been legally entitled to assert for or on behalf of any of the OEMs and further including those in any way related to the Chapter 11 Cases or the Plan.

Notwithstanding anything contained in the Plan to the contrary, the Debtors will not have released nor be deemed to have released by operation of Article XII.B of the Plan or otherwise any of the Causes of Action set forth on Exhibit A or any other claims, causes of action, debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that they or either Trust may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases provided in Article XII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the OEMs, representing good faith settlement and compromise of the claims released herein; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) approved after due notice and opportunity for hearing; (5) a bar to the Debtors and both Trusts asserting any Claim released herein against any of the Debtor Releasees or their respective property; and (6) a bar to each of the OEMs asserting any Claim released herein against any of the Debtors or their respective property.

3.       **Third Party Release**

As of the Effective Date, in consideration for the obligations of the Debtors and the Trusts under the Plan and the Cash, other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Releasing Party will be deemed to forever release, waive and discharge all claims (including Derivative Claims), causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies and liabilities (other than the right to enforce the Debtors' or either Trust's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered thereunder), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Chapter 11 Cases or the Plan that such Person has, had or may have against any Third Party Releasee and their respective property (which release will be in addition to the discharge of Claims and

termination of Equity Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code).

Notwithstanding anything contained in the Plan to the contrary, the Releasing Parties will not have released nor be deemed to have released by operation of Article XII.C of the Plan or otherwise any claims or causes of action that they, the Debtors or either Trust may have now or in the future against the Non-Released Parties.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the release provided under Article XII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Debtor Releasees and the Releasing Parties, representing good faith settlement and compromise of the claims released; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable, and reasonable; (4) approved after due notice and opportunity for hearing; and (5) a bar to any of the Releasing Parties asserting any claim released by Article XII.C of the Plan against any of the Third Party Releasees or their respective property.

MacKay Shields has objected to the Third Party Releases, as well as the Injunction described at Article V.J of this Disclosure Statement and in the Plan, as being overly broad and ambiguous because they may result in the release of and injunction against claims against certain non-Debtors. MacKay Shields maintains that no unusual circumstances exist and no consideration has been established to justify non-Debtor releases and injunctive relief. MacKay Shields further maintains that the identities of all persons intended to receive a release have not been adequately disclosed and, therefore, certain claims against such non-Debtors should be excluded from the release and injunctive provisions. The Debtors dispute MacKay Shields' position and believe that the releases and injunctions are valid. The parties reserve their rights with respect to this issue for the Confirmation Hearing.

4.      **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will neither have nor incur any liability to any Person for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing or administering the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or confirming or consummating the Plan; provided that (i) the provisions of Article XII.D of the Plan will have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, (ii) each Exculpated Party will be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan, (iii) the provisions of Article XII.D of the Plan will not apply to any acts or omissions expressly set forth in and preserved by the Plan and (iv) the provisions of the Article XII.D of the Plan will have no effect on the liability of the Post-Consummation Trust that results from any such acts or omissions in connection with the Customer Agreement or the Post-Petition OEM Contracts.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will not include the Non-Released Parties, and the Plan will not exculpate nor be deemed to have exculpated any of the Non-Released Parties for any acts they have taken, whether in contemplation of the restructuring of the Debtors, in confirming or consummating the Plan, or otherwise.

As used herein, Exculpated Parties means: (a) the Debtors; (b) the Trusts; (c) the Releasing Parties and their respective predecessors and successors in interest; (d) the OEMs and (e) all of the current (and former as it relates to the Persons described in foregoing clauses (c) and (d)) officers, directors, employees, members, partners, investment advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, affiliates and representatives of each of the foregoing Persons (in each case in his, her or its capacity as such). Notwithstanding the foregoing, no Non-Released Parties will be Exculpated Parties.

J.    **Injunction**

**IF YOU ACCEPT ANY DISTRIBUTION PURSUANT TO THE PLAN, YOU WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE FOLLOWING INJUNCTIONS SET FORTH IN ARTICLE XII.E OF THE PLAN.**

**Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Equity Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding against the Debtors, either Trust or their respective property, other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, any Trust or their respective property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, any Trust or their respective property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or any Trust; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

**Except as otherwise provided in the Plan, or in respect of the OEM Excluded Claims, the Confirmation Order or the Customer Agreement, as of the Effective Date, all Persons that have held, currently hold or may hold any claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies or liabilities that are released pursuant to the Plan will be permanently enjoined from taking any of the following actions against any released Person or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

K.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible.

L.    Miscellaneous Provisions

1.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims

Secondary Liability Claims include Claims that arise from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort or other obligation of another Debtor.

On the Effective Date, Holders of Allowed Secondary Liability Claims will be entitled to only one distribution in respect of such underlying Allowed Claim.  No multiple recoveries on account of any Allowed Secondary Liability Claim will be provided or permitted.  The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any (a) Allowed Claim that is being Reinstated under the Plan or (b) Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor or any other entity will be Reinstated.

2.    Dissolution of the Creditors Committee

Effective thirty (30) days after the Effective Date, if no appeal of the Confirmation Order is then pending, the Creditors Committee will dissolve and the members of the Creditors Committee will be released and discharged from all

duties and obligations arising from or related to the Chapter 11 Cases. The legal Professionals retained by the Creditors Committee and the members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after thirty (30) days after the Effective Date, the financial advisory Professionals retained by the Creditors Committee and the members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except in either case for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Article III.A.1(f)(ii)(a) of the Plan and in connection with any appeal of the Confirmation Order.

3.      Modification or Revocation of the Plan

Pursuant to the Plan, with the prior written consent of the Creditors Committee, the Debtors or the Post-Consummation Trust, as applicable, reserve the right to alter, amend or modify the Plan before its substantial consummation. In addition, the Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date.

