United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:

Collins & Aikman Corp., et. al.,                    Case No. 05-55927-swr
                                                    Chapter 11
            Debtors.                                Hon. Steven Rhodes
_____/

Opinion on Motion for Allowance and Payment of Administrative Expense Claim
of Phillips Tool & Mould (London) Ltd.

        Phillips Tool & Mould (London) Ltd. filed a motion for allowance of administrative expense

for certain tooling.    The debtor, Collins & Aikman Corporation, filed an objection.

        The Court concludes that because C&A induced and benefitted from Phillips' services on the

Toyota/LX tools, Phillips is entitled to an administrative expense claim in the amount of its invoices

on those tools - $964,235.00.   In the alternative, the Court concludes that because the parties'

executory contracts relating to that tooling was not rejected before Phillips completed its

performance, Phillips is entitled to an administrative expense claim for the value of its services, which

the evidence establishes is its invoice amounts.  Finally, the Court concludes that because Phillips had

completed its work for C&A on the Honda tooling before C&A filed its petition, Phillips is not

entitled to an administrative expense claim for its invoiced amounts on those tools.


                                         I.

        On May 17, 2005, C&A filed a voluntary petition under chapter 11.  C&A was an automotive

parts supplier and its customers were Original Equipment Manufacturers (OEMs), including Honda

and Toyota.  Phillips built tools that C&A utilized to manufacture parts for its customers.

## A. The Tooling Process

Some general background on the tooling component of the automobile industry is helpful to an understanding of the dispute that arose in this matter. During the evidentiary hearings, the Court heard testimony explaining the mechanics of the relationships between C&A and its tool suppliers and the tooling process generally.

When C&A needed to acquire a new tool, a C&A tool group manager selected a tool supplier such as a Phillips to build the tool and caused a purchase order to be issued to the tool supplier. A C&A tool engineer was assigned to follow the tool through its fabrication and manufacture, a process which typically took from four months to a year. When fabrication was complete, the C&A tool engineer arranged for the tool to be shipped from the tool supplier's facility to a C&A trial facility. At the trial facility, a series of tests were performed. This trial process typically involved a representative of the tool supplier, the C&A tool engineer, a C&A program manager and a representative of the OEM for whom the tool would be utilized to manufacture parts. At the conclusion of the trial process, a decision was made whether the tool would be moved to the manufacturing floor of a C&A plant or be returned to the tool supplier's facility for further work. This decision was made by the C&A tool engineer, C&A program manager and an OEM representative (usually a release engineer). This trial process might occur several times before a tool was moved to C&A's manufacturing floor.

After a tool was moved onto the manufacturing floor at a C&A plant, a variety of further tests and studies were performed, including a run-at-rate test, further dimensional studies and

2

environmental stability studies, among others. Representatives of the tool supplier continued to be involved, providing necessary tweaking, tuning, maintenance and repairs to the tool.

After all testing was complete and the OEM release engineer and supplier quality representative approved, the Production Part Approval Process ("PPAP") was concluded. PPAP is important to the OEM, C&A and the tool supplier because only after the completion of PPAP would a tool begin full production of parts.

The successful completion of PPAP, not the delivery of the tool itself, was customarily the contractual event that triggered the tool supplier's right to payment. Following PPAP, C&A would invoice the OEM and the tool supplier would invoice C&A.[1] After C&A received payment, it then paid the tool supplier. C&A did not have a formal process for informing a tool supplier that PPAP had been achieved; rather, a tool supplier would learn of PPAP through its involvement in the process or would call C&A and inquire.

Ann Samul was employed as a Program Manager for Global Tooling at C&A on the petition date. In that position, she dealt with tool suppliers. Samul is highly knowledgeable regarding tooling in the automobile manufacturing industry, having worked in her position at C&A for roughly two years and previously in a similar position at another parts manufacturer. Samul testified that the PPAP of a tool provided C&A with cash flow benefits. C&A could not receive payment on any customer level changes to base level tooling that had not completed PPAP. Samul testified that base level tooling that had not completed PPAP was a detriment to C&A.