4.      Certain Limitations on Releases and Exculpation

Notwithstanding anything contained in the Plan to the contrary, nothing in Article XII.C, Article XII.D, Article XII.E or any other provision of the Plan will limit the rights, if any, of RLI Insurance Company to seek and receive a distribution from the letters of credit issued by JPMorgan Chase Bank, N.A. (previously known as Chase Manhattan USA, N.A.) (or any replacements or renewals of said letter of credit) to RLI Insurance Company with respect to the bonds issued by RLI Insurance Company on behalf of Collins & Aikman Corporation and/or Collins & Aikman Products Co. RLI Bonds. Without any prejudice to the rights of RLI Insurance Company, on or before the Effective Date, the Debtors will advise RLI Insurance Company of the Debtors' intentions with respect to the RLI Bonds.

Notwithstanding anything to the contrary in the Plan, the third party releases set forth in Article XII.C of the Plan, the exculpation set forth in Article XII.D of the Plan, the injunction set forth in Article XII.E of the Plan or any other provision of the Plan are not intended to and do not limit the rights, if any, of Sales Engineering, Inc. to seek and receive a distribution from the letters of credit issued by JP Morgan Chase Bank to Sales Engineering, Inc. on behalf of Collins & Aikman Plastics, Inc. in that litigation or otherwise and nothing contained in the Plan will be deemed to enjoin Sales Engineering, Inc. from exercising its rights, if any, under the letter of credit issued in its favor by JP Morgan Chase Bank.

# ARTICLE VI.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON APRIL 19, 2007, AT 10:00 A.M. PREVAILING EASTERN TIME, BEFORE THE HONORABLE STEVEN W. RHODES, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION, 211 WEST FORT STREET, DETROIT, MICHIGAN 48226. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE OTHER THAN AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF; PROVIDED, IF THE DEBTORS ADJOURN THE CONFIRMATION HEARING AFTER THE PLAN OBJECTION DEADLINE, THE DEBTORS WILL PROVIDE WRITTEN NOTICE OF SUCH ADJOURNMENT TO ANY OBJECTING PARTY, THE CORE GROUP AND THE 2002 LIST (AS DEFINED IN THE CASE MANAGEMENT PROCEDURES).**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE APRIL 9, 2007, AT 5:00 P.M. PREVAILING PACIFIC TIME, IN ACCORDANCE WITH THE SOLICITATION NOTICE FILED AND SERVED ON HOLDERS OF CLAIMS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION NOTICE, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B.      Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that, among other things, the requirements of section 1129 of the Bankruptcy Code have been satisfied. The requirements of section 1129 of the Bankruptcy Code are summarized below.

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors, as Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation of the Plan is reasonable, or if such payment is to be fixed after the Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      With respect to each Class of Impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

6.      Each Class of Claims or Equity Interests that is entitled to vote on the Plan either has accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

7.      Except to the extent that the Holder of a particular Claim agrees to a different treatment of such Claim, Allowed Administrative Claims and Allowed Other Priority Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter.

8.      At least one Class of Impaired Claims or Equity Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in such Class.

9.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

10.     All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States trustee, will be paid as of the Effective Date.

11.     The Plan addresses payment of retiree benefits in accordance with section 1114 of the Bankruptcy Code.

The Debtors believe that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including, without limitation, that (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code and (iii) the Plan has been proposed in good faith.

C.      Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the Creditors pursuant to the terms of the Plan. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

D.      Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each Holder of a Claim or Equity Interest in each Impaired Class: (1) has accepted the Plan; or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case and the assets of such Debtor's Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtors management, together with KZC Services, LLC, the Debtors' restructuring consultants, and Lazard Frères & Co. LLC, the Debtors' financial advisors, prepared the analysis of estimated distributions to creditors under the Plan set forth below (the "Plan Distribution Analysis") and the Liquidation Analysis attached hereto as **Appendix C**.

1.      Plan Distribution Analysis

The Plan Distribution Analysis presents "High" and "Low" estimates of the proceeds that would be available for distribution to creditors if the Plan were confirmed and effectuated according to its terms. These estimates represent a range of management's assumptions regarding the costs that would be incurred to implement the Plan and the funds that would be available for distribution to creditors. The Plan Distribution Analysis has the same projected Effective Date as the Liquidation Analysis (the "Assumed Effective Date"). In addition, management's assumptions in the Plan Distribution Analysis regarding anticipated events and proceeds expected to be realized prior to the Assumed Effective Date are the same as those used to prepare the Liquidation Analysis.

If the Plan is confirmed, the Debtors will transfer certain of their assets to the Post-Consummation Trust on the Effective Date and the Post-Consummation Trust will continue the Sale Process. The Plan Distribution Analysis assumes that the Post-Consummation Trust would continue to operate according to the terms of the Customer Agreement. Consistent with the goals of the Sale Process discussed in Article IV, the Plan Distribution Analysis assumes, among other things: (i) a successful going concern sale of the Carpet & Acoustics business; (ii) going concern sales of certain plants in the Debtors' Plastics business segment; (iii) sales of all remaining assets; and (iv) net positive global settlements with certain customers regarding open commercial issues and receivable balances.

|  | | High | | Low |
|---|---|---|---|---|
| ***Estimated Proceeds*** | | | | |
| Aggregate Estimated Proceeds | $ | 773,000,000 | $ | 565,675,000 |
| | | | | |
| ***Less: Costs*** | | | | |
| Total Wind-Down Costs & Claims | $ | 337,209,000 | $ | 337,209,000 |
| *Net Proceeds Available for Distribution* | **$** | **435,791,000** | **$** | **228,466,000** |
| | | | | |
| ***Plan Distributions*** | | | | |
| Class 3 - Prepetition Facility Claims | | | | |
| Plan Distribution* | $ | 435,791,000 | $ | 228,446,000 |
| Recovery Percentage | % | 58.3 | % | 30.6 |
| Classes 5, 6 and 7 - Unsecured Claims | | | | |
| Plan Distribution** | $ | >0 | $ | >0 |
| Recovery Percentage | % | >0 | % | >0 |

\* THE TRANCHE A LITIGATION RECOVERY INTERESTS THAT WOULD BE DISTRIBUTED TO HOLDERS OF CLAIMS IN CLASS 3 ARE NOT VALUED FOR PURPOSES OF THIS ANALYSIS, BUT ARE ANTICIPATED TO BE GREATER THAN ZERO.