---

[1] An exception to this is established for "capacity tools," which are copies of tools that have already achieved PPAP. Capacity tools are typically invoiced when delivered.

Based on her experience, it was Samul's belief that a tool supplier was contractually obligated to continue work on a tool until PPAP was successfully completed. Samul had never seen a tool supplier refuse to participate in PPAP, simply because PPAP is a condition of receiving payment.

## B. The Phillips - C&A Relationship on the Petition Date

Naturally, C&A's bankruptcy filing caused significant anxiety among its suppliers, including Phillips. As of the petition date, C&A was one of Phillips' larger customers, accounting for roughly 20% of its annual sales.

On the petition date, Penelope Cloutier was Phillips' Vice President of Finance and Administration and was in charge of the C&A account. She testified that in the first ten days following the filing, Phillips did not perform any work on tooling at C&A. On May 26, 2005, Cloutier sent an email to Samul, her contact at C&A, to inquire as to the status of affairs. Samul's response of May 27, 2005, stated in pertinent part:

> I took a quick look at your [Phillips'] account, and it appears you will be in decent shape. The rules are these:
>
> Anything in your possession is secured, even if the invoice is dated prior to May 17. I will need a letter stating this and the location it is held in order to pay.
>
> Any tool which has left your possession, but for which you have a lien, is secured.
>
> Any tool which has left your possession, has PPAP terms on the PO, and we have not completed PPAP, or did so less than 90 days prior to filing, is secured.
>
> Any work completed and invoiced after May 17 is secured.

4

If you do happen to have liens on open invoices, and they are dated prior to May 17, please send them over, as every payment is scrutinized. In addition, all purchase orders issued prior to the filing are still good; we do not have to reissue any tooling purchase orders.

Give me a call next week if you have any questions. It will probably be a couple of weeks before I can start getting everyone back on a payment schedule.

Ann Samul
Program Manager – Global Tooling

Ex. 70.

Samul testified that the "rules" referred to in the email were not unique to Phillips, but were communicated to all tool suppliers. Samul could not recall the exact source of the rules, but she believed they came from her superiors at C&A or from BBK representatives working within C&A. Samul testified that she consulted with both of these sources before sending the email.

Samul testified that her purpose in communicating the rules was to provide assurances to the tool suppliers so that they would continue to work on the tools that had not yet achieved PPAP and continue to supply new tooling. If tool suppliers ceased performing work for C&A, the end result would have been that C&A's customers would have resourced their requirements to other parts manufacturers. Samul doubted that tool suppliers would continue to perform work if they were told they would only be paid for work going forward and not their past work.

After receiving the May 27 email, a meeting was held among Phillips' management and shareholders to discuss how to handle the C&A account. They decided that Phillips would continue providing tooling, servicing and credit to C&A. Cloutier testified that this decision would not have been made but for the assurances of Samul's May 27 email.

## C. The Post-Petition Phillips - C&A Relationship

After the meeting of Phillips' management, Phillips continued its relationship with C&A just as it had pre-petition. It continued to work on tools that had not yet achieved PPAP and continued to extend credit and to accept new purchase orders from C&A. Phillips filed proofs of claim as work was completed.[2]

Samul eventually left C&A. After that, Cloutier had a difficult time getting responses to her inquiries about payment. She attempted numerous times without success to contact Samul's former supervisor, Chris O'Connell, who was the Global Controller for Tooling, Testing and Manufacturing at C&A. Eventually, Cloutier began communicating with the BBK representatives at C&A, who provided her with assurance that the tooling would eventually be paid.

On May 30, 2006, Cloutier received a response from O'Connell. In this email, Exhibit 61, O'Connell informed Cloutier that unless Phillips had possession of the tools or perfected liens on the tools, its claims were pre-petition unsecured claims, because they were invoiced prior to the petition date. Cloutier immediately forwarded the email to Art Nelson at BBK, with whom she had previously discussed payment on the tooling. Nelson expressed surprise at the O'Connell email and opined that it appeared to be the result of confusion caused by invoicing prior to PPAP. Nelson requested some clarifying information from Phillips so that he could discuss the matter with O'Connell.