\*\* THE TRANCHE B LITIGATION RECOVERY INTERESTS THAT WOULD BE DISTRIBUTED TO HOLDERS OF CLAIMS IN CLASSES 5, 6 AND 7 ARE NOT VALUED FOR PURPOSES OF THIS ANALYSIS, BUT ARE ANTICIPATED TO BE GREATER THAN ZERO.

The Aggregate Estimated Proceeds reflect: (a) estimated values for cash as of the Assumed Effective Date (in an amount equal to that reflected in the Liquidation Analysis); (b) a range of expected proceeds from collections and settlements related to accounts receivable balances for production and tooling; (c) a range of proceeds relating to the expected going concern sales of the Carpets & Acoustics business and certain plastics plants; (d) a range of values associated with property, machinery and equipment for those plants assumed to be wound down; (e) a range of collections from European intercompany claims (in an amount equal to that reflected in the Liquidation Analysis); and (f) a range of potential cash flows from continuing operations. The Aggregate Estimated Proceeds exclude any recovery from Retained Causes of Action. The Plan Distribution Analysis presents these estimated proceeds in the aggregate, as an itemized listing of management's expectations with respect to these amounts could prejudice the Debtors in ongoing sale negotiations and settlement discussions, and reduce potential recoveries to creditors under the Plan.

The Total Wind Down Costs & Claims are derived from the funding protocol and budget used in developing the Customer Agreement and the claims estimates discussed more fully in Article III.H.5. Due to the confidentiality of the funding protocol and budget agreed to in the Customer Agreement, the Plan Distribution Analysis does not disclose an itemized listing of these amounts

The Confirmation Order would effectuate the substantive consolidation of the Debtors; therefore, the distributions to creditors estimated in the Plan Distribution Analysis are on a consolidated basis. In addition, consistent with the Plan, any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed one right to a distribution under the Plan.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF HYPOTHETICAL PLAN DISTRIBUTIONS IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THESE ESTIMATES THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS. NEITHER THE ESTIMATED PLAN DISTRIBUTIONS, NOR THE FINANCIAL

INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS OR PREPARED IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE PLAN DISTRIBUTION ANALYSIS.

    2.    Conclusion

In a liquidation under chapter 7, there would be <u>no recovery for unsecured creditors</u> classified in Classes 5, 6 and 7 under the Plan; therefore, the best interests test is satisfied. As made clear by the Liquidation Analysis, the proceeds of a liquidation would not surpass amounts owed on account of the Prepetition Facility Claims. Because all proceeds of any liquidation would be subject to the liens and security interests of the Holders of the Prepetition Facility Claims, nothing would be left for unsecured creditors. The recovery under the Plan provided to Classes 5, 6 and 7 is provided only because the acceptance of the Plan by Class 3 Prepetition Facility Claims permits such recovery pursuant to certain provisions of chapter 11 of the Bankruptcy Code, which provisions would not be applicable in a chapter 7 proceeding.

The Liquidation Analysis and Plan Distribution Analysis further demonstrate that the Holders of Class 3 Prepetition Facility Claims would receive considerably less in a chapter 7 liquidation than they would under the Plan. Under the Plan, it is management's expectation that Holders of Prepetition Facility Claims would receive a 58.3% recovery in the high case and a 30.6% recovery in the low case; while, in a chapter 7 liquidation, recoveries would range from 17.9% to 9.8% (in each case, excluding any recoveries from the Litigation Trust Claims).

E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or equity interests that is impaired under a plan accept the plan, with the exception described in the following section. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan (1) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (2) cures any default and reinstates the original terms of the obligation.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two-thirds in amount actually voting have voted to accept the plan.

F.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank. In determining whether a plan discriminates unfairly, courts will take into account a number of factors. Accordingly, two classes of holders of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent

of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the debtor's plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value as of the Effective Date equal to the allowed amount of such claim; or (2) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or equity interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of equity interests includes the requirements that either: (1) the plan provide that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the Effective Date, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled or (c) the value of such interest; or, (2) if the class does not receive such an amount as required under (1), no class of equity interests junior to the non-accepting class receives a distribution under the plan.

The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class, as applicable, presumed to reject the Plan, and the Debtors reserve the right to do so with respect to any other rejecting Class of Claims or Equity Interests, as applicable, or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that if the Debtors "cram-down" the Plan pursuant to Section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. If the Debtors seek to "cram-down" the Plan on Holders of Secured Claims, all such Holders will receive a distribution that satisfies the fair and equitable requirement. With respect to the fair and equitable requirement with respect to holders of unsecured claims, such holders will not receive a distribution equal to the Allowed amount of their Claims, but no junior Claim or Equity Interest receives any distribution under the Plan. Holders of Equity Interests will receive no distribution under the Plan, but there is no junior Claim or Equity Interest that will receive any distribution under the Plan either. Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors are required to "cram down."

## ARTICLE VII.
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.     Certain Bankruptcy Considerations

　　　　1.     The Debtors May Not Be Able to Obtain Confirmation of the Plan

The Debtors cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of Claims or Equity Interests might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court were to determine that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (b) Confirmation of the Plan is not likely to be followed by a liquidation, unless such liquidation is proposed in the plan, or a need for further financial reorganization; and (c) the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

2. The Bankruptcy Court May Not Approve the Compromises and Settlements Contemplated by the Plan, Including for Substantive Consolidation Purposes

As described in more detail in Article V.J.1 herein, the Plan constitutes a settlement, compromise and release, including for substantive consolidation purposes, of rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments under the Plan take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise. This settlement, compromise and release requires approval by the Bankruptcy Court in the Confirmation Order. The Debtors cannot ensure that the Bankruptcy Court will approve of the settlement contemplated in Article XII.A of the Plan.

3. Parties in Interest May Object to the Debtors' Classification of Claims

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. The Debtors believe that Claims that are subject to indentures, including the Senior Note Claims and the Senior Subordinated Note Claims are properly separated from each other and from General Unsecured Claims against the Debtors. Certain Holders of Claims may object to this.

4. The Debtors May Object to the Amount or Secured or Priority Status of a Claim

The Debtors reserve the right to object to the amount or the secured or priority status of any Claim or Equity Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of any Claims or Equity Interest whose Claim or Equity Interest is subject to an objection. Any such Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

5. The Actual Allowed Amounts of Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims

The estimated Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed Claims may differ significantly from the estimated amount of Allowed Claims contained herein. As a result, such differences may materially and adversely affect the recovery realized by Holders of such Claims under the Plan.