---

[2] At the hearing and in its post-trial brief, C&A argues that Phillips' proofs of claim covering the tooling at issue here are judicial admissions with binding effect on Phillips. However, Cloutier testified that she filed the proofs out of an abundance of caution so that Phillips would not miss the claims filing deadline and that Phillips intended to withdraw claims as they were paid. Accordingly, C&A's argument must be rejected.

6

Simultaneously, Phillips' counsel contacted C&A's counsel attempting to resolve the issue.[3]

These efforts were completely unsuccessful, and Phillips filed the present motion for an administrative expense claim.

### D. The Specific Tooling at Issue

The tooling comprising Phillips' claim in this motion can be separated into two groups - the Honda SUV tooling in the amount of $159,670.00 and the Toyota 050L and LX2004 tooling in the amount of $964,235.00. The following table is a summary of the information contained on the spreadsheet admitted as Exhibit 3:

---

[3]The Court heard testimony from Lawrence Lichtman, counsel to C&A, and Dennis Loughlin, counsel to Phillips, concerning a conversation alleged to have occurred between them in May or June of 2006 regarding whether the claims were entitled to adequate protection payments or were administrative expenses. Loughlin testified that the conversation occurred, while Lichtman denied it. The Court finds it unnecessary to resolve this conflict because C&A's inducement of Phillips to finish the Toyota/LX tooling is established beyond question in the testimony of Samul and Cloutier.

| Program Name | C&A Purchase Order Number | Terms | Invoice Amount | Date PPAP Achieved |
|---|---|---|---|---|
| | | | | |
| Honda SUV | 081439 | PPAP + 90 | $73,120.00 | 03/29/2005 |
| Honda SUV | 058048 | PPAP + 90 | $3,900.00 | 03/29/2005 |
| Honda SUV | 081440 | PPAP + 90 | $75,000.00 | 03/29/2005 |
| Honda SUV | 058850 | PPAP + 90 | $1,850.00 | 03/29/2005 |
| Honda SUV | 058050 | PPAP + 90 | $5,800.00 | 03/29/2005 |
| | | | | |
| 05 Toyota 050L | 058621 | PPAP + 90 | $146,000.00 | 09/2006 |
| 05 Toyota 050L | 058806 | PPAP + 90 | $5,000.00 | 09/2006 |
| 5 Toyota 050L | 060086 | PPAP + 90 | $6,800.00 | 09/2006 |
| 5 Toyota 050L | 060085 | | $18,800.00 | 09/2006 |
| 5 Toyota 050L | 060303 | | $5,900.00 | 09/2006 |
| 05 Toyota 050L | 056747 | PPAP + 90 | $27,000.00 | 09/2006 |
| | | | | |
| LX2004 | 045773 | PPAP S + 90 | $3,000.00 | 08/28/2005 |
| LX2004 | 042175 | PPAP S + 90 | $40,000.00 | 08/28/2005 |
| LX2004 | 053122 | PPAP + 90 | $5,000.00 | 08/28/2005 |
| LX2004 | 045399 | Progressive Terms | $2,190.00 | 08/28/2005 |
| LX2004 | 046124 | 20% on PPAP S + 90 | $1,140.00 | 08/28/2005 |
| LX2004 | 044927 | 10% on Launch + 90 | $1,065.00 | 08/28/2005 |
| LX2004 | 054027 | PPAP + 90 | $18,000.00 | 08/28/2005 |
| LX2004 | 046126 | Progressive Terms | $600.00 | 08/28/2005 |
| LX2004 | 041065 | Progressive Terms | $22,200.00 | 08/28/2005 |
| LX2004 | 044321 | Progressive Terms | $1,920.00 | 08/28/2005 |
| LX2004 | 049055 | Progressive Terms | $2,550.00 | 08/28/2005 |
| LX2004 | 046732 | Progressive Terms | $2,190.00 | 08/28/2005 |
| LX2004 | 044928 | Progressive Terms | $1,065.00 | 08/28/2005 |
| LX2004 | 044926 | Progressive Terms | $615.00 | 08/28/2005 |
| LX2004 | 051164 | Progressive Terms | $5,200.00 | 08/28/2005 |
| LX2004 | 057658 | PPAP + 90 | $319,000.00 | |
| LX2004 | 058051 | PPAP + 90 | $329,000.00 | |