6. Holders of Prepetition Facility Claims May Not Support the Plan

Pursuant to the Customer Agreement, the Agent for the Prepetition Lenders under the Prepetition Facility has consented to support the Plan so long as the Plan contains the claims treatment and releases set forth in the Plan Term Sheet appended to the Customer Agreement. In addition, the Steering Committee has consented to support the Plan so long as the plan contains the claims treatment and releases set forth in the Plan Term Sheet appended to the Customer Agreement. Nevertheless, the members of the Steering Committee are entitled to sell their Prepetition Facility Claims and, as a result, the composition of the Steering Committee may change and it could attempt to withdraw its consent. If either the Agent or the Steering Committee objects to the Plan, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan.

7. Administrative Expenses and Priority Claims May Exceed Expected Levels

Section 1129(a) of the Bankruptcy Code requires that, in order to confirm a chapter 11 plan, administrative expenses of the chapter 11 case and various classes of priority claims must be paid in full in cash, unless the respective holders of such expenses and claims agree to less favorable treatment. The Customer Agreement contemplates the use of cash collateral, to which the Agent has consented under the Customer Agreement, and the Steering Committee also has consented, to pay certain types and amounts of administrative expenses and priority claims so that the Plan can be confirmed. The Debtors currently expect that the amount of allowed administrative expenses and priority claims will not exceed such amounts, but there can be no assurance that such amounts will not be exceeded or, if such amounts are exceeded, that either (a) the Prepetition Lenders would agree to the use of a larger portion of their cash collateral to satisfy such expenses and claims or (b) claimants would consent to a less favorable treatment.

B.    Risks Relating to the Sale Process

1. The Debtors May Be Unable to Close the Carpet & Acoustics Sale Transaction

The Debtors currently expect that the Sale Process will culminate in the consummation of a sale of its Carpet & Acoustics segment to a stalking horse or alternative purchaser with a higher and better offer. The Debtors will incur considerable cost and expense in connection with the sale process and may ultimately be obligated to reimburse the out-of-pocket expenses of a stalking horse or certain other potential purchasers. There are many factors outside of the Debtors' control that will affect the Debtors' ability to locate a stalking horse and consummate a sales transaction involving the Carpet & Acoustics segment on acceptable terms and conditions, including the ability of a stalking horse or an alternative purchaser to finance the transaction, the ability of the Debtors to obtain necessary consents to the sale or transfer of certain of their assets, the ability of the Debtors to obtain regulatory and other governmental approval of a transaction and the ability of the Debtors to negotiate a definitive agreement for the sale of the Carpet & Acoustics segment on acceptable terms. Moreover, it is possible that the Debtors may not be able to meet various closing conditions and, as a result, a stalking horse or alternative purchaser may elect to cancel any asset purchase agreement as a result of these failures.

The Debtors can provide no assurance that they will be successful in consummating a sale transaction involving the Carpet & Acoustics segment. If the Debtors are unable to successfully complete a sale of the Carpet & Acoustics segment and consummate a sale transaction of the Carpet & Acoustics segment, it could have a material adverse effect on the business, financial condition and results of operations of the Debtors and the value of the Debtors' Estates. Additionally, the Debtors may be obligated to reimburse the out-of-pocket expenses of any stalking horse and certain potential purchasers regardless of whether a sale transaction is consummated and such expenses could be significant.

2. Expenses of Wind-Down Greater than Anticipated or Default by OEMs under Customer Agreement

The Debtors cannot ensure that the expenses of the wind-down of their non-salable businesses for which the Debtors are responsible will not be greater than the proceeds realized in the Sale Process. In addition, the Customer Agreement and the Plan contemplate the segregation of sale proceeds from the Sale Process from certain of the expenses of the Sale Process for which the OEMs are obligated pursuant to the Customer Agreement. The Debtors cannot ensure that the OEMs will not default on these obligations or otherwise shift these expenses to the Debtors, including by filing for bankruptcy protection. In addition, there are significant factors outside the Debtors control that may lead to the unenforceability of the Customer Agreement or inability to effectuate the Customer Agreement. If the OEMs default on their obligations under the Customer Agreement or otherwise shift expenses to the Debtors, it may have a material adverse effect on the business, financial condition and results of operations of the Debtors and the value of the Debtors' Estates.

C.    Other Risks

1. The Litigation Trust May Not Realize Any Recovery

Although certain assets will be transferred to the Litigation Trust, including the Litigation Trust Claims and $3 million to pursue the Litigation Trust Claims, there is no guarantee that the Litigation Trust will realize any recovery on the Litigation Trust Claims. The Litigation Trust Claims are contingent and unliquidated, and the prosecution of the Litigation Trust Claims may be vigorously defended.

2.      Extent and Treatment of Environmental Claims Arising from Debtor-Owned or Leased Properties May Reduce Recovery

Environmental agencies and others have asserted that the Debtors must ensure continued full performance of environmental investigation and remediation obligations with respect to certain properties owned or leased by the Debtors. As described in Article III.H.6, the ultimate disposition of the properties and leases has not been determined. It is possible that such disposition will require a commitment of assets from the Debtors or one of the Trusts. Such commitment of assets would necessarily reduce the potential recovery for other creditors. In addition, the environmental agencies may assert claims or initiate enforcement actions against the Debtors that could negatively affect the recovery of other creditors under the Plan.

3.      Risk of No Insurance Coverage from FFIC

Fireman's Fund Insurance Company, National Surety Company and, possibly, other related insurance companies (collectively, "FFIC") issued certain insurance policies for various policy periods (collectively, the "Policies") that may provide coverage for certain Claims. In connection with the Policies, FFIC and Debtors may have entered into various related agreements (together with the Policies, collectively, the "FFIC Agreements"). FFIC has asserted that the FFIC Agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code and that the FFIC Agreements must be assumed as a condition to FFIC's continuing obligation to provide coverage. To the extent that the FFIC Agreements are executory contracts, FFIC believes that the Debtors, Plan Administrator and/or Litigation Trust Administrator, as the case may be, will be required to either assume or reject the agreements pursuant to the terms of the Plan and section 365 of the Bankruptcy Code. FFIC believes that the Plan does not otherwise require that the Debtors, the Plan Administrator and/or Litigation Trust Administrator satisfy their continuing contractual obligations, if any, under the FFIC Agreements, and FFIC believes that confirmation of the Plan may affect a discharge and/or release of those obligations.