In this table, PPAP + 90 means payment due 90 days after 100% PPAP approval from C&A's customer.  PPAP S + 90 means payment due 90 days from PPAP submission.  Although no PPAP

completion date was provided for the last two purchase orders (057658 and 058051), C&A did not dispute that these two tools achieved PPAP subsequent to the petition date.

All of this tooling was initially shipped to C&A prior to the petition date. With the exception of three specific purchase orders, Phillips invoiced C&A for all of the tooling prior to the petition date. The three exceptions were Purchase Orders 081439 and 081440, invoiced on August 2, 2005 and Purchase Order 056747, invoiced on November 6, 2006.

The Honda tooling, represented by Purchase Order numbers 081439, 058048, 081440, 058850, and 058050, completed NMR6, the Honda equivalent of PPAP, on March 29, 2005, before the petition date. The Toyota/LX tooling achieved PPAP after the petition date.

## II.

The issue presented in this matter is whether Phillips is entitled to an administrative expense claim for the Honda and Toyota/LX tooling that it built for C&A.

Phillips argues that its claim involves goods or services provided post-petition at the inducement of C&A and is therefore entitled to administrative priority status. Underlying this argument is the contention that the obligation to pay for the tooling did not arise until PPAP was achieved. Alternatively, Phillips argues that the purchase orders for the tooling were executory contracts that were assumed by C&A post-petition and must be paid in full.

C&A argues that there was no post-petition benefit conferred upon the estate with respect to the tooling. Rather, C&A contends that achieving PPAP was only determinative of the timing of payment. C&A further argues that any post-petition work performed by Phillips' employees was required under the terms of the purchase orders and thus there was no inducement, as Phillips was

contractually bound to perform the work. While C&A agrees with Phillips that the purchase orders were executory contracts, it asserts that such purchase orders were rejected in its confirmed plan.

## III.

The Court concludes that under either of Phillips' alternative theories, a portion of Phillips' claim is entitled to administrative priority pursuant to 11 U.S.C. § 503(b).[4]

### A. Phillips' 11 U.S.C. § 503(b) Theory

Section 507(a) grants priority to claims qualifying as administrative expenses under section 503(b). Section 503 of the bankruptcy code provides:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—
>    (1) (A) the actual, necessary costs and expenses of preserving the estate[.]

11 U.S.C. § 503(b)(1)(A).

The purpose of this section is to encourage creditors to provide a debtor-in-possession with the goods and services necessary to rehabilitate its business. *Beneke Co. v. Economy Lodging Sys. (In re Economy Lodging Sys.)*, 234 B.R. 691, 697 (B.A.P. 6th Cir. 1999). "Thus, 'when third parties are *induced* to supply goods or services to the debtor-in-possession . . . the purposes of [§ 503] plainly require that their claims be afforded priority.'" *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984) (emphasis in original) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).

---

[4] All references are to the pre-BAPCPA bankruptcy code as the petition in this case was filed prior to the October 17, 2005, effective date of the 2005 amendments.

10

This priority "involves no injustice to the pre-petition creditors because it is for their benefit that rehabilitation is attempted," and it is to their benefit that the successes of rehabilitation will presumably redound. *Id.*

However, "[c]laims for administrative expenses under § 503(b) are strictly construed because priority claims reduce the funds available for creditors and other claimants." *City of White Plains v. A & S Galleria Real Estate, Inc. (In re Federated Dep't Stores, Inc.)*, 270 F.3d 994, 1000 (6th Cir. 2001). A creditor seeking administrative expense priority has the burden of proving that its claim is within section 503. *United Trucking Serv., Inc. v. Trailer Rental Co., Inc.* (*In re United Trucking Serv.*), 851 F.2d 159, 161 (6th Cir. 1988); *Employee Transfer Corp. v. Grigsby* (*In re White Motor Corp.*), 831 F.2d 106, 110 (6th Cir. 1987); *In re Sunarhauserman, Inc.*, 184 B.R. 279, 282 (Bankr. N.D. Ohio 1995).