FFIC believes that the failure of the Plan to require the Debtors, Plan Administrator and/or Litigation Trust Administrator to satisfy the continuing contractual obligations of the insureds under the FFIC Agreements will void any insurance coverage under the FFIC Agreements that otherwise may be available. FFIC also believes that the Plan seeks to provide the Debtors with certain injunctive relief that alters the Debtors' ongoing contractual obligations under the FFIC Agreements that would also vitiate any available insurance coverage. As such, FFIC believes that holders of Claims that may otherwise be covered under the FFIC Agreements may not be able to receive any insurance proceeds in full or partial satisfaction of such Claims.

FFIC has asserted that it reserves all of its rights, claims and defenses, if any, under the FFIC Agreements including, but not limited to, its rights to deny coverage. Based on the foregoing, FFIC has indicated that it may object to confirmation of the Plan and/or seek declaratory relief in a court of competent jurisdiction that the treatment of the FFIC Agreements under the Plan relieves it of any further obligation to provide coverage thereunder.

The Debtors reserve all rights and defenses with respect to the issues raised by FFIC.

4.      Risk of No Insurance Coverage from ACE

The Debtors' Disclosure Statement and proposed Plan anticipate that Insured Claims may be satisfied in whole or in part from available insurance coverage. ACE American Insurance Company and West Chester Fire Insurance Company (and possibly other members of the ACE group of companies) (collectively, "ACE") issued certain insurance policies to one or more Debtors (collectively, the "ACE Policies") which may provide pre- or postpetition coverage for part or all of certain Claims against the Debtors, including Insured Claims, and/or Claims of the Debtors' directors, officers and employees, as well as claims of the Debtors. ACE asserts that: (i) the ACE Policies require the Debtors, as insureds, to satisfy certain conditions in order for coverage to be provided; and (ii) the ACE Policies are executory contracts pursuant to section 365 of the Bankruptcy Code.

To the extent that the ACE Policies are executory contracts, the Debtors have not indicated yet whether they intend to assume or reject any of the ACE Policies that may provide coverage for Claims and/or the Debtors' obligations to indemnify their directors, officers and employees. ACE believes that the rejection of any or all of the ACE Policies, to the extent that they are executory contracts, may result in a loss of coverage for Claims and/or for the Debtors.

In addition, ACE believes that the Plan assumes the benefits of the coverage under the ACE Policies, but does not indicate how the insureds' obligations under the ACE Policies will be performed. ACE believes that the failure to provide for performance of the insureds' obligations under the ACE Policies may also result in a loss of coverage.

Based upon the foregoing, ACE believes that the Debtors, and holders of Claims that may otherwise be covered under the ACE Policies, may not be able to receive any insurance proceeds in full or partial satisfaction of their Claims.

Furthermore, ACE reserves its rights, claims and defenses under the ACE Policies, including, without limitation, its rights, if any, to deny coverage based upon either the rejection of any or all of the ACE Policies, to the extent they are executory contracts, or any failure of the Debtors to perform the insureds' obligations under the ACE Policies. ACE also reserves its rights to object to confirmation of the Plan and to all agreements, schedules and documents relating to the Plan, and/or to seek declaratory relief in a court of competent jurisdiction that the treatment of the ACE Policies under the Plan relieves it of any further obligation to provide insurance coverage thereunder.

The Debtors reserve all rights and defenses with respect to the issues raised by ACE.

D.       Liquidation under Chapter 7

If no chapter 11 plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the holders of Claims and, if permitted, Equity Interests in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Allowed Equity Interests is set forth in Article VI.D herein.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ADDITIONALLY, FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED OR ASSURED. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE CLOSING OF SALE TRANSACTIONS, THE ABILITY OF THE DEBTORS TO SUCCESSFULLY NEGOTIATE A DEFINITIVE AGREEMENT FOR THE SALE OF THE CARPET & ACOUSTICS SEGMENT, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS OR THAT THE DEBTORS CURRENTLY BELIEVE TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTORS' BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND THE VALUE OF THE DEBTORS' ESTATES. IF ANY OF THE RISKS OCCUR, THE DEBTORS' BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS AND THE VALUE OF THE DEBTORS' ESTATES, AS WELL AS THE DEBTORS' ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

# ARTICLE VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass-through entities and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that, except as recharacterized by a Final Order of the Bankruptcy Court, the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.      Certain United States Federal Income Tax Consequences to the Debtors

Under the Plan, the Debtors are transferring substantially all of their remaining assets to the Post-Consummation Trust and the Litigation Trust. These transfers of assets may result in the recognition of taxable gain or loss to the Debtors, based on the difference between the fair market value of these assets and the Debtor's tax basis in these assets. To the extent that the Debtors realize gain from the transfer of these assets the Debtors believe that they will have sufficient current losses and net operating loss carryovers to shelter these gains, although there could be some liability to the Debtors in certain states and under the federal alternative minimum tax.