Courts in the Sixth Circuit utilize a "benefit to the estate" test in determining whether a claim is within section 503. Under this test, a debt is "an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997); *In re White Motor Corp.*, 831 F.2d at 110 (citing *In re Mammoth Mart, Inc.*, 536 F.2d at 954, and *In re Jartran, Inc.*, 732 F.2d at 587).

1.

"In determining whether there was a 'transaction with the bankruptcy estate', 'the proper focus [is] on the inducement involved in causing the creditor to part with its goods or services.'" *Volvo Commer. Fin. L.L.C. the Ams. v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*,

11

326 B.R. 683, 687 (B.A.P. 6th Cir. 2005) (quoting *In re United Trucking Serv.*, 851 F.2d at 162).

Only when the debtor-in-possession induces the creditor's performance is consideration given to the bankruptcy estate. *Id.* at 687 (quoting *In re White Motor Corp.*, 831 F.2d at 110). If the pre-petition debtor induced the creditor's performance, then the consideration was given to that entity and not the debtor-in-possession. *Id.* at 687-688. However, if the debtor-in-possession induced the performance, then the claims can be given an administrative priority. *Id.* at 688. *See also In re Sunarhauserman, Inc.*, 126 F.3d at 818 ("[T]he proper standard for determining [a] claim's administrative priority looks to when the acts giving rise to a liability took place, not when they accrued.").

In this matter, the evidence clearly establishes that C&A, as debtor-in-possession, induced Phillips to continue performing post-petition with regard to tooling that had not yet achieved PPAP, which included the Toyota/LX tooling. Samul testified that her May 27 email was intended to induce Phillips to continue to perform post-petition and Cloutier testified that Phillips' decision to continue performance was a result of the email. Therefore, it is clear that as debtor-in-possession, C&A, induced Phillips to continue performing on the purchase orders for the Toyota/LX tooling.

Debtor argues that because Phillips was contractually obligated to perform, Phillips was incapable of being induced to that performance. Certainly the purchase orders required Phillips to perform until PPAP was achieved if it wanted to get paid. However, it does not follow at all that Phillips needed no further inducement to perform. Indeed , Phillips had stopped performing and Samul, C&A's own employee, clearly recognized the need to assure Phillips of payment in order to induce Phillips' continued performance. In the real world that §§ 365 and 503 are designed to address, a pre-petition contract is rarely sufficient inducement for continued post-petition

12

performance. If it were, those sections would be unnecessary. The evidence establishes that post-petition, C&A induced Phillips to perform with regard to the Toyota/LX tooling until PPAP was achieved.

On the other hand, Phillips was not induced post-petition to continue performing with regard to the Honda tooling, as that tooling had achieved PPAP pre-petition.

2.

Having determined that C&A induced Phillips to continue performing post-petition with regard to the Toyota/LX tooling, the Court must now determine whether the post-petition performance directly and substantially benefitted the estate. This determination turns on the importance of PPAP.

There was extensive testimony as to the general importance of PPAP. Samul testified that PPAP had significant cash flow implications for C&A and that a tool was a detriment before achieving PPAP. Prior to achieving PPAP, a tool is essentially an object with future prospects for production. It is not until PPAP is achieved that a tool can be fully utilized in production.

The subject matter of the purchase orders here was tooling - specifically, tooling that achieved PPAP. The testimony made it clear that PPAP was fundamental to every tool purchased. Contrary to C&A's assertions that the "PPAP date [was] merely a contractual term relating to when a claim is to be paid" (Debtor's Post-Evidentiary Hrg. Br. at 14, Dkt. # 8736), the evidence established that the achievement of PPAP was the crucial component of performance for Phillips and triggered the obligation of counter-performance - payment - by C&A.