B.      Certain United States Federal Income Tax Consequences to the Holders of Class 1 Claims and Class 2 Claims

Pursuant to the Plan, Holders of Class 1 Other Secured Claims (whose claims are not reinstated) and the Holders of Class 2 Other Priority Claims will receive, in full satisfaction and discharge of their Claims, either Cash or the

Collateral securing their Claims. A Holder who receives Cash or Collateral in exchange for its Claim pursuant to the Plan generally will recognize income, gain or loss, for federal income tax purposes, in an amount equal to the difference between (1) the amount of Cash or the value of the Collateral received in exchange for its Claim and (2) its adjusted tax basis in such Claim. The character of such gain or loss (whether capital gain or loss or ordinary income or loss) will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether, and to what extent, the Holder has previously claimed a bad debt deduction with respect to its Claim.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

C.      Certain United States Federal Income Tax Consequences to the Holders of Class 3 Claims

Pursuant to the Plan, Holders of Class 3 Prepetition Facility Claims will receive, in full satisfaction and discharge of their Claims, Cash, Post-Consummation Trust Beneficial Interests and Litigation Recovery Interests. The amount received, if any, from the Litigation Recovery Interests is contingent on the outcome of the Litigation Trust Claims. The Holder should recognize gain or loss equal to the difference between (1) the sum of (a) the amount of Cash received and (b) the fair market value as of the Effective Date of the Post-Consummation Trust Beneficial Interests and Litigation Recovery Interests received (to the extent such Cash, Post-Consummation Trust Beneficial Interests, and Litigation Recovery Interests are not allocable to accrued interest) and (2) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Cash, Post-Consummation Trust Beneficial Interests and/or Litigation Recovery Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the Post-Consummation Trust Beneficial Interests and Litigation Recovery Interests received should equal the fair market value as of the Effective Date. A Holder's holding period for the Post-Consummation Trust Beneficial Interests and Litigation Recovery Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Recovery Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for Cash, the Post-Consummation Trust Beneficial Interests and Litigation Recovery Interests on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

D.      Certain United States Federal Income Tax Consequences to the Holders of Class 5 Claims, Class 6 Claims and Class 7 Claims

Pursuant to the Plan, Holders of Class 5 General Unsecured Claims, Class 6 Senior Note Claims and PBGC Claims and Class 7 Senior Subordinated Note Claims will receive, in full satisfaction and discharge of their Claims, Litigation Recovery Interests. The amount received, if any, from such Litigation Recovery Interests is contingent on the outcome of the Litigation Trust Claims. The Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the Litigation Recovery Interests received (to the extent it is not allocable to accrued interest) and (2) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Recovery Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the Litigation Recovery Interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Litigation Recovery Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Recovery Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

To the extent that any amount received by a Holder of a Claim is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest is unclear. Nevertheless, the Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a Holder of a Claim who exchanges the Claim for Litigation Recovery Interests or Cash on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition of Claims that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

E.     Receipt of Interests in Post-Consummation Trust and in the Litigation Trust

On the Effective Date, the Post-Consummation Trust and the Litigation Trust shall be settled and are currently anticipated to exist as either grantor trusts or partnerships, in each case, for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator or the Litigation Trust Administrator), pursuant to Treasury Regulation Section 1.671-1(a) and/or Treasury Regulation Section 301.7701 4(d) and related regulations, the Plan Administrator and the Litigation Trust Administrator may designate and file returns for each of the Post-Consummation Trust and the Litigation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Post-Consummation Trust's and Litigation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

The Plan Administrator and the Litigation Trust Administrator intend to take a position on Post-Consummation Trust's and Litigation Trust's tax return that the Post-Consummation Trust and the Litigation Trust, respectively, should each be treated as a grantor trust set up for the benefit of creditors.

Holders of Claims that receive a beneficial interest in the Post-Consummation Trust and in the Litigation Trust will be required to report on their U.S. federal income tax returns their share of the Post-Consummation Trust's and the Litigation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Post-Consummation Trust and the Litigation Trust, respectively, whether or not each of the Post-Consummation Trust and the Litigation Trust is taxed as a partnership or a grantor trust. This requirement may result in Holders being subject to tax on their allocable share of the Post-Consummation Trust's and the Litigation Trust's taxable income prior to receiving any cash distributions from the Post-Consummation Trust and the Litigation Trust. In general, holders of interest in the Post-Consummation Trust and in the Litigation Trust will not be subject to tax on their receipt of distributions from the trust.

Any Post-Consummation Trust Assets and Litigation Trust Assets held by the Post-Consummation Trust and the Litigation Trust on account of Disputed Claims shall be treated as held in trust by the Post-Consummation Trust and the Litigation Trust as fiduciary for the benefit of the holders of Disputed Claims (each a "Disputed Claims Reserve").

Under section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the holders of disputed claims or by the Debtor (or, if applicable, any of its successors), or otherwise. On February 1, 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves of the type here involved that are established after the date such Treasury Regulations become final. In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Treasury Regulation sections 1.468B-1 et seq. and thus subject to a separate entity level tax. As to previously established escrows and the like, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Post-Consummation Trust and the Litigation Trust shall (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each disputed claim in the class of claims to which such reserve relates, in accordance with the trust provisions of Code, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Post-Consummation Trust and the Litigation Trust, in each case as fiduciary for Holders of Disputed Claims, will report as subject to a separate entity level tax any amounts earned by their respective Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year. In such event, any amount earned by a Disputed Claims Reserve that is distributed to a holder during the same taxable year will be includible in such holder's gross income.

Distributions from a Disputed Claims Reserve will be made to Holders of Disputed Claims when such claims are subsequently Allowed and to Holders of previously Allowed claims when any Disputed Claims are subsequently disallowed. Such distributions (other than amounts attributable to earnings) should be taxable to the recipient in accordance with the principles discussed above.

Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the Post-Consummation Trust and/or the Litigation Trust and each Holder of a Disputed Claim is urged to consult its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE IX.
### VOTING INSTRUCTIONS

The following is a brief summary regarding voting on the Plan. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys. Additional information regarding voting procedures is set forth in the Solicitation Notice accompanying this Disclosure Statement.

Pursuant to order dated January 26, 2007 [Docket No. 3988] (the "Solicitation Procedures Order"), the Bankruptcy Court approved the Debtors Motion for Order Approving the Debtors' Disclosure Statement and Relief Related Thereto [Docket No. 3815] (the "Solicitation Procedures Motion") and the Amended Solicitation Procedures (the "Solicitation Procedures") attached thereto. Capitalized terms used in this Article IX that are not otherwise defined herein shall have the meaning assigned to such terms in the Solicitation Procedures Motion and exhibits thereto.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS. THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

A.      Voting Record Date

The Bankruptcy Court has approved **January 26, 2007,** as the record date (the "Voting Record Date") for purposes of determining which creditors are entitled to vote on the Plan.