The evidence overwhelmingly establishes that if after the petition date, all of C&A's tool

suppliers had ceased working on tooling that had not achieved PPAP, the result would have been disastrous for C&A. It would have been totally unable to meet its obligations to the OEMs and its work would have been resourced to other parts manufacturers. C&A absolutely required the continued work of its tool suppliers, including Phillips, to avoid such a scenario. Samul testified that this necessity was what prompted her to send the May 27 email.

In its brief, C&A asserts that "PPAP conferred no benefit whatsoever on [C&A]." (Debtor's Post-Evidentiary Hrg. Br. at 20, Dkt. # 8736). In support of this remarkable assertion, C&A points to part of a statement in the testimony of Art Nelson, a representative of BBK. Responding to a question from the Court as to what was meant by the term "advance funding," Nelson stated:

> Well, in – in – in automotive advance funding would mean before the money was due according to the – tool purchase. And the tool purchase would normally be due at – at time of what is referred to as PPAP. And – and once a part was PPAP'd, you know, that usually would occur sometime either three months before production started up to sometimes even a year after production started to get – to get full PPAP. And – and the money technically would be due on, you know, 90 days after PPAP.

Nelson's testimony conveyed the sense that production prior to PPAP was the exception, not the rule. Moreover, his statement referenced *full* PPAP a year after the commencement of production, leaving the implication that there was some partial or tentative approval that had been given earlier. In any event, there was no evidence that the Toyota/LX tooling was producing parts prior to PPAP.

Therefore, it is clear that Phillips' post-petition performance resulted in the Toyota/LX tooling achieving PPAP and was therefore a direct and substantial benefit to the estate. The portion of

14

Phillips' claim attributable to these tools, $964,235.00, is entitled to administrative expense priority under 11 U.S.C. § 503(b)(1). The portion of Phillips' claim attributable to the Honda tooling, however, is not entitled to administrative expense priority because Phillips completed performance regarding those tools pre-petition when PPAP was achieved.

## B. Executory Contracts Under 11 U.S.C. § 365

11 U.S.C. § 365 allows a debtor-in-possession to assume or reject a pre-petition executory contract subject to the court's approval. This decision can be made any time until confirmation of the plan. 11 U.S.C. § 365(d)(2). If a contract is assumed, "'the estate becomes liable for performance of the entire contract, as if bankruptcy had never intervened.'" *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990) (quoting *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1507 (11th Cir. 1985)). The expenses and liabilities incurred as a result of the contract assumption are entitled to administrative priority under section 503(b)(1). *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 42 (1st Cir. 2003) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)). If a contract is rejected, the rejection is treated as a breach occurring immediately prior to the filing of the petition, resulting in a pre-petition breach of contract claim. 11 U.S.C. § 365(g).

Thus, Phillips' alternative argument seeks to establish the administrative nature of the claim by a subtly different theory.

### 1.

The bankruptcy code does not define the term "executory contract." It is thus left to the courts to develop the definition. Under the Countryman definition, approved by the Sixth Circuit in

15

*Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir. 1989), an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* at 471 n. 2 (quoting Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)). Another approach that has been utilized in this circuit is the "functional approach," set forth in *Chattanooga Mem. Park v. Still* (*In re Jolly*), 574 F.2d 349 (6th Cir. 1978). In determining whether a contract is executory under a functional approach, courts examine whether the estate would benefit from assumption or rejection of the contract at issue. *Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 84 F.3d 1364, 1374 (11th Cir. 1996).

Here, the parties are in agreement that the purchase orders for the Toyota/LX tooling were executory contracts on the petition date. Under the contracts, Phillips had the obligation to continue working on the Toyota/LX tooling until PPAP was achieved, and C&A had the obligation to submit a delivered tool to PPAP approval procedure and then to pay Phillips following the achievement of PPAP approval.

The purchase orders for the Honda tooling, however, were not executory contracts on the petition date. Phillips completed its performance pre-petition when PPAP was achieved. From that point, only C&A owed obligations under those purchase orders. Therefore, they were no longer executory.