B.      Voting Deadline

The Bankruptcy Court has approved **April 9, 2007, at 5:00 p.m. prevailing Pacific Time,** as the voting deadline (the "Voting Deadline") for delivering Ballots and Master Ballots with respect to the Plan. The Debtors may extend the Voting Deadline without further order of the Court, however, the Debtors will document any such extension in the Voting Report (as defined below). To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots must be properly executed, completed and delivered by: (1) first class mail; (2) overnight courier or (3) personal delivery so that they are <u>actually</u> <u>received</u> no later than the Voting Deadline by the Debtors' solicitation agent, Kurtzman Carson Consultants LLC (the "Solicitation Agent") at the following address (the "Solicitation Agent's Address"):

Collins & Aikman Ballot Processing
c/o Kurtzman Carson Consultants LLC
12910 Culver Boulevard, Suite I
Los Angeles, California 90066

C.      Holders of Claims Entitled to Vote

Only the following holders of Claims in Classes 3, 4, 5, 6 and 7 are entitled to vote with regard to such claims:

(1)      the holders of claims for which proofs of claim have been timely filed, as reflected on the official claims register, as of the close of business on the Voting Record Date, with the exception of those claims subject to a pending objection filed before the Voting Deadline, unless such claims are allowed for voting purposes pursuant to the procedures in Paragraph D.5 of the Amended Solicitation Procedures; provided that, to the extent that the Debtors have reached a settlement on a claim for which a proof of claim has been timely filed, the terms of such settlement will govern for purposes of determining the holder of the claim and the amount of the claim;

(2)      the holders of claims that are listed in the Debtors' Schedules, with the exception of those claims that are listed on the Schedules as contingent, disputed or unliquidated claims (excluding such claims on the Schedules that have been superseded by a timely-filed proof of claim); and

(3)      all entities that hold claims pursuant to an agreement or settlement with the Debtors executed prior to the Voting Record Date, as reflected in a court pleading, stipulation, agreement or other document filed with the Bankruptcy Court, in an order entered by the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a proof of claim has been filed.

The assignee of a transferred and assigned claim is permitted to vote such claim only if the appropriate documentation of such transfer has been noted on the Bankruptcy Court's docket as of the close of business on the Voting Record Date.

Only a beneficial owner (a "Beneficial Holder") of one or more of the Debtors' Senior Notes or Senior Subordinated Notes (each a "Note") as reflected in the records maintained by The Depository Trust Company ("DTC") and/or the applicable indenture trustee as of the close of business on the Voting Record Date is entitled to vote claims based on such Notes (the "Beneficial Holder Claims").

85

D.     Voting Procedures

The following materials constitute the solicitation documents (collectively, the "Solicitation Documents"):

(1)     the Solicitation Notice;

(2)     the appropriate Ballot(s) and/or Master Ballot(s), if any, and applicable Voting Instructions, together with a pre-addressed, postage pre-paid return envelope;

(3)     the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan), the Exhibits to the Plan and any other supplements or amendments to these documents that may be filed with the Bankruptcy Court;

(4)     the Solicitation Procedures Order;

(5)     the Solicitation Procedures;

(6)     any supplemental Solicitation Documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available; and

(7)     a CD-Rom containing electronic copies of the documents listed in (3), (4), (5) and (6) (except the Exhibits to the Plan) (the "CD-Rom").

The Debtors will cause to be served on the Core Group and the 2002 List, as defined in Case Management Procedures, all of the Solicitation Documents (except paper copies of the items set forth in (3), (4), (5) and (6) above, which documents will be included on the CD-Rom, and the Exhibits to the Plan). The Solicitation Notice will instruct the Core Group and the 2002 List that the Exhibits to the Plan can be obtained by accessing the Debtors' website at http://www.kccllc.net/collinsaikman or by requesting a copy of such documents from the Debtors' Solicitation Agent by writing to the Solicitation Agent's Address or by telephone at (888) 201-2205.

The Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

E.     Tabulation of Votes

In tabulating votes, the following hierarchy will be used to determine the claim amount associated with the vote of the holder of such claim:

(1)     the claim amount settled or agreed upon by the Debtors prior to the Voting Record Date, as reflected in a court pleading, stipulation, agreement or other document filed with the Bankruptcy Court, in an order entered by the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, regardless of whether a proof of claim has been filed;

(2)     the claim amount allowed (temporarily or otherwise) pursuant to the procedures set forth in the Amended Solicitation Procedures;

(3)     the claim amount contained on a proof of claim that has been timely filed (or deemed timely filed by the Bankruptcy Court); provided that Ballots cast by creditors whose claims are not listed on the Debtors' Schedules, but who timely file proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed before the Voting Deadline, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for claims in the amount of $1.00 solely for purposes of satisfying the dollar amount provisions of section 1126(c);

86

(4)     the claim amount listed in the Debtors' Schedules, provided that such claim is not scheduled as contingent, disputed or unliquidated and has not been paid;

(5)     if a claim holder identifies a claim amount on its Ballot and/or Master Ballot that is less than the amount otherwise calculated in accordance with the tabulation procedures, the claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot and/or Master Ballot; and

(6)     in the absence of any of the foregoing, zero.

The following voting procedures and standard assumptions will be used in tabulating ballots:

(1)     Except as otherwise provided in the Amended Solicitation Procedures, unless the Ballot or Master Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors will reject such Ballot or Master Ballot as invalid and, therefore, decline to count it in connection with confirmation of the Plan.

(2)     The Solicitation Agent will date and time-stamp all Ballots and Master Ballots when received.

(3)     In accordance with Local Rule 3018-1, on or before the date of the Confirmation Hearing, the Debtors will file with the Bankruptcy Court a verified summary of the ballot count in accordance with sections 1126(c) and (d) of the Bankruptcy Code (the "Voting Report").  The Voting Report will detail any defective, irregular or otherwise invalid Ballots and Master Ballots that were waived by the Debtors or were not waived and, therefore, not counted by the Debtors.  To relieve the Office of the Clerk of the Court of the heavy administrative burden associated with filing all original ballots with the Bankruptcy Court in accordance with Local Rule 3018-1, the Solicitation Agent will retain an electronic copy of the original Ballots and Master Ballots for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court.