2.

16

It must next be determined whether the Toyota/LX tooling contracts were ever assumed or rejected. Phillips maintains that the contracts were assumed. It notes that they were not rejected in the confirmed plan and that C&A has since sold the tooling. C&A takes the contrary position, arguing that the purchase orders were rejected in the confirmed plan.

Article V, Section C of the plan, "Executory Contracts and Unexpired Leases to Be Rejected," provides:

> Any Executory Contracts and Unexpired Leases not listed on <u>Exhibit F</u> and not previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court (other than those Executory Contracts and Unexpired Leases identified on <u>Exhibit E</u>) will be rejected on the Effective Date irrespective of whether such contract is listed on <u>Exhibit F</u> and the Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

The Toyota/LX tooling purchase orders were not listed on Exhibit E or Exhibit F to the plan. Pursuant to the purchase orders, Phillips fully performed when PPAP was achieved, which was well before the effective date of the plan. Subsequent to PPAP, the purchase orders were no longer executory contracts. Consequently, the purchase orders are outside of Article V, Section C. Therefore, the Court must conclude that the purchase orders, during the post-petition period in which they remained executory, were never formally assumed or rejected.

3.

This raises the interesting question of what results when (a) an executory contract exists at the time of the bankruptcy filing, (b) the non-debtor party thereafter fully performs, (c) the debtor-in-possession accepts and encourages such performance, and (d) the contract is never ultimately assumed or rejected. There is a line of cases holding such a contract assumed by fact or implication.

17

*See, In re Shoppers Paradise, Inc.*, 8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Even where court approval was not obtained the debtor-in-possession may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is whether or not such benefits should be entitled to an administration expense claim."); *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr. S.D.N.Y. 1982). Another line of cases holds that assumption under section 365 may not occur absent court approval. *See*, *In re FBI Distrib. Corp.*, 330 F.3d at 45; *Counties Contracting & Constr. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1060 (3rd Cir. 1988); *Data-Link Sys. Inc. v. Whitcomb & Keller Mortg. Co. (In re Whitcomb & Keller Mortg. Co.)*, 715 F.2d 375, 380 (7th Cir. 1983); *In re Swallen's, Inc.*, 210 B.R. 120, 122 (Bankr. S.D. Ohio 1997) ("There is no room in the bankruptcy scheme for assumption of an executory contract by implication."); *Gray v. W. Envtl. Servs. & Testing, Inc. (In re Dehon, Inc.)*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006) ("It is well-established that the doctrine of 'implied assumption' has little, if any, merit.").

Although the existence and merits of a doctrine of implied assumption presents an interesting legal issue, it need not be reached to resolve this matter. Where a debtor-in-possession induces a creditor to continue performing under an unassumed pre-petition executory contract, pending a decision to assume or reject, the creditor is entitled to administrative priority to the extent that the goods or services supporting the claim were provided post-petition and were beneficial to the estate. *In re FBI Distrib. Corp.*, 330 F.3d at 43 ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract."). *See also Bildisco*, 465 U.S. at 530.

18

Here, following the inducement of the May 27 email, Phillips provided post-petition services that resulted in a quantifiable benefit to the estate - the achievement of PPAP regarding the Toyota/LX tooling. This is what the purchase orders required and this is what resulted from Phillips' post-petition actions. Therefore, the benefit conferred upon the estate was the value of the PPAP-approved Toyota/LX tooling.

The Court finds that this value was the invoice price of $964,235.00, as there was no other evidence establishing any other value. Thus, Phillips is entitled to administrative expense priority in the amount of $964,235.00 for its services provided post-petition pursuant to its unassumed Toyota/LX executory contracts with C&A.

IV.

For the above reasons, Phillips is entitled to an administrative expense claim in the amount of $964,235.00. The balance of Phillips' motion will be denied. The Court will enter an appropriate order.

For Publication

.

**Signed on April 01, 2008**

**_/s/ Steven Rhodes_**
**Steven Rhodes**
**Chief Bankruptcy Judge**

19