(4)     The method of delivery of Ballots or Master Ballots to be sent to the Solicitation Agent is at the election and risk of each holder of a claim entitled to vote but, except as otherwise provided in the Solicitation Order, such delivery will be deemed made only when the original executed Ballot or Master Ballot is actually received by the Solicitation Agent.

(5)     An original executed Ballot or Master Ballot is required.  Delivery of a Ballot or Master Ballot to the Solicitation Agent by facsimile, email or any other electronic means will not be valid.

(6)     No Ballot or Master Ballot should be sent to any of the Debtors, their agents (other than the Solicitation Agent), any indenture trustee (unless specifically instructed to do so) or the Debtors' financial or legal advisors and, if so sent, will not be counted.

(7)     If multiple Ballots or Master Ballots are received from the same holder of a claim with respect to the same claims prior to the Voting Deadline, the last Ballot or Master Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot or Master Ballot with respect to the same claim.

(8)     Creditors holding claims in a class that is designated as impaired and entitled to vote under the Plan will receive only the Ballot appropriate for that impaired class.  To avoid duplication and reduce expenses, creditors who have filed duplicate claims in any given class are entitled to receive only one Ballot for voting their claims with respect to that class.

(9)     Holders of claims must vote all of their claims within a particular class to either accept or reject the Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan (or any portion of a Master Ballot reflecting a Ballot that partially rejects and partially accepts the Plan) will not be counted.

87

(10)     If a Ballot or Master Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity on a holder's or Beneficial Holder's behalf, such entities must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Solicitation Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder or Beneficial Holder.

(11)     The Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any Ballot or Master Ballot at any time, either before or after the close of voting and any such waivers will be documented in the Voting Report.

(12)     Neither the Debtors nor any other entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots and Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

(13)     Unless waived or as ordered by the Bankruptcy Court, any defect or irregularity in connection with the delivery of a Ballot or Master Ballot must be cured prior to the Voting Deadline or such Ballot or Master Ballot will not be counted.

(14)     If designation of a voting entity based on lack of good faith is requested by a party-in-interest under section 1126(e) of the Bankruptcy Code, such entity's vote will be counted by the Debtors unless otherwise ordered by the Bankruptcy Court in accordance with section 1126(e).

(15)     Subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any Ballot or Master Ballot not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules and any such rejection will be documented in the Voting Report.

(16)     If a claim is listed in the Schedules as being a non-priority claim (or is not listed in the Schedules) and a proof of claim is filed as a priority claim (in whole or in part), such claim will be temporarily allowed for voting purposes as a non-priority claim in an amount that such claim would have been so allowed in accordance with the other tabulation procedures had such proof of claim been filed as a non-priority claim.

(17)     If a claim is listed in the Schedules as being an unsecured claim (or is not listed in the Schedules) and a proof of claim is filed as a secured claim (in whole or in part), such claim will be temporarily allowed for voting purposes as an unsecured claim in an amount that such claim would have been so allowed in accordance with the other tabulation procedures had such proof of claim being filed as an unsecured claim.

(18)     If a claim has been allowed for voting purposes by order of the Bankruptcy Court, such claim will be temporarily allowed for voting purposes only and not for purposes of allowance or distribution.

(19)     If an objection to a claim is filed, such claim will be treated in accordance with the procedures set forth in Paragraph D.5 herein.

(20)     The following Ballots and Master Ballots will not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the creditor; (ii) any Ballot or Master Ballot cast by an entity that does not hold a claim in a class that is entitled to vote on the Plan; (iii) any Ballot or Master Ballot cast for a claim scheduled as contingent, unliquidated or disputed for which no proof of claim was timely filed; and (iv) any unsigned Ballot or Master Ballot.

In addition, the following additional procedures will apply to Beneficial Holders' Claims:

(1)     Any Nominee that is a holder of record with respect to a Note must vote on behalf of the Beneficial Holder of such Note by (i) immediately distributing the Solicitation Documents, including any applicable Ballot(s) it receives from the Solicitation Agent, to such Beneficial Holder, (ii) promptly collecting any completed Ballot(s) from such Beneficial Holder, (iii) compiling and validating the votes and other relevant information of all such Beneficial Holders on the applicable Master Ballot and (iv) transmitting such Master Ballot to the Solicitation Agent by the Voting Deadline.

(2)     Any Beneficial Holder holding a Note as a record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline.

(3)     A trustee (unless otherwise empowered to do so) is not entitled to vote on behalf of the holder of a Beneficial Holder Claim; rather, each such holder of a Beneficial Holder Claim must submit its own Ballot.

(4)     Any Beneficial Holder holding a Note in "street name" through a Nominee must vote on the Plan through such Nominee by completing and signing the Ballot and returning such Ballot to the appropriate Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return the Master Ballot to the Solicitation Agent prior to the Voting Deadline. A Ballot submitted by a Beneficial Holder holding a Note in "street name" will not be counted.

(5)     Any Ballot returned to a Nominee by a Beneficial Holder will not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Solicitation Agent a Master Ballot that reflects the vote of such Beneficial Holder by the Voting Deadline.

(6)     Nominees must retain all Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan.

(7)     If a Beneficial Holder holds a Note through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot and each such Beneficial Holder should execute a separate Ballot for each block of Notes that it holds through any Nominee and must return each such Ballot to the appropriate Nominee.

(8)     If a Beneficial Holder holds a portion of its Notes through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in Paragraph D.4.b.iii of the Amended Solicitation Procedures to vote the portion held in its own name and the procedures described in the rest of this Paragraph D.4.b of the Amended Solicitation Procedures to vote the portion held by any Nominees.

F.     Votes Required for Acceptance by a Class

The Classes entitled to vote will have accepted the Plan if (1) Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan.

THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE DEBTORS RESERVE THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

## ARTICLE X.
### RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to Holders of Claims than would otherwise result from a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Claims.  **Accordingly, the Debtors recommend that the Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan**.

K&E 11625375.1

Respectfully Submitted,


**COLLINS & AIKMAN CORPORATION**
(for itself and on behalf of its Debtor subsidiaries)


 /s/ *John R. Boken*
Name:  John R. Boken
Title:  Chief Restructuring Officer